

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

# FILED

MAR 21 2016 🅣

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, and | ) |
| STATE OF ILLINOIS, | ) |
| Plaintiffs, | ) Ca **1:16-cv-3463** |
| v. | ) **Judge Rebecca R. Pallmeyer** |
| STARK LAW, LLC, an Illinois limited liability company, also doing business as STARK RECOVERY, *et al.*, | ) **Magistrate Judge Sheila M. Finnegan** |
| Defendants. | ) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR**
***EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER**
**WITH ASSET FREEZE, APPOINTMENT OF A RECEIVER,**
**OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE**
**WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

### TABLE OF CONTENTS

I.  Introduction ........................................................................................................1

II. Defendants' Illegal Business Practices .............................................................3

    A.  Defendants Target Consumers Who Previously Sought Online Payday Loans ............................................................................................................3

    B.  Defendants' Deceptive Calls and False Claims ..........................................6

    C.  Defendants' Abusive Calling Practices .....................................................10

    D.  Defendants' Empty Threats .......................................................................12

    E.  Consumers Do Not Owe Any Money to Defendants.................................13

    F.  Private Consumer Lawsuits Filed Against Defendants .............................15

    G.  Consumer Complaints to Wisconsin Firm Unconnected to Defendants ...............15

    H.  Defendants' Marketing and Sale of Counterfeit Debt Portfolios.............16

III. Defendants' Wholesale Violations of Federal and State Debt Collection Laws ...............18

    A.  Defendants Blatantly Violate Both the Federal Fair Debt Collection Practices Act and the Illinois Collection Agency Act ...........................................18

        1.  Defendants are Violating the Fair Debt Collection Practices Act .............19

        2.  Defendants are Violating the Illinois Collection Agency Act ...................19

    B.  Defendants are Illegally Operating a Debt Collection Business in Illinois ...........20

IV. Defendants ........................................................................................................21

    A.  Corporate Defendants ...............................................................................22

    B.  Individual Defendants................................................................................25

V.  Argument ..........................................................................................................28

    A.  This Court Has the Authority to Grant the Requested Relief ...................29

    B.  A Temporary Restraining Order is Appropriate and Necessary ...............30

i

C.  The Evidence Demonstrates an Overwhelming Likelihood that Plaintiffs Will Prevail on the Merits ...................................................... 31

    1.  Defendants are Violating Section 5(a) of the FTC Act ............................. 31

        a.  Defendants' Deceptive Acts or Practices ...................................... 31

        b.  Defendants' Unfair Acts or Practices ............................................ 32

    2.  Defendants are Violating the Illinois Consumer Fraud Act ...................... 33

    3.  The Individual Defendants are Personally Liable ...................................... 34

D.  The Equities Tip Decidedly in the Commission's Favor ....................................... 35

E.  An Asset Freeze and the Appointment of a Receiver are Necessary and Appropriate ....................................................................... 35

F.  The Temporary Restraining Order Should Be Issued *Ex Parte* ............................. 37

VI.  Conclusion .................................................................................................. 37

## **TABLE OF AUTHORITIES**

### **Cases**

### ***Opinions***

*CFTC v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260 (D. Kan. 2003) ..........................22

*C. Howard Hunt Pen Co. v. FTC*, 197 F.2d 273 (3d Cir. 1952).....................................................32

*Delaware Watch Co. v. FTC*, 332 F.2d 745 (2nd Cir. 1964)..........................................................22

*Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562 (7th Cir. 2004).....................................................19

*FTC v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009)..............................................................33

*FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987) ....................................................30

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989)............................................29, 34, 35

*FTC v. Bay Area Bus. Council*, 423 F.3d 627 (7th Cir. 2005)...................................................31, 34

*FTC v. Datacom Mktg. Inc.*, 2006 WL 1472644 (N.D. Ill. 2006) ..................................................36

*FTC v. Febre,* 128 F.3d 530 (7th Cir. 1997).....................................................................................29

*FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925 (N.D. Ill. 2008) ...................................................33

*FTC v. J.K. Pubs., Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000).....................................................33

*FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010)..........................................................................32

*FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006)...................................................................31

*FTC v. Sabal*, 32 F. Supp. 2d 1004 (N.D. Ill. 1998)........................................................................35

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993 (N.D. Ind. 2000),
*aff'd*, 312 F.3d 259 (7th Cir. 2002)..................................................................................................21

*FTC v. Winsted Hosiery Co.*, 258 U.S. 483 (1922) .........................................................................32

*FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005) ....................................................31, 34

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988).............29, 30, 35, 36

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ....................................................35

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992), *cert. denied*, 507 U.S. 909 (1993) ..................31

*LVNV Funding, LLC v. Trice*, 2015 IL 116129, 32 N.E.3d 553 (Ill. 2015)...................................21

*People of the State of Illinois v. United Construction*, 2012 IL App (1st) 120308,
981 N.E.2d 404 (1st Dist. 2012) .......................................................................................33, 34

*Regina Corp. v. FTC*, 322 F.2d 765 (3d Cir. 1963)...........................................................32

*Sunshine Art Studios v. FTC*, 481 F.2d 1171 (1st Cir. 1973) .........................................22

*Veach v. Sheeks*, 316 F.3d 690 (7th Cir. 2003)..............................................................19

*Waltham Watch Co. v. FTC*, 318 F.2d 28 (7th Cir.), *cert. denied*, 375 U.S. 944 (1963) ..............32

### Orders and Filed Cases

*FTC v. AFD Advisors, LLC, et al.*, No. 13 C 6420 (N.D. Ill. Sep. 9, 2013) ...................................29

*FTC v. Am. Credit Crunchers, LLC, et al.*, No 12 C 1028 (N.D. Ill. Feb. 14, 2012) ................4, 29

*FTC v. Am. Yellow Browser, Inc., et al.*, No. 15 C 2047 (N.D. Ill. Mar. 9, 2015) ........................29

*FTC v. AMG Servs., Inc., et al.*, No. 2:12-cv-00536 (D. Nev. Apr. 2, 2012) .................................16

*FTC v. Apogee One Enters. LLC*, No 12 C 588 (N.D. Ill. Jan. 30, 2012) .....................................29

*FTC v. Broadway Global Master Inc., et al.*, No. 2:12-cv-00855-JAM-GGH (E.D. Cal. 2012) ....4

*FTC v. Centro Natural Corp., et al.*, No. 14-23879 CIV-Altonaga (S.D. Fla. 2014).....................4

*FTC v. Freedom Cos. Mktg., Inc.*, No. 12 C 05743 (N.D. Ill. July 23, 2012) ...............................29

*FTC v. Pinnacle Payment Servs., LLC, et al.*, No. 1:13-cv-3455 (N.D. Ga. 2013)........................4

*FTC v. Pro Credit Group, LLC, et al.*, No. 8:12-cv-586-T-35EAJ (M.D. Fla. 2012)....................4

*FTC v. Sitesearch Corp., et al.*, Case No. 2:14-cv-02750-NVW (D. Ariz. Dec. 22, 2014) ............4

*FTC v. Williams, Scott & Assocs., LLC, et al.*, No. 1:14-cv-1599 (N.D. Ga. 2014).......................4

*FTC and People of the State of New York v. Kelly S. Brace, et al.*,
No. 1:15-cv-00875-RJA (W.D.N.Y. Oct. 5, 2015)........................................................................18

*FTC and State of Illinois v. K.I.P., LLC, et al.*, No. 15 C 2985 (N.D. Ill. Apr. 6, 2015).......4, 5, 29

**Statutes**

Federal Trade Commission Act, 15 U.S.C. § 45(a) ........................................................3, 28, 31, 32

15 U.S.C. § 45(n) ...................................................................................................................32

15 U.S.C. § 53(b) ...................................................................................................................29

Truth in Lending Act, 15 U.S.C. §§ 1601-1666j ...................................................................16

Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p ...................................3, 28

15 U.S.C. § 1692a(5) ..............................................................................................................19

15 U.S.C. § 1692b ...................................................................................................................12

15 U.S.C. § 1692b(2) .........................................................................................................12, 18

15 U.S.C. § 1692b(3) ..............................................................................................................12

15 U.S.C. § 1692c(a)(2) ..........................................................................................................12

15 U.S.C. § 1692c(a)(3) ..........................................................................................................12

15 U.S.C. § 1692c(b) ..............................................................................................................12

15 U.S.C. § 1692d(5) .........................................................................................................11, 18

15 U.S.C. §1692e ....................................................................................................................19

15 U.S.C. § 1692e(4) ..............................................................................................................19

15 U.S.C. § 1692e(5) ..............................................................................................................19

15 U.S.C. § 1692g(a) .........................................................................................................13, 18

Electronic Fund Transfer Act, 15 U.S.C. §§ 1693-1693r ....................................................16

28 U.S.C. § 1367 .....................................................................................................................30

28 U.S.C. § 1367(a) ................................................................................................................29

Illinois Collection Agency Act, 225 ILCS 425/1 *et seq.* ...................................................3

225 ILCS 425/2 .......................................................................................................................20

225 ILCS 425/2.03 ........................................................................................21

225 ILCS 425/4 .....................................................................20, 29, 30

225 ILCS 425/9(a) ...............................................................19, 29, 30

225 ILCS 425/9(a)(15) ..............................................................................19

225 ILCS 425/9(a)(18) .....................................................................18, 20

225 ILCS 425/9(a)(19) ..............................................................11, 18, 20

225 ILCS 425/9(a)(21) ..............................................................12, 18, 20

225 ILCS 425/9(a)(22) .....................................................................12, 20

225 ILCS 425/9(a)(24) .....................................................................19, 20

225 ILCS 425/9(a)(35) ...............................................................................20

225 ILCS 425/9.7 .......................................................................................30

225 ILCS 425/14a .....................................................................................30

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ...............3

815 ILCS 505/1(f) .....................................................................................34

815 ILCS 505/2 ...........................................................28, 30, 33, 34

815 ILCS 505/7 .........................................................................................30

**Rules**

Fed. R. Civ. P. 65(b) .................................................................................37

## I.    **INTRODUCTION**

Plaintiffs, the Federal Trade Commission and State of Illinois, jointly ask the Court to

stop Defendants from operating an unlicensed and fraudulent "debt collection" scheme from the

Chicago suburbs.  Defendants cold-call consumers nationwide and demand payment for

allegedly delinquent payday loan debts.  They falsely threaten lawsuits, large judgments, and

criminal charges against consumers who do not pay immediately.  In reality, consumers do not

owe any money to Defendants, and Defendants do not follow through on any of their threats.

Through these activities, Defendants violate the Federal Trade Commission Act, the Illinois

Consumer Fraud and Deceptive Business Practices Act, and both federal and state debt collection

practices laws.

Defendants operate from a boiler room in Westmont, Illinois, although currently they

purport to be in California.  To conceal their identity, Defendants operate through a tangled web

of businesses, change business names frequently, and use mail drops as their purported business

address.  Over the last five years, Defendants have defrauded thousands of consumers out of at

least $3.8 million.  Consumers have filed hundreds of complaints against the various business

names Defendants have used, and individual consumers frequently have sued Defendants in

federal district court for many of the same law violations that Plaintiffs allege here.

Defendants have never had a debt collector's license, as required by Illinois law.  At one

point, they tried to obtain a license but were unsuccessful in doing so.  Shortly thereafter,

Defendants purported to begin operating as a law firm in an apparent attempt to evade the state

licensing requirement.  Acting as "Stark Law," Defendants now purport to be a law firm that has

been retained to collect the phony debts and that has been authorized to sue consumers who fail

1

to pay. Defendants even hire newly minted attorneys to make debt collection calls, thereby serving to make Defendants' threats of lawsuits and fraud charges seem more real.

