UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and | ) |
| STATE OF ILLINOIS, | ) |
| Plaintiffs, | ) Case No. 1:16-cv-3463 |
| v. | ) Judge Rebecca R. Pallmeyer |
| STARK LAW, LLC, an Illinois limited liability company, also doing business as STARK RECOVERY, *et al.*, | ) Magistrate Judge Sheila M. Finnegan |
| Defendants. | ) |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR A PRELIMINARY INJUNCTION
<u>WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF</u>**

## I. INTRODUCTION

Until this Court issued an *ex parte* TRO, Defendants had for many years operated an unlicensed, fraudulent debt collection scheme that bilked millions of dollars from victims across the country in violation of the FTC Act, 15 U.S.C. § 45(a), the Illinois Consumer Fraud Act, 815 ILCS 505/7, and both federal and state debt collection practices laws. The evidence supporting the TRO and the Court's finding that Plaintiffs have shown a substantial likelihood of success on the merits stands unrebutted, and by itself, overwhelmingly supports entry of a preliminary injunction. Since the entry of the TRO, moreover, Plaintiffs' evidence has only gotten stronger. Submitted with this Memorandum is additional evidence of Defendants' scheme obtained since filing this case. Based on all the evidence, the Court should enter a preliminary injunction that continues the asset freeze and makes the Receiver's appointment permanent.

Nearly three months after this Court entered an *ex parte* TRO, Defendants still have presented *no evidence* directly controverting the substantial evidence already submitted by Plaintiffs.[1] Indeed, the only evidence Defendants have offered are declarations from the three individual Defendants and three former employees, none of whom rebuts Plaintiffs' overwhelming case on the merits. The individual Defendants purport to provide some information about their personal assets, but *nothing* about their business operations or revenues. The three former employees, all debt collectors, admit they followed scripts, but attach none, and claim they received "training" on the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p, which, if true, did not prevent them from routinely violating that law. Included with this Memorandum are transcripts of recordings in which those very collectors, following Defendants' scripts, violate debt collection practices laws.

---

[1] *See* Defendants' Response to Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Defendants' Response") (Dkt. No. 58).

The remainder of Defendants' Response consists of untenable arguments, neither factually nor legally supportable, that consumer injury, and by extension, the asset freeze, should be limited only to those consumers who submitted declarations or who filed complaints. Those arguments are flatly contradicted by the overwhelming evidence showing that illegal practices were Defendants' standard way of doing business.

As the evidence demonstrates, Defendants routinely threatened consumers with lawsuits, large judgments, and criminal charges if they did not immediately pay an alleged payday loan debt. Defendants even claimed to be a law firm retained to collect the debts and that had been authorized to sue consumers who failed to pay. Consumers did not owe money to Defendants, and Defendants did not follow through on any of their threats. Moreover, Defendants did not (and could not) verify any of the alleged debts. Still, many consumers paid either out of fear of Defendants' threats, or simply to end Defendants' ongoing harassment and abuse.

As explained in Plaintiffs' Opening Memorandum,[2] moreover, Defendants also trafficked in counterfeit debt portfolios that they sold to other debt collectors. We also have learned since filing the case that Defendants sometimes contracted with third parties who would collect bogus debts on their behalf. Both practices caused countless more consumers to receive calls, and endure abuse, from third-party debt collectors attempting to collect on bogus debt.

Pursuant to the TRO, Plaintiffs have inspected and copied documents and records found at Defendants' business premises, including:

- Employee training manuals that teach illegal debt collection practices;
- Scripts used by Defendants' collectors that include the false claims and illegal

---

[2] References to Plaintiffs' Opening Memorandum are to Plaintiffs' Memorandum in Support of Their *Ex Parte* Motion for a Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue (Dkt. No. 9).

threats outlined in Plaintiffs' Opening Memorandum;

● Complaints and chargeback notices in which consumers often state that they do not owe the alleged debts and that describe Defendants' illegal tactics;

● Written critiques of collection calls that reprimand Defendants' collectors for not using the illegal debt collection practices in which they were trained;

● Contracts showing the purchase and sale of debt portfolios, many purporting to contain *hundreds of millions of dollars' worth* of delinquent debt; and

● Debt portfolios containing known bogus payday loan debts.