Defendants' practices are particularly egregious because Defendants target consumers who may already be in financial distress. Desperate consumers, such as those who cannot pay their rent or mortgage when due, may resort to payday loans to "bridge the gap" between paychecks. Many of these consumers apply for payday loans online and, in the process, reveal detailed personal information, often including Social Security and bank account numbers. Unfortunately, fraudulent debt collectors, like Defendants, sometimes obtain that personal information and use it to convince consumers that they must pay wholly fictitious debt.

Some consumers pay because they mistakenly believe that Defendants are a legitimate debt collector collecting legitimate debt. Other consumers, however, know they do not owe a payday loan because they already paid it or never actually obtained one. But even those consumers may pay when Defendants threaten a lawsuit, criminal charges, or even arrest or imprisonment.

Not only do Defendants attempt to collect "phantom" payday loan debts, but they also have marketed and sold counterfeit debt portfolios to other collectors. Defendants claim that the portfolios include information on thousands of delinquent payday loans, but the consumers identified in the portfolios do not owe anything to the listed lenders, and those lenders also have not authorized Defendants to sell any of their debts. Defendants' distribution of these counterfeit debt portfolios has caused countless consumers to receive telephone calls from debt collectors attempting to collect on bogus debt.

The evidence of Defendants' illegal scheme is overwhelming. That evidence includes a declaration from an Illinois licensed attorney who for a short time made debt collection calls for

Defendants before figuring out that they were operating a scam, declarations from more than a dozen consumers who received Defendants' collection calls, and a representative sample of consumer complaints Plaintiffs have received.[1] Additional evidence includes declarations from Federal Trade Investigators, a Westmont police sergeant who investigated complaints received by the police department, state licensing officials, and the owner of a licensed Wisconsin debt collector with a similar name that has received hundreds of complaints from consumers about Defendants' practices.

Those practices violate the Federal Trade Commission Act's ("FTC Act") prohibition against "unfair or deceptive acts or practices," 15 U.S.C. § 45(a), and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p. Defendants' practices also violate the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act"), 815 ILCS 505/1 *et seq.*, prohibiting unfair or deceptive acts or practices, and the Illinois Collection Agency Act, 225 ILCS 425/1 *et seq.*, which governs collection agencies in Illinois.

Plaintiffs ask that the Court issue an *ex parte* temporary restraining order ("TRO") ending Defendants' illegal practices, appointing a receiver over Defendants' businesses, and freezing their assets to ensure they do not disappear. An asset freeze will preserve the Court's ability to provide eventual restitution to victims.

## II.  DEFENDANTS' ILLEGAL BUSINESS PRACTICES

### A.  Defendants Target Consumers Who Previously Sought Online Payday Loans

Defendants target struggling consumers who have obtained payday loans in the past and

---

[1]  *See* Plaintiffs' Exhibit ("PX") 1 Menjivar Declaration ("Dec.") ¶¶ 101-107 & Attachment ("Att.") DD (sample consumer complaints).

even consumers who may only have *applied* for, but did not actually receive, a payday loan.[2] The payday loan industry often uses customer "lead generation" websites where consumers can apply online for a loan. To apply, consumers typically must disclose significant personal information, including Social Security numbers, employers, bank account numbers, and contact information.[3] Lead generators then electronically transmit this information to payday lenders that compete for payday loan customers.

Some lead generators sell consumers' personal information. For example, in 2014, the FTC sued a lead generator that sold payday loan applications for 50 cents apiece. The purchasers of that information used it to steal money from consumers' bank accounts.[4]

Defendants here operate as a "phantom" debt collector, attempting to collect payday loan "debts" from consumers who either do not owe the debt at all or do not owe it to Defendants. The FTC has brought several federal court cases against phantom debt collectors, including in this district.[5] Just last April, the FTC and State of Illinois jointly sued a phantom debt collector operating from Aurora and Oak Park that ran a scheme strikingly similar to that of Defendants.

---

[2]     *See, e.g.,* PX 8 Barnes Dec. ¶ 3; PX 14 James Dec. ¶ 2; PX 19 Scherck Dec. ¶ 4; PX 20 Turner Dec. ¶ 2.

[3]     *See* PX 1 Menjivar Dec. ¶ 109 (information requested to apply for online payday loans).

[4]     *See FTC v. Sitesearch Corp., et al.*, Case No. 2:14-cv-02750-NVW (D. Ariz. Dec. 22, 2014). Complaint and press release *available at* https://www.ftc.gov/news-events/press-releases/2014/ 12/ftc-charges-data-broker-facilitating-theft-millions-dollars. A simple Internet search for "payday loan leads" produces at least dozens of offers to sell this type of information.

[5]     *See FTC and State of Illinois v. K.I.P., LLC, et al.*, No. 15 C 2985 (N.D. Ill. Apr. 6, 2015) (Lee, J.); *FTC v. Am. Credit Crunchers, LLC, et al.*, No. 12 C 1028 (N.D. Ill. 2012) (Dow, J.). *See also FTC v. Centro Natural Corp., et al.*, No. 14-23879 CIV-Altonaga (S.D. Fla. 2014); *FTC v. Williams, Scott & Assocs., LLC, et al.*, No. 1:14-cv-1599 (N.D. Ga. 2014); *FTC v. Pinnacle Payment Servs., LLC, et al.*, No. 1:13-cv-3455 (N.D. Ga. 2013); *FTC v. Broadway Global Master Inc., et al.*, No. 2:12-cv-00855-JAM-GGH (E.D. Cal. 2012); *FTC v. Pro Credit Group, LLC, et al.*, No. 8:12-cv-586-T-35EAJ (M.D. Fla. 2012). *See also* FTC and Federal, State and Local Law Enforcement Partners Announce Nationwide Crackdown Against Abusive Debt Collectors, press release *available at* https://www.ftc.gov/news-events/ press-releases/2015/11/ftc-federal-state-local-law-enforcement-partners-announce.

Those defendants recently agreed to the entry of a $6.4 million judgment and are banned permanently from working in any debt collection business.[6]

Defendants skillfully deceive consumers into believing that they are dealing with someone who has a legal right to collect a legitimate debt, and they apply tremendous pressure to intimidate consumers into paying. Some consumers who have previously received several payday loans may not have kept careful records or are overwhelmed by their financial situation.[7] When Defendants call, these consumers often believe that Defendants are trying to collect actual payday loans.[8]

In their collection calls, Defendants make good use of the personal and financial information they possess about the consumer, including telephone numbers, employment information, addresses, and some or all of the consumer's Social Security or bank account numbers.[9] The fact that Defendants have this information leads even skeptical consumers to

---

[6]     *See FTC and State of Illinois v. K.I.P., LLC, et al.*, No. 15 C 2985 (N.D. Ill. Apr. 6, 2015) (Lee, J.). At the inception of that case, Judge Lee entered an *ex parte* temporary restraining order with asset freeze, appointment of a receiver and other equitable relief. Temporary restraining order and stipulated final judgment *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3048/kip-llc-payday-loan-recovery-group.

[7]     *See, e.g.,* PX 18 Rozman Dec. ¶ 2.

[8]     *See, e.g.,* PX 9 Burns Dec. ¶ 5; PX 14 James Dec. ¶ 3; PX 18 Rozman Dec. ¶¶ 8-9 (consumer believed caller because loan described "was very similar to a payday loan that I had actually received").

[9]     *See, e.g.,* PX 8 Barnes Dec. ¶ 3; PX 9 Burns Dec ¶ 3; PX 10 Duncan Dec. ¶ 4; PX 11 Gerstner Dec. ¶ 5; PX 14 James Dec. ¶ 2; PX 15 Johnson Dec. ¶ 4; PX 18 Rozman Dec. ¶ 6; PX 19 Scherck Dec. ¶ 2; PX 20 Turner Dec. ¶¶ 6-7.

believe that Defendants are collecting a legitimate debt.[10] Even consumers who know their loans were paid have doubts after receiving Defendants' calls.[11]

### B.    Defendants' Deceptive Calls and False Claims

Between 2011 and February 2015, Defendants used various business names when calling consumers,[12] but their pitch remained largely the same. Beginning in February 2015, Defendants began calling themselves Stark Law and emphasizing their status as a "law firm" to convince consumers to pay.[13]

Prior to February 2015, Defendants called consumers and demanded immediate payment for purportedly delinquent payday loans.[14] Defendants frequently told consumers that, with added interest and penalties, the consumer's delinquent debt was substantially more than the "original" outstanding loan balance.[15] Defendants demanded immediate payment of the debt,

---

[10]    *See, e.g.,* PX 9 Burns Dec. ¶¶ 3-5; PX 14 James Dec. ¶ 3; PX 18 Rozman Dec. ¶ 8.

[11]    *See, e.g.,* PX 1 Menjivar Dec. Att. DD at pp. 20, 24, 32, 40, 50, 54 (consumer complaints).

[12]    Defendants have used names such as "Capital Harris Miller," "Charles Hunter Miller," and "CHM Capital." *See* PX 1 Menjivar Dec. ¶¶ 102-104 (consumer complaint information). *See also* PX 8 Barnes Dec. ¶ 2 (Capitol Harris Miller & Associates); PX 9 Burns Dec. ¶ 3 (Capital Harris Miller & Associates); PX 10 Duncan Dec. ¶ 2 (same); PX 13 Hunter Dec. ¶ 2 (Capital Harris Miller); PX 15 Johnson Dec. ¶ 3 (Capital Harris Miller and Associates).

[13]    Defendants also currently use the names "Stark Legal," "Stark Recovery," and "Pacific Capital." *See* PX 1 Menjivar Dec. ¶¶ 102-104 (consumer complaint information). *See also* PX 3 Thompson Dec. ¶¶ 3, 10; PX 6 Prempeh Dec. ¶¶ 8, 20 & Att. A (script, Stark Law Firm), ¶ 22 & Att. C (script, Stark Law), ¶ 25 & Att. G (script, Stark Law Firm), ¶ 27 & Att. H (script, Stark Law); PX 7 Kussart Dec. ¶¶ 17, 19 (Stark Recovery); PX 11 Gerstner Dec. ¶ 2 (Stark Law); PX 12 Gladstein Dec. ¶ 2 (Stark Recovery); PX 14 James Dec. ¶ 2 (Stark Law Firm); PX 16 Lusher Dec. ¶ 2 (Pacific Capital); PX 17 Oaks Dec. ¶ 2 (Stark Law Firm); PX 18 Rozman Dec. ¶ 3 (Stark Law); PX 20 Turner Dec. ¶ 3 (Stark Law).

[14]    *See, e.g.,* PX 8 Barnes Dec. ¶ 2; PX 9 Burns Dec. ¶¶ 2-4; PX 10 Duncan Dec. ¶¶ 5, 8-9; PX 13 Hunter Dec. ¶¶ 4-5.