In addition, Plaintiffs also found *hundreds of thousands of recorded telephone conversations* stored on Defendants' computer servers. Recordings of conversations between Defendants' collectors and consumers indisputably—and often graphically—demonstrate the illegal practices that Defendants used to coerce consumers to pay alleged debts. The recordings are incontrovertible and prove that Defendants' practices were illegal and widespread.

The overwhelming and unrebutted evidence supports the entry of a preliminary injunction, which is necessary to prevent Defendants from resuming their unlawful conduct.[3] An asset freeze extending to *all* of Defendants' assets is necessary to ensure that the Court retains the ability to fashion appropriate final relief, including restitution to victims. Consumer injury from Defendants' unlawful debt collection practices and unjust enrichment from their sale and placement of phantom debt is estimated to total over $47 million, far more than what is frozen.[4] Finally, the preliminary injunction should make the Receiver's appointment permanent. That would enable the Receiver to continue marshalling assets and preserve them for eventual restitution to victims, and to continue to untangle the complex and confusing web of corporate entities through which Defendants operated their scheme. At this critical juncture, that enterprise

---

[3] A proposed preliminary injunction is being filed with this Memorandum.
[4] *See* Second Report of Receiver Gregg Szilagyi ("Second Receiver Report") (Dkt. No. 69) ¶¶ 29-30.

cannot simply be returned to Defendants' control, as Defendants suggest.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A. Defendants' Threats and Intimidation Tactics

Defendants use threats and intimidation to coerce consumers to pay alleged debts. Documents from Defendants' business, including training manuals, scripts, and consumer complaints and chargeback notices, confirm the widespread use of these illegal tactics.

#### 1. The "Bull's Eye"

Defendants' reliance in their Response on their collector training program is curious because Defendants' own training manuals *teach illegal debt collection practices*. Debt collection laws prohibit collectors from contacting third parties except to obtain a consumer-debtor's location,[5] but Defendants train their collectors to contact consumers' employers, relatives, and associates before making initial contact with the consumer himself. Called the "pressure cooker," Defendants visually depict this calling technique in their training manuals with a "bull's eye" containing the consumer (referred to as the "debtor") at the center, followed by "associates," "relatives," and "POE [Place Of Employment]" in successive concentric outer rings. Defendants train their collectors to begin at the outer ring—by calling the consumer's POE—and work their way to the center, so that the consumer is the last person called.[6]

Defendants use the pressure cooker to intimidate and to embarrass consumers into paying an alleged debt. By the time Defendants call the consumer directly, Defendants already have called the consumer's employer, relatives, and/or associates, and broadcast to them that the consumer owes a debt or is involved in a legal matter. The consumer often learns about

---

[5] *See, e.g.,* 15 U.S.C. §§ 1692b, c(a), and c(b); 225 ILCS 425/9(a)(18), (19), (21), and (22).
[6] *See* Plaintiffs' Exhibit ("PX") 21 Menjivar Supplemental Declaration ("Supp. Dec.") ¶ 13 & Att. C at pp. 1, 2 ("Bulls Eye"), ¶ 12 & Att. B at pp. 4-17 (training materials).

Defendants not from Defendants themselves, but rather from these third parties, just as Defendants have planned.[7] Defendants' training materials explain the rationale for this practice:

1. Third parties have an established relationship and have more access to the debtor.
2. They will do the work for you.  They are your own little collection company.
3. People will communicate what they think they heard, and will embellish unknowingly.  (The story will change)
4. People love drama, so they will contact them.
5. It will motivate the debtor.  (Builds Urgency!)[8]

Defendants use a separate bull's eye—called the "POE Bulls Eye"—to depict visually the order in which Defendants instruct their collectors to contact the consumers' work associates. The POE bull's eye instructs collectors to "[a]void the debtor at the POE," and to begin by first calling the consumer's human resources director, followed by the consumer's human resources department, then manager, then co-worker.  Again, the rationale for this practice is to intimidate and to embarrass the consumer, which is illustrated by the statement on the POE bull's eye that "[t]he debtor can't avoid his/her HR Director or Manager.  This will build the urgency!"[9]