[15]    *See, e.g.,* PX 9 Burns Dec. ¶ 5 (alleged $350 loan now $700); PX 10 Duncan Dec. ¶ 5 (alleged $1,000 loan now $1,490). *See also* PX 1 Menjivar Dec. Att. DD at pp. 10 ($200 "locator fee"), 18 ($1,800 to $2,500 in "court costs").

and, if consumers refused, Defendants made a series of threats: that Defendants would sue the consumers and obtain large judgments against them;[16] that Defendants would send someone to consumers' homes or workplaces to serve legal papers;[17] and that Defendants would have consumers arrested or imprisoned.[18] Moreover, Defendants frequently tried to convince consumers that they had committed a crime by defaulting on the original loan.[19]

Beginning in February 2015, Defendants organized Stark Law, LLC, and began posing as a law firm purportedly retained to collect consumers' delinquent debts on behalf of a "client."[20] Although they continued many of the same illegal practices,[21] they also revised their pitch slightly to focus more directly on the threat that the law firm would sue and obtain a large judgment against any consumer who did not immediately pay.[22] Defendants even hired newly

---

[16]    *See, e.g.,* PX 13 Hunter Dec. ¶ 4; PX 15 Johnson Dec. ¶¶ 3-5. *See also* PX 1 Menjivar Dec. Att. DD at pp. 1, 18, 22 (consumer complaints).

[17]    *See, e.g.,* PX 8 Barnes Dec. ¶ 2; PX 9 Burns Dec. ¶ 4; PX 13 Hunter Dec. ¶¶ 2-3, 5; PX 15 Johnson Dec. ¶ 2. *See also* PX 1 Menjivar Dec. Att. DD at pp. 6, 10, 14, 16, 22 (consumer complaints).

[18]    *See, e.g.,* PX 8 Barnes Dec. ¶¶ 3, 5, 7; PX 9 Burns Dec. ¶ 4; PX 10 Duncan Dec. ¶ 12; PX 13 Hunter Dec. ¶¶ 2-4; PX 15 Johnson Dec. ¶ 2. *See also* PX 1 Menjivar Dec. Att. DD at pp. 1, 20, 24, 26 (consumer complaints).

[19]    *See, e.g.,* PX 8 Barnes Dec. ¶ 3; PX 9 Burns Dec. ¶¶ 2, 4; PX 10 Duncan Dec. ¶ 12; PX 13 Hunter Dec. ¶ 2 (consumer's co-workers told consumer "was in a legal case where fraud was involved"). *See also* PX 1 Menjivar Dec. Att. DD at pp. 6, 8, 10, 18, 20, 22 (consumer complaints).

[20]    *See, infra,* § IV (Defendants). *See also* PX 6 Prempeh Dec. ¶¶ 5, 8 & Atts. F, G, H (scripts).

[21]    For example, threatening arrest and imprisonment and sending someone to consumers' homes or workplaces to serve legal papers continued. *See, e.g.,* PX 6 Prempeh Dec. ¶¶ 35-38; PX 18 Rozman Dec. ¶ 7; PX 19 Scherck Dec. ¶ 2. *See also* PX 1 Menjivar Dec. Att. DD at pp. 30, 34, 38, 48 (consumer complaints).

[22]    *See* PX 6 Prempeh Dec. ¶¶ 9, 14, 25-27 & Atts. F, G, H (scripts). *See, e.g.,* PX 14 James Dec. ¶¶ 2, 4-5; PX 18 Rozman Dec. ¶¶ 7, 9; PX 19 Scherck Dec. ¶ 2; PX 20 Turner Dec. ¶ 5. *See also* PX 1 Menjivar Dec. Att. DD at pp. 30, 32, 36, 40, 46, 50, 54, 56, 58 (consumer complaints).

licensed attorneys, who make the same debt collection calls as their non-attorney collectors.[23] The only difference is that the attorneys use their real names and titles when contacting consumers.[24] The "attorneys" claim that their "firm" has been retained by a "client" to collect the alleged debt, and that they have been authorized to sue should those consumers refuse to pay.[25] Threats of litigation, made by an attorney at a "law firm," are especially intimidating.

In all of their collection efforts since 2011, Defendants have used consumers' personal and financial information to help deceive consumers into believing that their collection efforts are legitimate.[26] Even skeptical consumers are concerned when they realize Defendants are in possession of so much of their personal and financial information.[27] The Stark Law collectors, for example, typically start their calls by reciting the consumer's Social Security number—under the pretext that they are merely confirming the consumer's identity.[28]

After telling consumers that they are delinquent on a payday loan, Defendants demand immediate payment to prevent the case from going to litigation.[29] They frequently name a lender

---

[23]    See PX 6 Prempeh Dec. ¶¶ 4, 7, 9-10.

[24]    See id. at ¶ 14-15. See also PX 1 Menjivar Dec. Att. DD at pp. 38, 40, 60 (consumer complaints); PX 14 James Dec. ¶ 2.

[25]    See PX 6 Prempeh Dec. ¶¶ 14, 41 & Atts. F, G, H (scripts).

[26]    See, e.g., PX 8 Barnes Dec. ¶ 8; PX 10 Duncan Dec. ¶ 4; PX 11 Gerstner Dec. ¶ 8; PX 14 James Dec. ¶¶ 2-3; PX 15 Johnson Dec. ¶ 4; PX 18 Rozman Dec. ¶¶ 6, 8; PX 19 Scherck Dec. ¶ 2; PX 20 Turner Dec. ¶¶ 6-8.

[27]    See, e.g., PX 8 Barnes Dec. ¶ 8; PX 14 James Dec. ¶¶ 5, 8; PX 20 Turner Dec. ¶¶ 11-12. See also PX 1 Menjivar Dec. Att. DD at pp. 10, 30, 54 (consumer complaints).

[28]    See, e.g., PX 6 Prempeh Dec. ¶ 25 & Atts. F, G, H (scripts); PX 14 James Dec. ¶ 2; PX 18 Rozman Dec. ¶ 6.

[29]    See, e.g., PX 6 Prempeh Dec. ¶¶ 14, 25; PX 14 James Dec. ¶ 2; PX 16 Lusher Dec. ¶ 3; PX 18 Rozman Dec. ¶ 7; PX 19 Scherck Dec. ¶ 2; PX 20 Turner Dec. ¶ 5. See also PX 1 Menjivar Dec. Att. DD at pp. 30, 32, 36, 40, 46, 50, 54, 56, 58 (consumer complaints).

that purportedly provided the consumer's original loan, and provide an amount that supposedly represents the balance on the delinquent loan.[30] The delinquent loan balance varies, but typically ranges from between a few hundred dollars up to $1,000.[31] Defendants tell consumers that they can avoid litigation by making an immediate, one-time payment for the alleged delinquent amount.[32] If they refuse, Defendants threaten to file suit and seek a judgment of at least $2,000 plus the balance of the defaulted loan.[33]

In their collection calls, Defendants also frequently characterize a consumer's alleged failure to repay the payday loan as a crime. Defendants tell consumers that they have committed fraud or engaged in passing a bad check—allegations that many consumers reasonably interpret to be criminal.[34] A script provided to Defendants' attorneys for use in their collection calls illustrates the point:

> I show two charges in your file. The first charge is for a bad check and the second is for an attempted defrauding of a financial institution. Both these charges stem from a loan taken out with (*Original Creditor*). You authorized a

---

[30]     *See, e.g.,* PX 11 Gerstner Dec. ¶ 2 (Compass Capital); PX 14 James Dec. ¶ 2 (Kenwood Services, $2,700); PX 16 Lusher Dec. ¶ 3 (SGP Processing); PX 18 Rozman Dec. ¶¶ 5-6 ($800); PX 20 Turner Dec. ¶ 5 ($690). *See also* PX 1 Menjivar Dec. Att. DD at pp. 36, 40, 46, 50, 56, 58, 60 (consumer complaints).

[31]     *See, e.g.,* PX 12 Gladstein Dec. ¶ 2 ($690); PX 14 James Dec. ¶ 2 ($1,700); PX 18 Rozman Dec. ¶ 6 ($800); PX 20 Turner Dec. ¶ 5 ($690).

[32]     *See, e.g.,* PX 14 James Dec. ¶ 2; PX 18 Rozman Dec. ¶ 7; PX 19 Scherck Dec. ¶ 2; PX 20 Turner Dec. ¶ 5. *See also* PX 6 Prempeh Dec. ¶¶ 14, 25-27 & Atts. F, G, H (scripts). Defendants agree to accept installment payments from consumers who cannot make a full payment immediately. *See* PX 6 Prempeh Dec. ¶ 25. *See also* PX 12 Gladstein Dec. ¶ 3; PX 18 Rozman Dec. ¶¶ 9-10.

[33]     *See* PX 6 Prempeh Dec. ¶¶ 14, 25-27 & Atts. F, G, H (scripts); PX 14 James Dec. ¶ 2; PX 18 Rozman Dec. ¶ 7; PX 20 Turner Dec. ¶ 5. *See also* PX 1 Menjivar Dec. Att. DD at pp. 40, 42, 46, 50, 56 (consumer complaints).

[34]     *See, e.g.,* PX 16 Lusher Dec. ¶ 2 (consumer had "two charges" pending against him); PX 20 Turner Dec. ¶ 5 (charge consumer with "defrauding a company"). *See also* PX 1 Menjivar Dec. ¶ 106 & Att. DD at pp. 36, 38, 42 (consumer complaints).

> draft from your checking account, that draft had insufficient funds.  Now
> *sir/ma'am* was it your intent to breach your contract?  *Wait for response...*[35]

Defendants then use these threats of criminal charges to convince consumers to pay.  If

consumers still refuse, Defendants often ramp up the pressure by repeatedly threatening to file a

lawsuit, and by repeatedly calling the consumer and the consumer's relatives, friends, and

employers.

### C.    Defendants' Abusive Calling Practices

Defendants also regularly engage in abusive and illegal calling practices to pressure

consumers to pay the alleged debt.  Defendants routinely, and often repeatedly, call consumers'

relatives, friends, and employers.[36]  In many cases, Defendants use a "bull's eye" calling method,

meaning that they call a consumer's relatives, friends, and employers *before* calling the

consumer directly.[37]  Although Defendants already know how to contact the consumer, they

pretend that they are trying to obtain location information on the consumer relating to a "legal

matter."[38]  During these calls, Defendants often reveal that the consumer owes a debt.[39]

Defendants then purposely wait (sometimes hours) before calling the consumer directly so that

---

[35]        PX 6 Prempeh Dec. ¶ 25 & Att. F ("***CLOSE***" script).

[36]        *See, e.g.,* PX 8 Barnes Dec. ¶¶ 5-6; PX 10 Duncan Dec. ¶ 7; PX 13 Hunter Dec. ¶ 2; PX 14 James Dec. ¶ 4; PX 15 Johnson Dec. ¶ 2; PX 17 Oaks Dec. ¶¶ 2, 4; PX 18 Rozman Dec. ¶ 16; PX 20 Turner Dec. ¶ 7.  *See also* PX 1 Menjivar Dec. Att. DD at pp. 6, 8, 10, 12, 14, 16, 18, 20, 24, 26, 30, 32, 34, 38, 42, 44, 46, 50, 52, 56 (consumer complaints).

[37]        *See* PX 6 Prempeh Dec. ¶¶ 16-18.  *See also* PX 14 James Dec. ¶ 4; PX 17 Oaks Dec. ¶¶ 2-3; PX 20 Turner Dec. ¶ 7.

[38]        *See* PX 6 Prempeh Dec. ¶¶ 16, 20-24 & Atts. A, B, C, D, E (scripts).  *See also* PX 17 Oaks Dec. ¶¶ 2-4.