The pressure cooker is so integral to Defendants' scheme that Defendants reprimanded collectors who did not properly work it.  Although Defendants claim their managers "conducted audits of collectors to ensure compliance with the FDCPA[,]"[10] those audits actually were to ensure Defendants' collectors *violated* the FDCPA.  Hundreds of employee evaluation forms and critiques of collection calls contain statements such as the following:

● "Today, you only called the debtor!!  You have to work the pressure cooker on your call ins.  Calling the debtor does 'Nothing.'  It's the pressure that makes them pay. If you allow her to make the decisions, it's no longer <u>urgent</u>!"

---

[7] Defendants often reveal to third parties that consumers owe alleged debts, and they even attempt to collect the alleged debts from them.  *See* Opening Memorandum § II.C at pp. 10-11.
[8] *See* PX 21 Menjivar Supp. Dec. Att. C at pp. 1, 2 ("Bulls Eye").
[9] *See id.* at Att. C at p. 3 ("POE Bulls Eye").
[10] *See* Defendants' Response at p. 8; *see also* Defendants' Exhibits ("DX") 7 Stevens Dec. ¶ 4; DX 8 Czarnik Dec. ¶¶ 7-8; DX 9 Dunning Dec. ¶¶ 4-5.

- "Don't think too much about the calls! Poe's are your '$$ shots.' [. . .] Remember you are building your own little collection company. The more vm's [voice mails] + live messages you leave, the more pressure you are putting on your debtor."[11]

### 2. Defendants' Deceptive Scripts and Rebuttals

Numerous scripts found at Defendants' business premises show the widespread use of deception and false threats.[12] The scripts often contain threats to charge consumers with breach of contract, "bad check," and "defrauding of a financial institution," and they often identify Defendants as a law firm. The scripts consistently threaten that Defendants will take, or already have taken, legal action should consumers refuse to pay.[13] For example, one script begins:

> Law Office. This is Attorney, (*Attorney Name*), How may I help you? [. . .] I show two charges in your file. The first charge is for a bad check and the second is for an attempted defrauding of a financial institution. [. . .] Now *sir/ma'am* was it your intent to breach your contract? *Wait for response...*

According to the script, moreover, Defendants already have sued the consumer:

> Ok, first, I need to check the docket to see if you have a court date. If a date has not been issued, I can check if we can bring the case back and allow you to resolve it now out of court. Allow me a moment to do my due diligence on the case and I'll be right back. *Place on hold*

Conveniently, no court date has been set:

> Ok, here is the information I have. You do not have a court date issued. But as soon as a date is set our client would simply allow the legal process to continue and seek damages ($$). In regards to the balance... they are seeking a judgment in court for (*$ Balance + $2,000*). But this has not happened yet, so I can allow you to resolve this outside of court today.[14]

No evidence was found indicating that Defendants ever pursued, intended to pursue, or had any right to pursue legal action against consumers who refused to pay, a fact confirmed by a

---

[11] *See* PX 21 Menjivar Supp. Dec. ¶ 14 & Att. D (critiques of collector calls); *see also id.* at Att. D at pp. 2-3, 38.
[12] *See id.* at ¶ 11 & Att. A (scripts).
[13] *See, e.g., id.* at Att. A at pp. 1, 10-15, 20-22, 29-30, 37-40, 42-43, 53-56, 58-60, 71-74, 76-77, 86-89, 91-92, 103-04, 118-19, 120-24.
[14] *See id.* at Att. A at p. 29.