[39]        *See, e.g.,* PX 8 Barnes Dec. ¶ 5; PX 10 Duncan Dec. ¶ 7; PX 13 Hunter Dec. ¶ 2; PX 14 James Dec. ¶ 4; PX 18 Rozman Dec. ¶ 16; PX 20 Turner Dec. ¶ 7.  *See also* PX 1 Menjivar Dec. Att. DD at pp. 10, 12, 24, 38 (consumer complaints).

the consumer often has learned about the calls received by friends and relatives.[40]  Although

Defendants have no valid reason for contacting these third parties, they routinely do so to

embarrass the consumer and thereby increase the pressure to pay the bogus debt.[41]  Defendants

also try intimidating consumers' co-workers and supervisors,[42] and even attempting collection of

consumers' alleged debts from those consumers' relatives.[43]

      Defendants also harass consumers by repeatedly calling, even after consumers tell them

to stop.[44]  They repeatedly call consumers at work when they know consumers cannot receive

such calls there,[45] and they continue to call consumers after being told that the consumer is

represented by an attorney with respect to that consumer's debt.[46]

      All of Defendants' tactics violate federal and state debt collection laws, which prohibit

harassment or abuse and certain communications in connection with the collection of debt.  Debt

collectors cannot repeatedly call consumers with intent to abuse or harass.[47]  They cannot call

---

[40]     *See* PX 6 Prempeh Dec. ¶¶ 16-17.

[41]     *Id.* at ¶ 17. *See also* PX 13 Hunter Dec. ¶ 3 (consumer "embarrassed and upset"); PX 14 James Dec. ¶ 4 (consumer "upset and embarrassed"); PX 15 Johnson Dec. ¶ 2.

[42]     *See, e.g.,* PX 13 Hunter Dec. ¶ 2 (co-workers told police would come to arrest consumer at work); PX 15 Johnson Dec. ¶ 2 (consumer's director told consumer would be arrested at work).

[43]     *See, e.g.,* PX 8 Barnes Dec. ¶ 5 (relatives could keep consumer from going to jail by paying consumer's alleged debt); PX 10 Duncan Dec. ¶ 7 (threatened to collect debt from consumer's grandmother). *See also* PX 1 Menjivar Dec. Att. DD at p. 18 (consumer complaint).

[44]     *See, e.g.,* PX 8 Barnes Dec. ¶ 7; PX 10 Duncan Dec. ¶¶ 6, 8-9, 14-15; PX 13 Hunter Dec. ¶ 5; PX 16 Lusher Dec. ¶ 4; PX 18 Rozman Dec. ¶ 12. *See also* PX 1 Menjivar Dec. Att. DD at pp. 8, 12, 32, 46, 52.

[45]     *See, e.g.,* PX 15 Johnson Dec. ¶ 7. *See also* PX 1 Menjivar Dec. Att. DD at pp. 14, 20 (consumer complaints).

[46]     *See, e.g.,* PX 1 Menjivar Dec. ¶ 106 & Atts. CC at pp. 1-2 (Affidavit of Kendra Green), 32-35 (Complaint), 42-46 (Complaint), 47-54 (Complaint), DD at p. 54 (consumer complaint).

[47]     15 U.S.C. § 1692d(5); 225 ILCS 425/9(a)(19).

consumers at work when the collector knows, or has reason to know, that such calls are prohibited,[48] and they cannot call consumers when the collector knows that a consumer is represented by an attorney with respect to that consumer's debt.[49] Debt collection laws also prohibit debt collectors from communicating with third parties except for the limited purpose of obtaining location information about the consumer.[50] Even under that limited exception, the debt collector cannot disclose that the consumer owes a debt[51] and generally cannot communicate with such person more than once.[52] Nevertheless, Defendants use all of these illegal practices in their scheme to collect bogus debts.

### D. Defendants' Empty Threats

Defendants' empty threats are simply attempts—often successful—to scare and intimidate consumers into paying debts they do not owe. Consumers cannot be arrested or imprisoned for failing to pay a private debt, and despite Defendants' threats of fraud charges, lawsuits, and large judgments, Defendants do not actually sue any consumers.[53] In fact, Defendants instruct their employees simply to "move on" to the next consumer if a consumer steadfastly refuses to pay or demands proof of the debt.[54] Defendants know they cannot use the courts to enforce any of these debts because consumers do not owe any money to Defendants.

---

[48]    15 U.S.C. § 1692c(a)(3).

[49]    15 U.S.C. § 1692c(a)(2).

[50]    *See generally* 15 U.S.C. §§ 1692b and 1692c(b).

[51]    15 U.S.C. § 1692b(2); 225 ILCS 425/9(a)(21) - (22).

[52]    15 U.S.C. § 1692b(3).

[53]    *See* PX 6 Prempeh Dec. ¶¶ 41, 45. *See, e.g.,* PX 10 Duncan Dec. ¶ 20; PX 13 Hunter Dec. ¶ 7; PX 18 Rozman Dec. ¶ 24.

[54]    *See* PX 6 Prempeh Dec. ¶ 40.

### E.    Consumers Do Not Owe Any Money to Defendants

Defendants have no right to collect money from their victims.  Federal law specifically requires a debt collector to provide proof of the debt and to identify the creditor and the amount of the debt.[55]  Defendants do not provide proof of the debt, even when consumers specifically ask.[56]  Moreover, when Defendants provide a lender's name, the name often is inaccurate and, just as likely, fabricated.[57]

Many consumers targeted by Defendants have never even obtained a payday loan.[58]  Thus, Defendants cannot prove that these consumers owe any alleged debt.  Some of these consumers confirm that the alleged loan proceeds were never deposited into their bank accounts.[59]  Other consumers have obtained a payday loan, but they verified that they had paid the loan or had no overdue debt.[60]  Even Defendants' own employees doubt Defendants' claims that the consumers they contact owe Defendants for delinquent payday loans.  When specifically

---

[55]    15 U.S.C. § 1692g(a).

[56]    *See, e.g.,* PX 8 Barnes Dec. ¶¶ 3, 7; PX 9 Burns Dec. ¶¶ 4-5; PX 10 Duncan Dec. ¶¶ 5, 8, 11, 16 & Exhibit ("Ex.") A at p. 4 (cease and desist letter); PX 11 Gerstner Dec. ¶ 2; PX 12 Gladstein Dec. ¶ 3; PX 13 Hunter Dec. ¶¶ 4, 7; PX 14 James Dec. ¶ 7; PX 15 Johnson Dec. ¶¶ 4, 8; PX 16 Lusher Dec. ¶¶ 3-4; PX 18 Rozman Dec. ¶ 10; PX 19 Scherck Dec. ¶ 2; PX 20 Turner Dec. ¶¶ 6, 9. *See also* PX 1 Menjivar Dec. Att. DD at pp. 4, 6, 12, 16, 20, 24, 44, 46, 50, 56, 60 (consumer complaints).

[57]    *See, e.g.,* PX 11 Gerstner Dec. ¶ 3; PX 14 James Dec. ¶¶ 2-3; PX 15 Johnson Dec. ¶ 3; PX 16 Lusher Dec. ¶ 2. *See also* PX 1 Menjivar Dec. Att. DD at pp. 10, 40 (consumer complaints).

[58]    *See, e.g.,* PX 8 Barnes Dec. ¶ 3; PX 14 James Dec. ¶ 2; PX 20 Turner Dec. ¶¶ 2, 9. *See also* PX 1 Menjivar Dec. Att. DD at p. 58 (consumer age sixteen at time of alleged loan).

[59]    *See, e.g.,* PX 8 Barnes Dec. ¶ 4; PX 14 James Dec. ¶ 3. *See also* PX 1 Menjivar Dec. Att. DD at pp. 54, 60 (consumer complaints).

[60]    *See, e.g.,* PX 10 Duncan Dec. ¶ 10; PX 11 Gerstner Dec. ¶ 8; PX 18 Rozman Dec. ¶¶ 15, 25. *See also* PX 1 Menjivar Dec. Att. DD at pp. 18, 32, 40, 50 (consumer complaints).

asked by their own employees, Defendants would not—and could not—provide any proof that the consumers Defendants contacted actually owed payday loan debt.[61]

A former employee confirms the deceptive and predatory nature of Defendants' scheme. Joe Prempeh is an Illinois licensed attorney who was hired to work for Defendants in February 2015.[62] Purportedly hired to negotiate debt settlements and to litigate debt collection cases, Mr. Prempeh actually did neither.[63] Instead, Defendants gave Mr. Prempeh scripts and instructed him to make the same debt collection calls that their non-attorney collectors were making.[64] The vast majority of consumers that Mr. Prempeh called claimed that they had never taken the payday loans he was trying to collect, and Defendants could not provide proof that the consumers owed the alleged debt.[65] Some consumers Mr. Prempeh contacted paid Defendants solely for fear of being sued, even though they vehemently denied ever owing anything on a payday loan.[66] After just over two weeks, Mr. Prempeh concluded that Defendants were running a scam and quit.[67]

---

[61]    *See* PX 6 Prempeh Dec. ¶ 30.

[62]    *See generally* PX 6 (Declaration of Joe H. Prempeh, Esq.).

[63]    *See* PX 6 Prempeh Dec. ¶¶ 4, 9-10.

[64]    *See id.* at ¶¶ 9, 42.

[65]    *See id.* at ¶¶ 13, 30-32, 34, 37, 39-40.

[66]    *See id.* at ¶¶ 35, 45.

[67]    *See id.* at ¶¶ 47-48, 50 & Att. I (whistleblower complaint filed by Mr. Prempeh with the Illinois Attorney General's Office).

14

### F.    Private Consumer Lawsuits Filed Against Defendants

Individual consumers have sued Defendants at least fifteen times in federal court for their debt collection calls.[68] The plaintiffs in those cases alleged multiple violations of the FDCPA and tell similar stories of abuse and harassment by Defendants. In all but one case, Defendants apparently failed to appear or to answer the complaint. Most of those cases were resolved with the entry of default judgments or voluntarily dismissals after apparent out-of-court settlements.[69] The practices alleged in those cases are consistent with Plaintiffs' allegations here.[70]

### G.    Consumer Complaints to Wisconsin Firm Unconnected to Defendants

Defendants' illegal practices also are demonstrated through the hundreds of complaint calls received by a licensed Wisconsin debt collector with a similar name.[71] Pauline Kussart is the owner and president of The Stark Collection Agency, Inc.[72] Beginning in July 2015, Ms. Kussart's business began receiving telephone calls from consumers who had confused her business with that of Defendants due to the similar name.[73] The consumers complained about calls from Defendants demanding payment and threatening lawsuits on payday loans the consumers said they did not owe.[74] Many consumers also complained that Defendants

---

[68]    PX 1 Menjivar Dec. ¶¶ 97-99 & Att. BB (chart of lawsuits filed against Defendants). Ten of the fifteen cases were filed in the Northern District of Illinois. *Id.*

[69]    *See id.* Defendants' bank records include checks payable to third parties for the apparent settlement of some of these lawsuits. *See id.* at ¶ 49.

[70]    *See, e.g., id.* at ¶¶ 99-100 & Att. CC (court case records).

[71]    *See generally* PX 7 (Declaration of Pauline Kussart).

[72]    *See* PX 7 Kussart Dec. ¶ 1.

[73]    *See id.* at ¶¶ 17-19.