6

former attorney-employee.[15] Instead, Defendants used these threats and lies purely to frighten and to intimidate consumers. Defendants' baseless threats alone violate debt collection laws.[16]

Defendants' scripted "rebuttals" to consumers' frequently asked questions likewise contain misrepresentations and false threats.[17] Reiterating that legal action already has started, Defendants' response to consumers who indicate that they already paid the alleged debt is: "I assure you legal action would not have started if you already paid this. Our evidence has been verified during our discovery process on this case." Another rebuttal states, in part, "I can assure you this is NOT a scam. This litigation process has already started on this case."[18]

Defendants disregard consumers' assertions that they did not take out the loan that Defendants are trying to collect. Defendants' rebuttal on that point states, in part, "[a]t this stage the fact of not taking out this loan is not valid."[19] Defendants also refuse to provide consumers with any proof of the alleged loan, claiming that the original creditor sent notice of the defaulted loan, and that all of their information "has been verified." Defendants even admit, "[t]here is nothing I can provide you in writing that I have not already told you."[20]

Defendants' own declarants admit that they used scripts during their collection calls, but tellingly, no scripts are attached to their declarations. One of their former collectors even *admits* to scripts containing the deceptive claim of "fraud related to a person writing a bad check."[21] Defendants also attempt to downplay the deceptive scripts Plaintiffs obtained from a former

---

15     *See* PX 6 Prempeh Dec. ¶ 41 & Att. I at p. 10 (complaint).
16     *See, e.g.,* 15 U.S.C. § 1692e(5); 225 ILCS 425/9(a)(24).
17     *See, e.g.,* PX 21 Menjivar Supp. Dec. Att. A at pp. 8-9, 31-32, 44-45, 78-79, 93-94.
18     *See id.* at Att. A at p. 9.
19     *See id.*
20     *See id.* at Att. A at p. 79. Defendants entirely ignore that they are *legally required* to provide consumers with statutorily-required information about the debt. *See* 15 U.S.C. § 1692g(a).
21     *See* DX 8 Czarnik Dec. ¶¶ 4, 9; *see also* DX 7 Stevens Dec. ¶ 2; DX 9 Dunning Dec. ¶ 2.

employee, suggesting that those scripts were used for, at most, a two week period in 2015.[22] But nearly identical deceptive scripts were found at Defendants' business on March 23, 2016.[23]

### B. Consumer Complaints and Law Enforcement Inquiries

Consumer complaints found at Defendants' business describe Defendants' abusive and deceptive practices. The complaints show that consumers routinely disputed owing the alleged debt, that Defendants did not validate the debt, that Defendants knew or should have known the alleged debts were bogus, and that Defendants were keenly aware of the complaints.[24] One consumer who denied ever taking out a payday loan wrote, for example:

> [S]he just threatened me with legal action if I didn't pay. She said she had a copy of the loan agreement with my signature on it. I asked for a copy and she said I wasn't entitled to one if I had not retained my own copy of the original.[25]

Defendants threatened to sue another consumer who denied owing the alleged debt for over $2,000. The consumer would have paid had Defendants provided proof:

> I nicely asked SEVERAL times for a copy of the loan agreement so I could validate it, and said if it WAS mine I'd be happy to pay it. I was told they are legal, not collections, so they don't have to validate anything.[26]

### C. Defendants' Chargeback Notices and Merchant Accounts

Chargeback notices found at Defendants' business indicate that consumers regularly disputed Defendants' charges, asserting fraud.[27] The notices sometimes provided consumers' reasons for initiating the chargeback, which are completely consistent with the complaints and

---

[22] *See* Defendants' Response at p. 7.
[23] *Compare* PX 6 Prempeh Dec. Atts. A-H *to* PX 21 Menjivar Dec. Att. A at pp. 24, 33, 49, 67, 82, 109 (POE Live Jiggle); 25 (POE Message); 26-27, 35 (3pty Live Jiggle); 28 (3rd Party Message); 47, 64, 95, 102 (NSF Message); 29, 42-43, 76-77 (Close); 37-38, 53-54, 71-72, 86-87, 118-19 (Live Right Party Jiggle/Close); 13-14, 22, 39-40, 55-56, 73-74, 88-89, 122-23 (Live RPC Followup Close).
[24] *See* PX 21 Menjivar Supp. Dec. ¶ 16 & Att. F (complaints).
[25] *See id.* at Att. F at p. 2.
[26] *See id.* at Att. F at p. 16. Defendant typically ignored consumer complaints. *See, e.g., id.* at Att. F at pp. 1, 4, 6, 8, 14, 17. Just days before this case was filed, the Minnesota Attorney General's Office served a Civil Investigative Demand on Defendants. *See id.* at ¶ 17 & Att. G.
[27] *See, e.g., id.* at ¶ 15 & Att. E at pp. 1-2, 6, 16, 19-20, 29-30, 32-34.