[74]    *See id.* at ¶¶ 18-19, 22, 26-27 & Ex. C (log of over 400 consumer complaint calls received by The Stark Agency about Defendants' debt collection practices).

threatened arrest, repeatedly called their friends, family, ex-spouses, and employers, and refused to provide proof of the debt.[75]  The volume of calls to her small business became so great that Ms. Kussart had to assign employees full time to field the incoming calls.  For several days in December 2015, all twenty-seven of her employees had to field complaint calls from consumers.[76]

### H.     Defendants' Marketing and Sale of Counterfeit Debt Portfolios

As if collecting on bogus payday loan debt were not bad enough, Defendants also have sold payday loan portfolios they knew to be bogus to third parties for collection.  Such practices have caused additional consumers to be subjected to collection calls relating to debts they do not owe at all, or do not owe to the collector calling them.

In at least two instances beginning in July 2014, Defendants provided to third parties debt portfolios that purported to include delinquent loans originated by lenders affiliated with AMG Services, Inc. ("AMG"), a payday loan servicer.[77]  The portfolios identified consumers who purportedly had defaulted on payday loans they had obtained from AMG-affiliated lenders that

---

[75]      *See id.* at ¶¶ 23.

[76]      *See id.* at ¶¶ 21, 32.  Ms. Kussart also has received written consumer complaints and cease and desist letters, and complaints from the Better Business Bureau and government agencies.  *See id.* at ¶ 31 & Exs. D-I (written consumer complaints), ¶ 36 & Ex. J (complaints from Better Business Bureau and government agencies).

[77]      In 2012, the FTC sued AMG and others for violations of the FTC Act, the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1666j, and the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693-1693r.  *See FTC v. AMG Servs., Inc., et al.*, No. 2:12-cv-00536 (D. Nev. Apr. 2, 2012).  Complaint and press release *available at* https://www.ftc.gov/enforcement/cases-proceedings/112-3024-x120026/amg-services-inc.  Some of the defendants in that case settled the FTC's charges.  *See id.*  Litigation continues against the remaining defendants.  On February 10, 2016, the U.S. Attorney's Office for the Southern District of New York announced the unsealing of a criminal indictment charging Scott Tucker, a principal of AMG, and another with violations of the Racketeer Influenced and Corrupt Organizations Act and TILA.  Press release *available at* https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-charges-against-owner-and-attorney-2-billion-unlawful.

used the name "500 Fast Cash."[78]  The consumers in the portfolios, however, did not owe any

debts to the 500 Fast Cash lenders, and those lenders also did not sell any of their debt or

authorize any third parties to collect on their behalf.[79]  The portfolios falsely associated

consumers with bogus 500 Fast Cash debts.

Defendants provided one such portfolio to debt buyer Open Assets, LLC ("Open

Assets"), in July 2014.[80]  The portfolio purported to contain over 2,300 "500 Fast Cash"

delinquent loans with a face value of over $1 million.[81]  Open Assets placed the debts for

collection, but quickly learned that consumers either did not recognize the alleged lender, had

never received the alleged loan, stated the debt was fraudulent, or indicated that they had already

paid off the loan.[82]  In September 2014, AMG served Open Assets with cease and desist letters

and notified it that the 500 Fast Cash portfolios were fraudulent.[83]

In September 2014, Defendants sold another portfolio of 500 Fast Cash debt to Kelly

Brace.[84]  The portfolio purportedly contained over 77,000 "500 Fast Cash" delinquent loans with

a face value of over $33 million, yet Brace purchased the portfolio for only $165,000—one-half

---

[78]  *See* PX 2 Goldstein Dec. ¶ 3 & Ex. A (Declaration of Michael Jared Marsh).

[79]  *See id.* at ¶ 4 & Ex. A at p. 2 (¶ 6).

[80]  *See id.* at ¶¶ 19-20 & Ex. E (Declaration of Shawn Bure).

[81]  *See id.* at Ex. E at pp. 2 (¶ 7), 8-9 (e-mail from Preetesh Patel).

[82]  *See id.* at Ex. E at pp. 2 (¶ 8), 10-17 (e-mails from collectors about 500 Fast Cash debt).

[83]  *See id.* at Ex. E at pp. 3 (¶ 14), 28-32 (e-mail exchange between Marsh and Bure).  AMG fielded hundreds of telephone calls from consumers complaining about abusive collection calls from debt collectors claiming to be collecting on behalf of AMG-affiliated lenders.  Many of the consumers that called were not customers of any AMG-affiliated lenders.  *See id.* at Ex. A at p. 2 (¶¶ 5, 7-8).

[84]  *See* PX 2 Goldstein Dec. ¶¶ 10-14.

17

of one percent of its purported face value.[85]  In September and October 2014, AMG served Brace

with cease and desist letters relating to the collection of fraudulent 500 Fast Cash debt.[86]  In

October 2015, the FTC and State of New York jointly sued Brace and his companies for

unlawful debt collection practices, including collecting on the fraudulent 500 Fast Cash debt.[87]

## III.  DEFENDANTS' WHOLESALE VIOLATIONS OF FEDERAL AND STATE DEBT COLLECTION LAWS

Beyond preying on consumers by collecting on and trafficking in bogus debts,

Defendants also blatantly violate numerous specific provisions of federal and state debt

collection laws.  Even if Defendants collected legitimate debt in amounts actually owed, these

federal and state law violations, by themselves, would justify the relief Plaintiffs seek.

### A.  Defendants Blatantly Violate Both the Federal Fair Debt Collection Practices Act and the Illinois Collection Agency Act

Both the FDCPA and Illinois Collection Agency Act require Defendants to make certain

disclosures to consumers that Defendants entirely ignore.[88]  Both statutes prohibit Defendants

from harassing consumers by repeatedly calling, and from disclosing the existence of a

consumer's debt to third parties.[89]  Yet, these are among the precise tactics Defendants use to

coerce consumers to pay.  Even if Defendants had legal authority to collect these debts, both

---

[85]     *See id.* at ¶¶ 12-18 & Exs. B (Receivables Purchase Agreement), C (Solidus Group, LLC, bank records), D (CHM Capital Group, LLC, bank records).

[86]     *See id.* at Ex. A at pp. 3-4 (¶¶ 13-16), 7-12 (cease and desist letters).

[87]     *See id.* at ¶¶ 7-9. *See also FTC and People of the State of New York v. Kelly S. Brace, et al.*, No. 1:15-cv-00875-RJA (W.D.N.Y. Oct. 5, 2015).  Complaint and press release *available at* https://www.ftc.gov/enforcement/cases-proceedings/152-3136/delaware-solutions.  The District Court entered a temporary restraining order that prompted Brace to close his collection agency. *See* Temporary Restraining Order, *available at* https://www.ftc.gov/system/files/documents/cases/ 151104delawaresoltro.pdf.

[88]     15 U.S.C. § 1692g(a); 225 ILCS 425/9(a)(18).

[89]     15 U.S.C. §§ 1692b(2) and 1692d(5); 225 ILCS 425/9(a)(19) and (21).

18

statutes prohibit them from threatening actions they do not intend to take or cannot lawfully take against a consumer for failing to pay a private debt.[90]

### 1.    Defendants are Violating the Fair Debt Collection Practices Act

The FDCPA applies regardless of whether a debt actually is owed because it applies when the collection is regarding an "*alleged* obligation of a consumer to pay money," 15 U.S.C. § 1692a(5) (emphasis added).  To determine whether communications violate the FDCPA, courts "examine them from the standpoint of an unsophisticated consumer." *Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 564 (7th Cir. 2004) (citing *Veach v. Sheeks*, 316 F.3d 690, 692 (7th Cir. 2003)).  Defendants' deceptive claims violate both the FTC Act and Section 807 of the FDCPA, 15 U.S.C. § 1692e.  Defendants also regularly ignore the FDCPA's prohibitions against certain communications, communications with third parties except for a specified purpose, and harassment or abuse.  Defendants also do not comply with the statute's notice requirements.

### 2.    Defendants are Violating the Illinois Collection Agency Act

Section 9(a) of the Illinois Collection Agency Act provides an extensive list of prohibited conduct.[91]  The Corporate Defendants and Individual Defendants Hirsh Mohindra and Preetesh Patel have engaged in numerous knowing violations of Section 9(a),[92] many of which mirror Defendants' FDCPA violations, including the following:

- Threatening to instigate arrest or criminal prosecution where no basis for a criminal complaint lawfully exists, in violation of 225 ILCS 425/9(a)(15);

- Initiating or threatening to initiate communication with a consumer's employer

---

[90]    15 U.S.C. §§ 1692e(4) and 1692e(5); 225 ILCS 425/9(a)(15) and (24).

[91]    *See* 225 ILCS 425/9(a).

[92]    The State of Illinois does not allege violations of the Illinois Collection Agency Act against Defendant Gaurav Mohindra.

19

before timely written notice has been given to the consumer, in violation of 225 ILCS 425/9(a)(18);

- Communicating with a consumer or the consumer's family at times and with such frequency as to constitute harassment, in violation of 225 ILCS 425/9(a)(19);

- Disclosing or threatening to disclose information relating to a consumer's debt to any other person, except where such other person has a legitimate business need for the information or where permitted by law, in violation of 225 ILCS 425/9(a)(21);

- Disclosing or threatening to disclose information concerning the existence of a debt reasonably known to be disputed by the consumer without disclosing the fact that the consumer disputes the debt, in violation of 225 ILCS 425/9(a)(22);

- Attempting or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist, in violation of 225 ILCS 425/9(a)(24); and

- Engaging in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud or harm the public, in violation of 225 ILCS 425/9(a)(35).

### B.   Defendants are Illegally Operating a Debt Collection Business in Illinois

Defendants are a "collection agency" that is required to be licensed under Illinois law,[93] but they are not now and have never been licensed.[94] Therefore, Defendants cannot lawfully collect *any* debts, legitimate or otherwise.[95]

---

[93]   A "collection agency" is defined as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in the collection of a debt." 225 ILCS 425/2.

[94]   *See* PX 4 Aidich Dec. ¶ 4 & Ex. A (certifications of non-licensure); PX 5 Koehl Dec. ¶ 3.

[95]   Section 4 of the Illinois Collection Agency Act expressly provides that, "[n]o collection agency shall operate in this State, directly or indirectly engage in the business of collecting debt, solicit debt claims for others, have a sales office, a client, or solicit a client in this State, exercise the right to collect, or receive payment for another of any debt, without obtaining a license under this Act [ ]." 225 ILCS 425/4.

Defendant Hirsh Mohindra filed a collection agency application with the Illinois Department of Financial and Professional Regulation ("IDFPR") in 2011 for Defendant CHM Capital Group, LLC.[96] After Defendants failed to cure deficiencies in their application that were identified by the IDFPR, that agency denied the application in June 2014.[97] Notified that they could reapply,[98] Defendants instead organized Stark Law in February 2015, and thereafter hired attorneys to make the same debt collection calls to consumers as their non-attorney collectors. This was a naked attempt to evade the state's collection agency statute, which exempts "licensed attorneys at law."[99] A collection agency like Defendants, however, cannot avoid the statute and its licensing requirement simply by hiring attorneys as its collectors. *Cf. LVNV Funding, LLC v. Trice*, 2015 IL 116129, ¶¶ 25, 40, 32 N.E.3d 553, 559-60, 563 (Ill. 2015) (noting that an unlicensed collection agency's hiring of attorney does not insulate it from the Illinois Collection Agency Act, including the Act's registration requirements).

## IV.  DEFENDANTS

Defendants are a group of six interrelated companies and three individuals that together operate as a common enterprise. The same individuals control, manage, and direct all six companies. The companies operate from a common business premises, use the same managers, employees, and business practices, commingle funds, and generally participate in a common scheme. As participants in a common enterprise, Defendants are all jointly and severally liable. *See FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000) (*citing*

---

[96]     *See* PX 5 Koehl Dec. ¶¶ 4-6 & Exs. A-E (CHM Capital Group, LLC, collection agency application for registration and supporting documents).