sworn consumer declarations already submitted by Plaintiffs.[28]

Defendants opened and quickly lost merchant processing accounts. Defendants were concerned about the loss of the accounts because they had difficulty making money without them.[29] As they continued to lose processors, Defendants resorted to using offshore merchant processing accounts,[30] and they explored creating businesses just to open merchant accounts.[31]

### D. Defendants' Recorded Telephone Conversations

Incredibly, Defendants recorded *over 400,000* telephone conversations between approximately April 2015 and December 2015. These recordings include conversations between Defendants' collectors and consumers, which, in their own words, unequivocally demonstrate Defendants' illegal practices and confirm the use of deceptive scripts and rebuttals. Plaintiffs transcribed and submit herewith a small sampling of those recordings, including:[32]

- Reba, who asks, "Let me ask you, do you consider it harassing when you get a message left saying that we will track you down in your employment or residence and have you arrested?" (PX 21, Att. N at p. 24.)

- Adrienne, who asks, "But if someone called you at your home [ ] and said to you, you took a loan out almost two years ago that you never paid back, you have no recollection of doing that, you're fairly certain you did not, and they're telling you you can either pay us -- wait for legal action and pay $2,000 or pay us $690 right now, and you have nothing to show that you did -- you took this loan out, wouldn't you want something? Wouldn't you want papers?" (PX 21, Att. Q at p. 10.)

Tellingly, the same former employee-collectors who provided Defendants with declarations are caught in these recordings making illegal threats and violating the FDCPA.

---

[28] *See, e.g., id.* at Att. E pp. 3, 7, 23.
[29] *See, e.g., id.* at ¶ 41 & Att. BB at pp. 4-5 (transcript of September 2015 call with Hirsh Mohindra); *see also id.* at Att. E at p. 37 (July 2015 e-mail from Preetesh Patel to Hirsh Mohindra).
[30] *See, e.g., id.* at Att. E at p. 37, Att. BB at pp. 5-9 (discussion of offshore accounts).
[31] *See, e.g., id.* at ¶ 40 & Att. AA (transcript of call between Hirsh and Gaurav Mohindra).
[32] *See id* at ¶¶ 26-38 & Atts. N-Y, ¶¶ 47-54 & Atts. FF-LL. If it will assist the Court, Plaintiffs will make the corresponding audio recordings available for *in camera* review. The recordings often include consumers' personal identifying information, including Social Security numbers, which cannot easily be redacted from an audio recording and protected from public disclosure.

Each claims to have been trained and monitored to comply with the FDCPA,[33] but as their recorded conversations with consumers reveal, each routinely violated the law simply be reading the scripts Defendants provided them. Plaintiffs also transcribed and submit herewith a few of these recordings.[34] For example:

- Dunning tells a consumer, "everything has to be verified, so if this loan had of been paid in full, legal action would not have started[,]" and, "this is a law firm. There's nothing I can provide to you in writing that I have not provided to you over the phone." (PX 21, Att. FF at pp. 13, 18.)

- Stevens threatens, "[i]f it's something you're not looking to resolve, you're going to receive court documents to appear[,]" and "[i]f you don't choose to resolve it, you're going to receive a solidified court date." (PX 21, Att. GG at pp. 12, 16.)

- After a consumer asks for validation, Czarnik responds, "Yeah, we're not going to do that, sir." He threatens, "I could file the suit today in Horry County for the amount of $2,810[,]" and claims, "[w]e are a law firm." Mr. Czarnik later threatens, "We will pursue litigation [. . .] in Horry County." (PX 21, Att. KK at pp. 5, 7, 11.)