[97]     *See id.* at ¶¶ 7-10 & Exs. G (deficiency checklist dated July 13, 2011), H (second deficiency checklist dated March 23, 2012), I (notice of application denial dated June 2, 2014).

[98]     *See id.* at ¶ 10 & Ex. I (notice of application denial dated June 2, 2014).

[99]     225 ILCS 425/2.03.

*Sunshine Art Studios v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973)), *aff'd*, 312 F.3d 259 (7th Cir. 2002); *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746-47 (2nd Cir. 1964); *see also CFTC v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003).

### A. Corporate Defendants

Corporate Defendants are the Illinois limited liability companies **Stark Law, LLC** ("Stark Law"); **Stark Legal, LLC** ("Stark Legal"); and **CHM Capital Group, LLC** ("CHM"), and the Illinois corporations **Ashton Asset Management, Inc.** ("Ashton"); **HKM Funding, Ltd.** ("HKM"); and **Pacific Capital Holdings, Inc.** ("Pacific").

Over the last five years, Defendants have constantly reinvented themselves by using different businesses and frequently changing business names when contacting consumers. Between 2011 and early 2015, Defendants operated primarily through Defendants CHM and Pacific, and they used business names such as "Capital Harris Miller & Associates," "Charles Hunter Miller & Associates," and "CHM Capital" when contacting consumers.[100] Since February 2015, Defendants have been operating primarily through Stark Law and Stark Legal, and they have been using the business names "Stark Law," "Stark Legal," and "Stark Recovery."[101] CHM continues to be involved with the Stark operation—it maintains a bank

---

[100]      *See, e.g.,* PX1 Menjivar Dec. ¶ 104 (consumer complaint search) & Att. DD at pp. 1-27 (consumer complaints). *See also* PX 8 Barnes Dec. ¶ 2 (Capitol Harris Miller & Associates); PX 9 Burns Dec. ¶ 3 (Capital Harris Miller & Associates); PX 10 Duncan Dec. ¶ 2 (same); PX 13 Hunter Dec. ¶ 2 (Capital Harris Miller); PX 15 Johnson Dec. ¶ 3 (Capital Harris Miller and Associates).

[101]      *See* PX1 Menjivar Dec. ¶ 104 (consumer complaint search) & Att. DD at pp. 28-61 (consumer complaints). *See also* PX 11 Gerstner Dec. ¶ 2 (Stark Law); PX 12 Gladstein Dec. ¶ 2 (Stark Recovery); PX 14 James Dec. ¶ 2 (Stark Law Firm); PX 16 Lusher Dec. ¶ 2 (Pacific Capital); PX 17 Oaks Dec. ¶ 2 (Stark Law Firm); PX 18 Rozman Dec. ¶ 3 (Stark Law); PX 20 Turner Dec. ¶ 3 (same).

account to finance the debt collection operation.[102]  And Defendants' scripts indicate that Pacific is now the purported "client" of Stark Law and the holder of consumers' debts.[103]

Although business records show various registered and business addresses for the Corporate Defendants, this enterprise physically is located at 500 Quail Ridge Drive in Westmont, Illinois.[104]  Defendants conceal their whereabouts from consumers, however, by using mail drops as their addresses.  When Stark Law was organized in February 2015, Defendants used a Westmont mail drop as their address.[105]  In July 2015, however, a Westmont police sergeant investigating complaints about Defendants received by the police department determined that Defendants actually were operating from 500 Quail Ridge Drive.[106]  After the sergeant paid Defendants a visit, they changed the business addresses of both Stark Law and Stark Legal to a mail drop in Irvine, California.[107]  Defendants simultaneously opened a second mail drop in Bakersfield, California, which they now use as their business address with consumers.[108]

---

[102]     *See* PX 1 Menjivar Dec. ¶¶ 42-49 & Att. I (CHM bank records).

[103]     *See* PX 6 Prempeh Dec. ¶¶ 8, 28-29, 31-33 & Atts. F, G (scripts).

[104]     *See* PX 3 Thompson Dec. ¶¶ 5, 9 & Att. B (Application for Business License); PX 6 Prempeh Dec. ¶ 2.

[105]     *See* PX 1 Menjivar Dec. ¶ 7 & Att. A at pp. 2-5 (business records); PX 3 Thompson Dec. ¶¶ 4, 7 & Att. A (mailbox service agreement); PX 11 Gerstner Dec. ¶ 3; PX 14 James Dec. ¶ 5; PX 18 Rozman Dec. Att. B at p. 2 (Stark Law letterhead).  Prior to using the Westmont mail drop as their business location, Defendants were associated with addresses in Chicago and Bolingbrook, Illinois.  *See* PX 1 Menjivar Dec. ¶ 108.

[106]     *See* PX 3 Thompson Dec. ¶¶ 5, 12.

[107]     The sergeant visited Defendants on July 8, 2015.  *See id.* at ¶ 12.  Defendants changed their business addresses on or about July 20, 2015.  *See* PX 1 Menjivar Dec. ¶¶ 10, 13, 88-89 & Atts. A at pp. 8-9, B at pp. 6-7, V (Regus Irvine Business Center office agreement).

[108]     *See id.* at ¶¶ 90-91 & Atts. W (Regus Bakersfield office agreement), DD at pp. 51, 52, 55, 57 (consumer complaints).  *See also* PX 7 Kussart Dec. ¶ 25.

23

Funds collected by this operation regularly move amongst the accounts of the Corporate

Defendants, with distributions then being made to the Individual Defendants.  Both Stark Law

and Stark Legal have, or have had, separate merchant accounts to process consumers'

payments,[109] but money from these separate accounts is deposited into the same Stark Law bank

account.[110]  Transfers from that Stark Law account are regularly made to (and received from)

accounts held by Ashton and CHM.[111]  Ashton's bank account has been used to write sizeable

checks to Gaurav Mohindra and Preetesh Patel,[112] and to make payments and transfers to Hirsh

Mohindra's other business interests.[113]  In addition, millions of dollars have been transferred

amongst CHM's bank account and Corporate Defendants' other bank accounts, including those

of Ashton and Stark Law, [114] and bank accounts of Hirsh Mohindra's other business interests.[115]

The CHM account was used to fund new accounts opened by Stark Law and Pacific,[116] to pay

---

[109]     See PX 1 Menjivar Dec. ¶¶ 64-65 & Att. M (Bank of America Merchant Services, Stark Law), ¶¶ 66-69 & Att. N (TSYS Merchant Solutions, Stark Law), ¶ 70 & Att. O (Harbortouch Payments, Stark Legal); ¶¶ 71-72 & Att. P (Wells Fargo Merchant Services, Stark Law).

[110]     See, e.g., id. at Att. O at pp. 2, 4 (merchant account application showing Stark Legal merchant deposits to be made into Stark Law bank account).

[111]     See id. at ¶ 56.

[112]     See id. at ¶ 41.

[113]     For example, between April 2015 and June 2015, ten checks totaling over $2.3 million were written from the Ashton account payable to Aura Development, an Illinois corporation controlled by Hirsh Mohindra. See id. at ¶¶ 31-34, 41 & Att. G (Aura Development, Inc., business records).

[114]     See id. at ¶ 45.

[115]     For example, between December 2011 and July 2015, 60 transfers totaling over $5.2 million were made from the CHM bank account to an Aura Development bank account.  Id.

[116]     See id. at ¶¶ 48, 52, 58.

24

the collection agency license application fee to the IDFPR,[117] to receive payment for the sale of counterfeit debt portfolios,[118] and for settlement payments to consumers who sued Defendants.[119]

Finally, HKM is solely controlled by Hirsh Mohindra and serves as the manager of CHM.[120] According to merchant account records, HKM holds the lease on Defendants' Quail Ridge Drive business premises, and in January 2015, HKM sublet the premises to Stark Law.[121]

Defendants may be in the process of reinventing themselves yet again. In January 2016, they reported to the Westmont police sergeant that they were firing their employees and closing their debt collection business.[122] We do not know whether the business is currently operating, but Defendants still occupy the Quail Ridge Drive business premises. Thus, even if they are not currently making collection calls, they could easily begin to do so again using new names and addresses, given their history over the years of reinventing themselves with new business names and business tactics. The Quail Ridge Drive business premises also presumably continues to hold the records relating to Defendants' past illegal activities.

### B.    Individual Defendants

This fraudulent enterprise is controlled by three individuals, all of whom share in the financial control, management, and day-to-day business operations of Corporate Defendants. **Hirsh Mohindra** serves in various management capacities. He was a previous manager of Stark

---

[117]    *See id.* at ¶ 48.

[118]    *See* PX 2 Goldstein Dec. ¶¶ 17-18 & Ex. D at p. 3.

[119]    *See* PX 1 Menjivar Dec. ¶ 49.

[120]    *See id.* at ¶¶ 28-29 & Att. F (HKM business records), ¶ 18 & Att. D at pp. 5-6 (CHM business records adding HKM as manager).

[121]    *See id.* at ¶ 68 & Att. N at pp. 11-15 (commercial and industrial lease agreement).

[122]    *See* PX 3 Thompson Dec. ¶¶ 17-19.

Legal and CHM.[123]  He incorporated and is president of Ashton, president and secretary of

Pacific, and president, secretary and director of HKM.[124]  Hirsh Mohindra maintains near

exclusive financial control over this operation.  He, along with his brother, Gaurav Mohindra, is

a signatory on several of Corporate Defendants' bank accounts, including accounts held by Stark

Law, Pacific, Ashton, and CHM.[125]  Hirsh Mohindra obtained merchant accounts for Stark

Legal, CHM, and Pacific that were used to process consumers' payments.[126]  He also opened the

virtual office mail drops in Irvine and Bakersfield, California.[127]  Hirsh Mohindra is present at

Defendants' business premises daily.  He meets with employees, answers questions, and has held

himself out as responsible for revising Defendants' scripts.  A former employee describes Hirsh

Mohindra as, "the person who made all decision[s]."[128]

Defendant **Gaurav Mohindra** is a previous manager or member of Stark Law and Stark

Legal,[129] and he is vice president of Pacific, Ashton, and CHM.[130]  He opened the Westmont

---

[123]     See PX 1 Menjivar Dec. ¶ 12 & Att. B at pp. 4-5 (Stark Legal business records), ¶ 17 &
Att. D at pp. 2-4 (CHM business records).

[124]     See id. at ¶¶ 14-16 & Att. C (Ashton business records), ¶¶ 24-27 & Att. E at p. 15-16
(Pacific business records), ¶ 29 & Att. F at pp. 4-6 (HKM business records).

[125]     See id. at ¶ 53 & Att. K (Stark Law bank records), ¶ 50 & Att. J (Pacific bank records), ¶
36 & Att. H (Ashton bank records), ¶ 42 & Att. I (CHM bank records).

[126]     See id. at ¶ 70 & Att. O (Stark Legal merchant account application), ¶ 74 & Att. Q
(Charles Hunter Miller & Associates, Inc./Pacific merchant account application), ¶ 75 & Att. R (Charles
Hunter Miller & Associates, Inc./CHM merchant account application).

[127]     See id. at ¶ 89 & Att. V (Regus Irvine Business Center office agreement), ¶ 91 & Att. W
(Regus Bakersfield office agreement).  The credit card used to pay for the mail box services is in the
name of Gaurav Mohindra.  See id.