E. **Defendants' Purchase and Sale of Debt Portfolios**

Defendants regularly trafficked in counterfeit debt. As detailed in Plaintiffs' Opening Memorandum, Defendants sold a counterfeit debt portfolio in September 2014 containing allegedly delinquent 500 Fast Cash accounts.[35] Defendants' e-mails show that they knew the accounts were bogus prior to the sale.[36] Not surprisingly, debt portfolios containing known bogus accounts were found in Defendants' electronic records.[37]

Numerous contracts show that Defendants regularly purchased, sold, and placed debt

---

[33] See DX 7 Stevens Dec. ¶¶ 3-4; DX 8 Czarnik Dec. ¶¶ 3, 7-8; DX 9 Dunning Dec. ¶¶ 3-7.
[34] See PX 21 Menjivar Supp. Dec. Atts. X, FF-LL. In their collection calls, Stevens used the aliases "Karen Baker" and "Leslie Fox," and Dunning used the aliases "Kimberly Smith" and "Alicia Lee." See id. at ¶ 46 & Att. EE (employee directory and alias lists).
[35] See Opening Memorandum § II.H at pp. 16-18; see also PX 2 Goldstein Dec.
[36] See PX 21 Menjivar Supp. Dec. ¶¶ 43-45 & Att. DD at pp. 2-3 (August 20, 2014 e-mail); see also id. at Att. DD at pp. 14-17 (January 22, 2015, e-mail from Shawn Bure to Hirsh Mohindra).
[37] See PX 22 Goldstein Supp. Dec. ¶¶ 3-7.

portfolios that purport to contain hundreds of millions of dollars of alleged debt.[38] Most or all of the portfolios that Defendants purchased originated with Joel Tucker, who, as the Receiver reports, is a dubious source found by a United States Bankruptcy Judge to be "untrustworthy."[39]

Although Defendants ask the Court to assume that the debt portfolios they sold included valid consumer debts, the evidence plainly indicates otherwise. The evidence reveals that Defendants knowingly possessed and sold bogus debt, as well as a systematic failure to verify debts. The fact that Defendants themselves were collecting on phantom payday loan debt also strongly suggests that the debts they were selling or placing with third parties also were phantom. Overwhelming evidence, including the testimony of a former employee, sworn consumer declarations, complaints, chargeback notices, and recorded telephone calls in which consumers dispute the alleged debts or state that they do not recognize the alleged lender, establish that Defendants themselves were collecting on phantom debts.

Moreover, the Court-appointed Receiver independently assessed Defendants' debt portfolios and concluded, "it is impossible to verify the genuineness of the underlying loans in the portfolio simply by looking at these spreadsheets." Defendants "conceded [to the Receiver] that they had no such records to validate any of the underlying loans."[40] The Receiver also reports that "Defendants did not seem to be concerned with loan validation," and that they provided no instructions to employees on how to verify the loans or deal with consumer requests for such verification information.[41]

In stark contrast to Plaintiff's voluminous evidence, Defendants have produced *nothing* to

---

[38] *See, e.g.,* PX 21 Menjivar Supp. Dec. ¶¶ 20-25 & Atts. J-M.
[39] *See* Second Receiver Report ¶¶ 23-24 & Exhibit B at p. 3; *see also* PX 21 Menjivar Supp. Dec. ¶ 23 & Att. K (purchase agreements), ¶ 39 & Att. Z (transcript).
[40] *See* Second Receiver Report ¶¶ 22, 27. Defendants' concession is an apparent admission that Defendants violated 15 U.S.C. § 1692g(b), which requires debt collectors to provide written verification of the debt upon a consumer's written request.
[41] *See id.* at ¶ 26.

suggest that their debt portfolios are anything but phantom. Although Defendants claim that they "tested" portfolios before purchase,[42] they do not disclose the alleged testing methodology or criteria. No doubt the sole criteria was Defendants' success in collecting payments without regard to whether consumers actually owed the debts. Defendants also point to "various contractual representations and warranties" received from the debt sellers, *i.e.*, the "untrustworthy" Joel Tucker.[43] Defendants' apparent attempt to claim "good faith," even if believed, is not a defense to an FTC action.[44] The overwhelming evidence, the Receiver's independent assessment, and Defendants' failure to provide *any* affirmative evidence that the debts are real or can be verified leads to only one logical conclusion—that all of Defendants' debts are phantom.