[128]     See PX 6 Prempeh Dec. ¶¶ 11, 30, 37-40 & Att. I at p. 4 (whistleblower complaint, ¶ 19).

[129]     See PX 1 Menjivar Dec. ¶¶ 8-10 & Att. A at pp. 4-9 (Stark Law business records), ¶¶ 11-
12 & Att. B at pp. 2-5 (Stark Legal business records).  After the Westmont police sergeant's visit,
Defendants changed the named managers of Stark Law and Stark Legal to "Clark Hall" and "Mitchell
LLC" located at the Irvine, California, mail drop.  See id. at ¶ 10 & Att. A at pp. 8-9, ¶ 13 & Att. B at pp.

mail drop initially used by Stark Law,[131] a Stark Law bank account, and merchant accounts used by Stark Law to process consumers' payments, including an account that the processor closed because of high rates of declined transactions.[132]  Gaurav Mohindra is a signatory on several of Corporate Defendants' bank accounts.[133]  He is present at Defendants' business premises daily. He interviews and hires attorney employees, meets with and answers questions from employees,[134] and occasionally responds to consumer complaints.[135]  Gaurav Mohindra met with the Westmont police sergeant to address consumer complaints and assured him that complaints to the Westmont Police would cease.[136]  He also requested the assistance of the Westmont Police when he purportedly fired his employees in January 2016.[137]

Defendant **Preetesh Patel** supervises Defendants' debt collectors, manages Defendants' debt collection software, assigns collection files to employees, and meets with employees and

---

6-7. Gaurav Mohindra is an attorney admitted to practice in Illinois and California. *See id.* at ¶ 95 & Att. Z (California attorney record), ¶ 96 & Att. AA (Illinois attorney record).

[130]     *See id.* at. ¶ 50 & Att. J (Pacific bank records), ¶ 36 & Att. H (Ashton bank records), ¶ 42 & Att. I (CHM bank records).

[131]     *See* PX 3 Thompson Dec. ¶ 7 & Att. A (mailbox service agreement).

[132]     *See* PX 1 Menjivar Dec. ¶ 53 & Att. K (Stark Law bank records), ¶ 65 & Att. M (Stark Law merchant account 7880 application), ¶¶ 67, 69 & Att. N (Stark Law merchant account 9910 application), ¶ 72 & Att. P (Stark Law merchant account 2995 application), ¶ 76 & Att. S (Stark Law merchant account 9073 application), ¶ 77 & Att. T (Stark Law merchant account 6230 application).

[133]     *See id.* at ¶ 36 & Att. H (Ashton bank records), ¶ 42 & Att. I (CHM bank records), ¶ 50 & Att. J (Pacific bank records), ¶ 53 & Att. K (Stark Law bank records).

[134]     *See* PX 6 Prempeh Dec. ¶¶ 4-8, 28-30, 37-40, 48.

[135]     *See* PX 14 James Dec. ¶ 6 & Att. A at p. 2 (e-mail from Gaurav Mohindra to Illinois Attorney General's Office regarding consumer's complaint).

[136]     *See* PX 3 Thompson Dec. ¶¶ 12, 14 & Att. E (e-mail from Gaurav Mohindra to Sergeant Stephen Thompson).

[137]     *See id.* at ¶¶ 17-18.

27

answers their questions.[138]  Patel is the contact for Defendants' telecommunications services.[139]

He signed the lease agreement between HKM and Stark Law for Defendants' business premises

as a "principal" of HKM, and is identified as vice president of "Asset Recovery" on Ashton's

Internet website [140]  According to a former employee, Gaurav Mohindra referred to Patel as the

"client" of Stark Law.[141]  Patel also is at the business premises daily, and, with Gaurav

Mohindra, was present when the sergeant visited to investigate consumer complaints.[142]  Like

Hirsh and Gaurav Mohindra, Patel has profited handsomely from Defendants' scheme.[143]

## V.  ARGUMENT

Defendants have defrauded thousands of consumers out of millions of dollars by

collecting on bogus debts[144] and have engaged in unfair practices by selling to other collectors

counterfeit debt portfolios.  Defendants' practices squarely violate Section 5(a) of the FTC Act,

15 U.S.C. § 45(a), multiple provisions of the FDCPA, 15 U.S.C. §§ 1692-1692p, Section 2 of the

Illinois Consumer Fraud Act, 815 ILCS 505/2, and Sections 4 and 9(a) of the Illinois Collection

---

[138]  *See* PX 6 Prempeh Dec. ¶¶ 11-13, 30, 36-38, 40.

[139]  *See* PX 1 Menjivar Dec. ¶ 85.

[140]  *See id.* at ¶ 68 & Att. N at pp. 11-15 (commercial and industrial lease agreement), ¶ 86 & Att. U at p. 3 (ashtonasset.com website). *See also* PX 2 Goldstein Dec. ¶ 20 & Ex. E at pp. 2 (¶ 7), 8-9 (email from Patel containing 500 Fast Cash debt portfolio).

[141]  *See* PX 6 Prempeh Dec. ¶ 28.

[142]  *See* PX 3 Thompson Dec. ¶ 12.

[143]  *See, e.g.,* PX 1 Menjivar Dec. ¶¶ 41 (14 checks totaling $479,900.80), 48 (44 checks totaling $461,566.01), 57 (six checks totaling $102,783.91).

[144]  *See, e.g.,* PX 1 Menjivar Dec. ¶ 84 (Defendants' four merchant accounts processed over $3.8 million in net sales).

Agency Act, 225 ILCS 425/4 and 425/9(a).[145]  To prevent further injury to innocent consumers,

Plaintiffs ask that the Court issue *ex parte* their proposed TRO.  That order would enjoin

Defendants from engaging in illegal conduct, freeze their assets, appoint a temporary receiver

over the businesses, and prohibit Defendants from dissipating or destroying assets or documents.

The Court has full authority to enter the requested relief, which is strongly supported by the

evidence.  Courts in this district have repeatedly granted similar TROs in FTC actions, including

in actions against similar phantom debt collectors.[146]

### A.    This Court Has the Authority to Grant the Requested Relief

The FTC Act provides that "in proper cases the Commission may seek, and after proper

proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b).  Once the FTC invokes

the federal court's equitable powers, the full breadth of the court's authority is available,

including the power to grant such ancillary final relief as rescission of contracts and restitution.

*FTC v. Febre,* 128 F.3d 530, 534 (7th Cir. 1997); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564,

571-72 (7th Cir. 1989).  The court also may enter a temporary restraining order, a preliminary

injunction, and whatever additional preliminary relief is necessary to preserve the possibility of

providing effective final relief.  *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020,

1026 (7th Cir. 1988); *see also Amy Travel,* 875 F.2d at 571.  Such ancillary relief may include an

asset freeze to preserve assets for eventual restitution to victimized consumers.  *World Travel*,

---

[145]    The State of Illinois may seek a remedy for Defendants' violations of state law pursuant
to the Court's supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(a).

[146]    *See, e.g., FTC and State of Illinois v. K.I.P., LLC, et al.*, No. 15 C 2985 (N.D. Ill. Apr. 6,
2015) (Lee, J.) (*ex parte* TRO with asset freeze and appointment of receiver); *FTC v. Am. Credit
Crunchers, Inc.*, No 12 C 1028 (N.D. Ill. Feb. 14, 2012) (Guzman, J.) (*ex parte* TRO with asset freeze).
*See also FTC v. Am. Yellow Browser, Inc., et al.*, No. 15 C 2047 (N.D. Ill. Mar. 9, 2015) (Norgle, J.);
*FTC v. AFD Advisors, LLC, et al.*, No. 13 C 6420 (N.D. Ill. Sep. 9, 2013) (Zagel, J.); *FTC v. Freedom
Cos. Mktg., Inc.*, No. 12 C 05743 (N.D. Ill. July 23, 2012) (Shadur, J.) (*ex parte* TRO with asset freeze);
*FTC v. Apogee One Enters. LLC*, No 12 C 588 (N.D. Ill. Jan. 30, 2012) (Kennelly, J.) (same).

29

861 F.2d at 1031. Appropriate ancillary relief also includes the appointment of a receiver. *See, e.g., FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987) (*aff'g*, without discussion, district court's order appointing receiver).

The Court also has the authority to provide equitable relief for the Illinois state law claims. As discussed above, Defendants have violated Section 2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, and Sections 4 and 9(a) of the Illinois Collection Agency Act, 225 ILCS 425/4 and 425/9(a).[147] Section 7 of the Illinois Consumer Fraud Act authorizes the Attorney General to bring suit "to restrain by preliminary or permanent injunction" violations of Section 2 of the Act. 815 ILCS 505/7. "The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction" and "appointment of a receiver [ ]."[148] *Id.* The State therefore is entitled to injunctive and other relief for Defendants' violations of state law, including a TRO, and the Court has the authority to enter the requested relief.

## B. A Temporary Restraining Order is Appropriate and Necessary

To grant preliminary injunctive relief in an FTC Act case, the district court must: (1) determine the likelihood that the Commission will ultimately succeed on the merits, and (2) balance the equities. *World Travel*, 861 F.2d at 1029. Under this "public interest" test, "it is not necessary for the FTC to demonstrate irreparable injury." *Id.* When the court balances the equities, the public interest "must receive far greater weight" than any private concerns. *Id.*

---

[147]    The Illinois Consumer Fraud Act and Illinois Collection Agency Act allegations are made solely by the State, pursuant to the supplemental jurisdiction conferred by 28 U.S.C. § 1367, because the FTC has no authority to enforce state law.

[148]    Further, Section 9.7 of the Illinois Collection Agency Act, 225 ILCS 425/9.7, provides that the Attorney General may enforce knowing violations of relevant portions of Section 9 as unlawful practices under the Illinois Consumer Fraud Act. Section 14a of the Illinois Collection Agency Act, 225 ILCS 425/14a, also authorizes the Attorney General to bring suit for violations of Section 4 of the Act, *i.e.*, the unlicensed practice of a collection agency.

**C.     The Evidence Demonstrates an Overwhelming Likelihood that Plaintiffs Will Prevail on the Merits**

As outlined above, Defendants' abusive and deceptive debt collection practices violate federal and state debt collection laws. Defendants' deceptive claims also independently violate both the FTC Act and the Illinois Consumer Fraud Act, and Defendants' distribution of counterfeit debt portfolios violates the FTC Act's and the Illinois Consumer Fraud Act's prohibitions against unfair acts or practices. Therefore, Plaintiffs are likely to succeed on the merits.

**1.     Defendants are Violating Section 5(a) of the FTC Act**

**a.     Defendants' Deceptive Acts or Practices**

Defendants' widespread misrepresentations are deceptive acts or practices under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. *See FTC v. Bay Area Bus. Council*, 423 F.3d 627, 635 (7th Cir. 2005); *FTC v. World Media Brokers*, 415 F.3d 758, 763 (7th Cir. 2005); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 957 (N.D. Ill. 2006). The materiality requirement is satisfied if the misrepresentation or omission involves information that is likely to affect a consumer's choice of, or conduct regarding, a product or service. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992), *cert. denied*, 507 U.S. 909 (1993). In deciding whether particular statements are deceptive, courts must look to the "overall net impression" of consumers. *See id.* Here, as discussed above, Defendants violate the FTC Act by making a series of deceptive claims to induce consumers to pay debts they either do not owe or that Defendants have no authority to collect.