### III. THE PRELIMINARY INJUNCTION SHOULD CONTINUE THE ASSET FREEZE AND MAKE THE RECEIVER'S APPOINTMENT PERMANENT

The Court should enter a preliminary injunction that continues the asset freeze and that makes the temporary receiver's appointment permanent. Defendants have not really contested the need for a preliminary injunction with an asset freeze—they have challenged only the scope of the freeze. Total consumer injury here far exceeds what we currently know about Defendants' available assets, and as a result, all of Defendants' assets should remain subject to the freeze.

#### A. The Asset Freeze Should Cover All of Defendants' Assets

Since its inception, Defendants' operation has been riddled with illegal practices. At the TRO stage, Plaintiffs submitted the sworn declarations of a former employee-collector who confirms Defendants' illegal conduct, of more than a dozen consumer victims, of a small

---

[42] *See* Defendants' Response p. 5.
[43] *See id.* at p. 5 & DX 5.
[44] *See, e.g., FTC v. US Sales Corp.*, 785 F. Supp. 737, 751 (N.D. Ill. 1992) ("[g]ood faith belief in a deceptive advertisement is no defense"); *FTC v. NCH, Inc.*, 1995 WL 623260, *7 (D. Nev. May 25, 1995) (a defendant's "good faith" is not a defense to liability for a violation of the FTC Act).

business owner who was overwhelmed by complaint calls about Defendants' illegal practices, and of a police sergeant who investigated consumer complaints. In addition, Plaintiffs produced samples of more than one-thousand consumer complaints about Defendants collection practices, and proof that Defendants previously had sold bogus debt portfolios to third parties. That mountain of evidence is even more staggering considering that it is fully corroborated by Defendants' own records, including training materials, deceptive scripts, critiques of collection calls, complaints and chargeback notices, and recorded telephone conversations. Significantly, moreover, Plaintiffs' evidence is not controverted by anything Defendants have produced. The number of complaints alone is incredible considering that only a small percentage of defrauded consumers actually complain.[45]

The Seventh Circuit has explained that once the district court has found a likelihood of success on the merits and that restitution is an appropriate remedy, the court has "a duty to ensure that the assets of the corporate defendants [are] available to make restitution to the injured consumers." *See FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 & n.9 (7th Cir. 1988). The freeze should extend to individual assets as well when individuals are likely to be liable for restitution. *Id.* (affirming freeze on individual assets).

The appropriate amount of monetary relief is the full amount of consumer injury caused by Defendants' unlawful business practices, *i.e.*, "the full amount lost by consumers." *FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997). That equals the amount paid by consumers, less any refunds. *See FTC v. U.S. Sales Corp.,* 785 F. Supp. 737, 753 (N.D. Ill. 1992). Here, that figure—and therefore the appropriate scope of the asset freeze—is estimated to be over $47

---

[45] *See, e.g.,* Anderson, Keith, *Consumer Fraud in the United States: An FTC Survey*, August 2004, p. 80, available at http://www.ftc.gov/reports/consumer-fraud-united-states-ftc-survey (only 8.4% of fraud victims actually complained to an official source).

million, which represents the total revenue generated from Defendants' illegal debt collection practices, and their sale and placement of bogus debt.[46]

Defendants' potential liability of over $47 million far exceeds the meager $819,000 presently known to be frozen.[47] It also exceeds the more than $15 million in potential assets that are referenced in the individual Defendants' declarations. Incredibly, however, Defendants want the Court to ignore the overwhelming evidence that their business was permeated by fraud, and to focus solely on their calculation of the losses to consumers who actually complained that they did not owe the debt. That simply is not the law.