By selling counterfeit debt portfolios to other debt collectors, moreover, Defendants have provided the means and instrumentalities for others to deceive consumers, which independently

violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). "Those who put into the hands of others the means by which they may mislead the public, are themselves guilty of a violation of Section 5 of the Federal Trade Commission Act." *Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir.), *cert. denied*, 375 U.S. 944 (1963); *see also FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 494 (1922); *C. Howard Hunt Pen Co. v. FTC*, 197 F.2d 273, 281 (3d Cir. 1952) (finding violations of the FTC Act for furnishing others with the means to commit a fraud). Liability may rest on a finding that the defendant knew deception was a "possible" result of the supported practices. *See Regina Corp. v. FTC*, 322 F.2d 765, 768 (3d Cir. 1963) (intent to deceive "is not a prerequisite to a finding of a violation; it is sufficient that deception is possible.") (citations omitted).

Here, Defendants provided debt portfolios to debt buyers, representing that the consumers listed in the portfolios owed unpaid payday loans, and that they were providing the debt buyers the right to collect the debts in the portfolios. The consumers listed in the debt portfolios, however, did not owe any debts to the listed lenders, nor did those lenders sell their debt or authorize third parties to collect on their behalf. Defendants' distribution of counterfeit debt portfolios to others who would then attempt to collect the portfolios made deception not only possible, but virtually certain. By selling the portfolios, Defendants provided the means and instrumentalities for others to deceive, and thereby separately violated Section 5(a).

### b. Defendants' Unfair Acts or Practices

By selling counterfeit debt portfolios, Defendants also have engaged in unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n). An act or practice is unfair under Section 5 of the FTC Act if: (1) it causes or is likely to cause substantial injury to consumers; (2) the harm to consumers is not outweighed by any countervailing benefits; and (3) the harm is not reasonably avoidable by consumers. 15 U.S.C. § 45(n); *FTC v. Neovi, Inc.*, 604

F.3d 1150, 1155 (9th Cir. 2010); *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1193 (10th Cir. 2009); *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 945 (N.D. Ill. 2008) (Cole, J.). Substantial injury is caused when consumers are "injured by a practice for which they did not bargain." *FTC v. J.K. Pubs., Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000).

Here, Defendants have caused substantial injury by distributing debt portfolios that falsely convey that a consumer is delinquent on a payday loan. Defendants' practice caused consumers to receive collection calls in which they were falsely accused of owing debts and in which payment was demanded. Such calls are likely to substantially injure the affected consumers. There is no countervailing benefit to consumers or competition from the practice of selling bogus debt portfolios. Nor is the harm to consumers reasonably avoidable. The collectors who purchased the bogus portfolios and called consumers to collect the alleged debts were armed with detailed personal and financial information about consumers and their purported loans, and, therefore, could recite loan dates, identify a lender, and reveal sensitive information about consumers that gave credence to their demands. Consumers could reasonably believe the debt collectors' demands were for payment of a legitimate loan. Moreover, consumers could reasonably choose to pay to avoid the negative consequences that were threatened if they failed to pay.

### 2. Defendants are Violating the Illinois Consumer Fraud Act

The false claims made by Defendants also violate Section 2 of the Illinois Consumer Fraud Act, which prohibits unfair or deceptive acts or practices. 815 ILCS 505/2. Under Section 2, the Attorney General need only plead and prove that: (1) Defendants engaged in an unfair or deceptive act or practice; and (2) the unfair or deceptive act or practice occurred in the course of conduct involving trade or commerce. *People of the State of Illinois v. United Construction,*

33

2012 IL App (1st) 120308, ¶ 8, 981 N.E.2d 404, 408 (1st Dist. 2012). In addition, a deceptive

act, such as a misrepresentation, must be done with the intent that consumers rely upon it. *Id.*

As described herein, Defendants' false debt collection claims and abusive debt collection

practices are among the unfair or deceptive acts or practices prohibited by Section 2.[149] Also,

Defendants would not make the fraudulent debt collection calls if they did not intend for

consumers to believe their misrepresentations and pay Defendants for debts consumers do not

owe. By operating as a debt collector in Illinois, and attempting to collect alleged debts from

consumers in Illinois and elsewhere, Defendants' conduct fits the definition of "trade" and

"commerce."[150]

### 3. The Individual Defendants are Personally Liable

Individual Defendants Hirsh Mohindra, Gaurav Mohindra, and Preetesh Patel are

responsible for the deceptive practices of the Corporate Defendants. They therefore should be

subject to the temporary restraining order and asset freeze. An individual defendant is liable

under the FTC Act if he (1) participated directly in, or had some control over, a corporation's

deceptive practices, and (2) had actual or constructive knowledge[151] of the practices. *World

Media Brokers*, 415 F.3d at 764; *Bay Area Bus. Council*, 423 F.3d at 636. The FTC does not

---

[149]     Section 2 specifically provides, "[i]n construing this section consideration shall be given
to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of
the Federal Trade Commission Act." 815 ILCS 505/2.

[150]     Section 1(f) of the Illinois Consumer Fraud Act defines the terms "trade" and
"commerce" to mean the "advertising, offering for sale, sale, or distribution of any services and any
property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of
value wherever situated, and shall include any trade or commerce directly or indirectly affecting the
people of this State." 815 ILCS 505/1(f).

[151]     The knowledge requirement is satisfied by a showing that the defendant (1) had actual
knowledge of the deceptive acts or practices, (2) was recklessly indifferent to the truth or falsity of the
representations, or (3) had an awareness of a high probability of fraud coupled with an intentional
avoidance of the truth. *World Media Brokers*, 415 F.3d at 764; *Bay Area Bus. Council*, 423 F.3d at 636;
*Amy Travel*, 875 F.2d at 574.

need to show intent to defraud. *Amy Travel*, 875 F.2d at 573-74. The evidence of the Individual

Defendants' participation, control, and knowledge, as detailed in Section IV above, demonstrates

that the FTC is likely to succeed in showing that the Individual Defendants are liable.

### D.     The Equities Tip Decidedly in the Commission's Favor

Once the FTC has shown a likelihood of success on the merits, the Court must balance

the equities, giving greater weight to the public interest than to any of Defendants' private

concerns. *World Travel*, 861 F.2d at 1029. The public equities here are compelling, as the

public has a strong interest in halting the deceptive scheme, and in preserving the assets

necessary to provide effective final relief to victims. *See FTC v. Sabal*, 32 F. Supp. 2d 1004,

1009 (N.D. Ill. 1998). Defendants, by contrast, have no legitimate interest in continuing to

deceive consumers and persisting with conduct that violates federal law. *See id.*; *FTC v. World

Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) (upholding district court finding of "'no

oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from

fraudulent representation or preserve their assets from dissipation or concealment.'"). An

injunction is necessary to ensure that Defendants do not continue their scheme while the case is

pending.

### E.     An Asset Freeze and the Appointment of a Receiver are Necessary and
####        Appropriate

The relief sought by Plaintiffs includes restitution for the victims of Defendants' fraud.

To preserve the possibility of such relief, Plaintiffs seek a freeze of Defendants' assets and an

immediate accounting to prevent concealment or dissipation of assets. A freeze reduces the very

tangible risk that Defendants will quickly conceal or dissipate funds. An asset freeze also is

needed to prevent Defendants from moving their cash and other assets outside the United States.

An asset freeze is appropriate once the Court determines that the FTC is likely to prevail

on the merits and that restitution would be an appropriate final remedy. *See World Travel*, 861

F.2d at 1031 & n.9. The district court at that juncture has "a duty to ensure that the assets of the

corporate defendants [are] available to make restitution to the injured consumers." *Id.* at 1031.

In a case such as this, in which the FTC is likely to succeed in showing that officers and

managers are individually liable for the payment of restitution, the freeze should extend to

individual assets as well. *Id.* (affirming freeze on individual assets); *see also FTC v. Datacom*

*Mktg. Inc.*, 2006 WL 1472644, at *5 (N.D. Ill. 2006) (freezing assets of individual and corporate

defendants).

Appointing a temporary receiver also is necessary and appropriate. A receiver can

prevent the destruction of documents and the dissipation of assets while the case is pending.

Such an appointment is appropriate particularly in light of the tangled web of businesses created

by Defendants to operate their scheme and Defendants' pervasive fraud, which presents the

likelihood of continued misconduct. If Defendants are allowed to remain in control of their

businesses, it is likely that evidence will be destroyed and the fruits of their fraud will be

dissipated. A temporary receiver could eliminate those risks with a minimal disruption of

legitimate business activity, if any. The receiver also could help assess the extent of Defendants'

fraud, trace the proceeds of that fraud, prepare an accounting, and make an independent report of

Defendants' activities to the Court.

Finally, given that Defendants purport to be operating as a law firm and hire attorneys to

make their debt collection calls, a receiver also could assess whether any of Defendants' business

records are privileged and take the necessary steps to protect any such privilege.

36

**F.     The Temporary Restraining Order Should Be Issued *Ex Parte***

To prevent Defendants from liquidating, dissipating, or concealing their assets, the

requested TRO should be issued *ex parte*.  An *ex parte* TRO is warranted when the facts show

that immediate and irreparable injury, loss, or damage will occur before the defendants can be

heard in opposition.  *See* Fed. R. Civ. P. 65(b).  Here, as in similar FTC actions in this district in

which courts have granted *ex parte* TROs (*see supra* n.146), assets and evidence stemming from

the illegal activity are seriously at risk of disappearing if Defendants receive prior notice.[152]  In

this case, the blatantly deceptive nature of Defendants' scheme, their continued operation despite

law enforcement scrutiny and multiple private lawsuits, and their frequent name and address

changes all indicate a high risk that Defendants will destroy documents and dissipate assets if

given advance notice of Plaintiffs' motion.

## VI.     CONCLUSION

Defendants have caused, and are likely to continue to cause, substantial injury to the

public through their violations of the FTC Act, the FDCPA, the Illinois Consumer Fraud Act,

and the Illinois Collection Agency Act.  Plaintiffs, the FTC and State of Illinois, respectfully

request that the Court issue the proposed *Ex Parte* Temporary Restraining Order with Asset

Freeze, Appointment of a Receiver, Other Equitable Relief, and Order to Show Cause Why a

Preliminary Injunction Should Not Issue to protect the public from further harm and to help

ensure the possibility of effective final relief for defrauded consumers.

//

//

---

[152]     *See* Declaration and Certification of Plaintiff Federal Trade Commission's Counsel
Pursuant to Fed. R. Civ. P. 65(b) and Local Rule 5.5(d) in Support of Plaintiffs' *Ex Parte* Motion for
Temporary Restraining Order and *Ex Parte* Motion to Seal File Temporarily (describing need for *ex parte*
relief and citing cases in which defendants who learned of impending FTC action withdrew funds,
destroyed vital documents, and fled the jurisdiction).

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

Dated: March 21, 2016

WILLIAM J. HODOR
JOHN C. HALLERUD
Federal Trade Commission
Midwest Region
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
(312) 960-5634 [telephone]
(312) 960-5600 [facsimile]
whodor@ftc.gov [e-mail, Hodor]
jhallerud@ftc.gov [e-mail, Hallerud]
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

LISA MADIGAN
Attorney General

ERIN GROTHEER
KIMBERLY SLIDER
THOMAS P. JAMES
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-8966 [telephone]
(312) 814-2593 [facsimile]
egrotheer@atg.state.il.us [e-mail, Grotheer]
kslider@atg.state.il.us [e-mail, Slider]
tjames@atg.state.il.us [e-mail, James]
Attorneys for Plaintiff
STATE OF ILLINOIS

38