Courts have consistently rejected arguments by defendants in FTC cases that consumer injury is limited to consumers who have submitted declarations or complained to law enforcement agencies or other third parties even when entering a final judgment on the merits. *See, e.g., FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605-06 (9th Cir. 1993), *cert. denied*, 510 U.S. 1110 (1994); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991); *FTC v. U.S. Sales Corp.*, 785 F. Supp. 737, 753 (N.D. Ill. 1992). As the Eighth Circuit stated:

> It would be virtually impossible for the FTC to offer such proof, and to require it would thwart and frustrate the public purposes of FTC action. This is not a private fraud action, but a government action brought to deter unfair and deceptive trade practices and to obtain restitution on behalf of a large class of defrauded investors. It would be inconsistent with the statutory purpose for the court to require proof of subjective reliance by each individual consumer.

*Security Rare Coin*, 931 F.2d at 1316. All of the evidence detailed above confirms Defendants' widespread use of illegal practices, thereby justifying a complete freeze of their assets.

---

[46] *See* Second Receiver Report ¶¶ 6, 30. Estimating Defendants' revenues is difficult. Defendants failed to keep records, to complete financial statements required by the TRO, and to cooperate meaningfully with the Receiver. *Id.* at ¶¶ 13-19. Defendants who create uncertainty and withhold information must bear the uncertainty in the calculation of monetary relief. *See Febre*, 128 F.3d at 535.

[47] The Receiver currently holds only about $819,000, less $213,000 paid for expenses. *See* Second Receiver Report ¶ 29. The true extent of the individual Defendants' assets is unknown because of their refusal to complete financial statements required by the TRO. *See id.* at ¶¶ 13-15.

### B. The Temporary Receivers' Appointment Must Be Made Permanent

The preliminary injunction also should make the Receiver's appointment permanent. As demonstrated in the Second Receiver Report, Defendants operated through a tangled web of businesses that regularly commingled funds, that failed to keep records, and that apparently failed to file tax returns. The extent of Defendants' assets still is largely unknown, and even the Receiver notes that it is "extremely difficult" to "develop a meaningful financial picture of any of the Defendants."[48] The Receiver has already undertaken substantial efforts to assess the extent of Defendants' fraud, to trace the proceeds of that fraud, and to prepare an accounting, and those efforts continue.[49]

Moreover, a permanent receiver would ensure that Defendants' illegal conduct does not continue. The Receiver is uncomfortable with collecting on Defendants' debt portfolios or marketing their sale to third parties.[50] In these circumstances, it would not make sense to return control of this fraudulent enterprise to Defendants so that they could continue the same activity. *See SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963) ("It is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of [the corporate defendant's] affairs for the benefit of those shown to have been defrauded.").

### IV. CONCLUSION

The supplemental evidence presented here and the previously submitted evidence demonstrates that Defendants are engaged in a massive fraud. Plaintiffs are likely to succeed on the merits, and we ask that the Court enter Plaintiffs' proposed preliminary injunction.

---

[48] *See* Second Receiver Report ¶ 16.
[49] *See id.* at ¶¶ 20, 35, 37. Defendants already have demonstrated a propensity to thwart the Receiver's duties to marshal assets and to evade the asset freeze. *See id.* at ¶ 12.
[50] *See id.* at ¶¶ 21, 28.

Respectfully submitted,

Dated:  June 27, 2016

/s/ William J. Hodor
WILLIAM J. HODOR
JOHN C. HALLERUD
GUY G. WARD
Federal Trade Commission
Midwest Region
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
(312) 960-5634 [telephone]
(312) 960-5600 [facsimile]
whodor@ftc.gov [e-mail, Hodor]
jhallerud@ftc.gov [e-mail, Hallerud]
gward@ftc.gov [e-mail, Ward]
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

ERIN GROTHEER
KIMBERLY SLIDER
THOMAS P. JAMES
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-8966 [telephone]
(312) 814-2593 [facsimile]
egrotheer@atg.state.il.us [e-mail, Grotheer]
kslider@atg.state.il.us [e-mail, Slider]
tjames@atg.state.il.us [e-mail, James]
Attorneys for Plaintiff
STATE OF ILLINOIS

16