# Menjivar Attachment M

## RECEIVABLES PURCHASE AND SALE AGREEMENT

THIS RECEIVABLES PURCHASE AND SALE AGREEMENT (this "Agreement") is made effective as of November 27, 2015 (the "Effective Date") by and between Mainbrook Asset Partners I, LLC, a Delaware limited liability company with an address at 3500 South DuPont Highway, Dover, DE 19901 ("Seller") and Prudent Investimentos LTDA, a limited liability company established under the laws of Brazil with an address at 145 Avenida Fagundes, Filho, 15 Andar, Vila Monte Alegre, Sao Paulo, SP, CEP 04304-010, Brazil ("Buyer" and each of the Seller and Buyer being a "Party" and together the "Parties").

WHEREAS, Seller is the owner of certain Financial Accounts with an aggregate Outstanding Balance approximately equal to $166,666,667.00; and

WHEREAS, Buyer has agreed to purchase from Seller and Seller has agreed to sell to Buyer certain Financial Accounts in one or more Closings, whereby Seller will sell, transfer, convey and assign to Buyer all of Seller's right, title and interest in and to the Financial Accounts;

NOW, THEREFORE, in consideration of the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     DEFINITIONS. For purposes of this Agreement, the following terms shall have the meanings ascribed thereto in this Section 1.

(a)     "Agreement" shall have the meaning ascribed to such term in the introduction paragraph above.

(b)     "Bill of Sale" means a bill of sale and assignment for those Financial Accounts in the form attached hereto as Exhibit C hereto.

(c)     "BMG Warehouse Debt" means Financial Accounts originated by various lenders serviced by the Tucker Entities, charged-off due to extended delinquency, sold, assigned and/or transferred to the Tucker Entities, warehoused and never collected upon by the Tucker Entities prior to their sale, assignment and/or transfer to an affiliate of Seller.

(d)     "Buy-back Accounts" shall have the meaning ascribed to such term in Section 3(d) below.

(e)     "Buyer" shall have the meaning ascribed to such term in the introduction paragraph above.

(f)     "Buyer Indemnified Parties" shall have the meaning ascribed to such term in Section 7(b) below.

(g)     "Claim" or "Claims" means any all claims, obligations, liabilities, manners of action, causes of action, suits, debts, dues, sums of money, accounts, covenants, controversies,

**Menjivar Att. M**
**Page 1 of 22**

FTC-SLL-0004340

agreements, promises, damages, judgments, executions, claims and demands whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, whether at Law or in equity, whether known or unknown, foreseen or unforeseen.

      (h)    **"Closing"** shall have the meaning ascribed to such term in Section 4(a) below.

      (i)    **"Closing Date"** shall have the meaning ascribed to such term in Section 4(a) below.

      (j)    **"Confidential Information"** shall have the meaning ascribed to such term in Section 8(b)(i) below.

      (k)    **"Cut-off Date"** means November 27, 2015.

      (l)    **"Effective Date"** shall have the meaning ascribed to such term in the introduction paragraph above.

      (m)    **"Financial Accounts"** means each and any of the charged-off transaction accounts as identified on <u>Exhibit A</u> attached hereto and made a part hereof. The Financial Accounts do not include any application, agreement, billing statement notice, correspondence or other information that relate to such Financial Account, including, without limitation, the original documents or copies thereof, whether by photocopy, microfiche, microfilm, computer data, electronic media or other reproduction process.

      (n)    **"Governmental Entity"** means any government or subdivision thereof, any governmental agency, department, bureau, commission, authority or instrumentality, court or arbitration tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority, whether international, foreign, domestic, federal, state or local.

      (o)    **"Indemnified Party"** shall have the meaning ascribed to such term in Section 7(c)(i) below.

      (p)    **"Indemnifying Party"** shall have the meaning ascribed to such term in Section 7(c)(i) below.



      (q)    **"Law"** means any constitutional provision, statute or other law, rule, ordinance, regulation, administrative ruling or executive order in the United States of America, any foreign country or any domestic or foreign national state, provincial, municipal or other local political subdivision thereof issued or promulgated by any Governmental Entity.



      (r)    **"Liens"** means any and all liens, pledges, encumbrances, Claims, charges, security interests, rights of sellers and any third party, rights of redemption, equities, and any other restrictions or limitations of any kind or nature whatsoever.



**Menjivar Att. M**
**Page 2 of 22**

FTC-SLL-0004341

     (s)    **"Obligor"** means the current and unreleased debtor of any of the Financial Accounts, as indicated on any of the applicable promissory notes, loan agreements and other documents, records or files governing, evidencing, securing or relating to such financial assets, including, without limitation, any and all guarantors, sureties or other persons or entities liable on a Financial Account.

     (t)    **"Original Balance"** means the balance of each Financial Account at the time acquired by Seller.

     (u)    **"Outstanding Balance"** means the balance of each Financial Account as of the Cut-Off Date.

     (v)    **"Person"** means any natural person, corporation, partnership, limited liability company, association, trust, Governmental Entity, syndicate, joint venture, affiliated group or other entity or organization, whether incorporated or unincorporated.

     (w)    **"Purchase Price"** means the sale price as set forth on <u>Exhibit A</u> and as defined in Section 3(a) below.

     (x)    **"Purchase Rate"** shall have the meaning ascribed to such term in Section 3(a) below.

     (y)    **"Recalled Accounts"** shall have the meaning ascribed to such term in Section 3(d) below.

     (z)    **"Representatives"** shall have the meaning ascribed to such term in Section 8(b)(ii) below.

     (aa)    **"Seller"** shall have the meaning ascribed to such term in the introduction paragraph above.

     (bb)    **"Seller Indemnified Parties"** shall have the meaning ascribed to such term in Section 7(a) below. 

     (cc)    **"Third Party Claim"** shall have the meaning ascribed to such term in Section 7(c)(i) below.

     (dd)    **"Transfer Documents"** means the Bill of Sale and all such other documents necessary to effect the legal transfer to Buyer of all of Seller's right, title and interest in and to the Financial Accounts.  

     (ee)    **"Tucker Entities"** shall have the meaning ascribed to such term in Section 1(ff)(iv) below.

FTC-SLL-0004342

(ff)　"Unqualified Accounts" means any Financial Accounts that are classified as follows:

(i)　Seller does not have title to a Financial Account;

(ii)　The Obligor is deceased prior to the Closing Date;

(iii)　The Obligor has filed for bankruptcy since the date of the loan origination and the court has not otherwise dismissed the case (with reasonable evidence provided by Buyer);

(iv)　If any Financial Accounts were owned at any time by any party other than the original lender, Seller or its affiliates, or JR Holdings LLC and/or Graywave Capital, LLC (being entities owned and controlled by Joel Tucker and being hereinafter referred to as the "Tucker Entities");

(v)　Pending litigation (with reasonable evidence of court documents or prior correspondence directed to a prior owner or servicer of the Financial Account);

(vi)　The Financial Account has been satisfied, settled, or released (the account was paid or otherwise released or settlement was received by Seller or any prior owner prior to the Closing Date);

(vii)　The outstanding balance of a Financial Account does not reflect payments made by the Obligor to Seller or any prior owner for credit to the same Financial Account (same lender, loan date, charge off date, balance and customer number); or

(viii)　Seller and Buyer mutually agree in writing to a repurchase of a specific Financial Account.

2.　PURCHASE AND SALE OF FINANCIAL ACCOUNTS.

(a)　Agreement to the Sale and Purchase of the Financial Accounts. Seller agrees to sell, transfer, convey and assign to Buyer, and Buyer agrees to purchase the Financial Accounts described in the Purchase Statement attached hereto as Exhibit A, subject to the terms, provisions, conditions, limitations, waivers and disclaimers set forth in this Agreement.

(b)　Consideration. On the Closing Date, Buyer shall pay to Seller the Purchase Price as set forth on Exhibit A and in Section 4(c)(i) and as updated on or prior to the Cut-off Date, by wire transfer according to the wire instructions noted on Exhibit B.

(c)　No Impairment. Nothing contained herein shall limit, reduce or in any way adversely affect Buyer's full ownership of, and right to receive, claims payments, Obligor payments or other recoveries received by or on behalf of Seller after the Closing Date.

3.　PURCHASE PRICE, CUT-OFF DATE, AND **SELLER'S** REPURCHASE OF UNQUALIFIED ACCOUNTS.

FTC-SLL-0004343

(a)     The purchase price for each of the Financial Accounts shall be an amount equal to 1.5% for the first 40% of the Accounts and 1.0% for the remaining 60% of the Accounts (the "Purchase Rate") of the Original Balance of each Financial Account as of the Cut-off Date, that as of the Effective Date is in the aggregate, approximately $2,000,000.00 (US Dollars) (the "Purchase Price").

(b)     Effective as of the Cut-off Date but following the Closing Date, Seller shall remit all net proceeds related to the Financial Accounts to Buyer on a periodic basis, no less frequently than once per month.

(c)     Upon Buyer's reasonable demand, that shall include all necessary or appropriate supporting documentation, on or before the sixtieth (60th) day after the Closing Date, Seller at its sole option shall either (i) replace and exchange any Unqualified Account with a Financial Account of similar quality, or (ii) purchase from Buyer and Buyer shall sell, transfer, convey and assign back to Seller any Unqualified Accounts (collectively the "Buy-back Accounts"). The purchase price for the Buy-back Accounts shall be the Purchase Rate times the then current outstanding balance of each such Financial Account. Upon Seller's receipt of any such reasonable demand, including all necessary or appropriate supporting documentation, Seller shall deliver (x) such replacement accounts described in subsection (c)(i) above or (y) the purchase price payment described in subsection (c)(ii) above to Buyer on or before the tenth (10th) day after receipt of such reasonable demand. Buyer shall transfer to Seller any and all files associated with any such Buy-back Accounts on or before the second (2nd) business day after receipt of payment from Seller.

(d)     Seller reserves the right to recall any Financial Accounts that may be recalled by the prior owners or the Tucker Entities at their discretion (each a "Recalled Account"). In the event that Seller receives notice of a recall, Seller shall provide the same such notice to the Buyer. If Buyer has sold any of the Financial Accounts, it agrees to recall the Financial Accounts from future buyers. Seller, at its sole option, may either replace the Recalled Accounts or buy the Recalled Accounts for the Purchase Rate times the then current outstanding balance of each such Financial Account. If the Recalled Account is actively being paid under a payment arrangement and settlement, the Buyer shall notify the Seller of such payment plan and terms and the party recalling the Recalled Account shall instruct the Buyer in its sole discretion to maintain the payment plan or cancel the payment plan and close the Recalled Account as paid in full. 

4.     CLOSING AND DELIVERIES.

(a)     Closing. The closing of the transactions contemplated by this Agreement ("Closing") shall be held on the Effective Date whereby the Seller shall transfer the Financial Accounts to Seller and Buyer shall pay to Seller the Purchase Price as described below in Section 4(c)(i) (the "Closing Date"). 

(b)     Deliveries by the Seller on at Closing. 

(i)     The Bill of Sale;

FTC-SLL-0004344

(ii)     The transfer of the Financial Accounts in electronic format in the form of a Microsoft Excel spreadsheet, whereby each row is a unique Financial Account and each column represents a specific field related to each Financial Account;

(iii)    Any and all such other documents, instruments and certificates as the Buyer shall reasonably request in order to effectuate the transactions contemplated by this Agreement.

(c)    Deliveries by the Buyer on at Closing.

(i)     The Purchase Price that shall be delivered by (A) the payment of $500,000 (US Dollars) on or before the Effective Date and (B) a second payment of approximately $500,000 (US Dollars) on or before January 15th 2016 and (C) a third and final payment of $1,000,000 on or before March 11 2016 based upon the final number of Financial Accounts as determined by the Seller on the Cut-off Date. The receipt of the portion of the Purchase Price in Section 4(c)(i)(A) is hereby acknowledged as received by Seller as of the Effective Date.

(ii)     Any and all such other documents as the Seller shall reasonably request in order to effectuate the transactions contemplated by this Agreement.

5.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER. Buyer hereby represents, warrants and covenants to Seller as of the Closing Date:

(a)    Organization: Authority.

(i)     Buyer has all requisite power and authority (A) to execute and deliver this Agreement and (B) to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by Buyer, the performance by Buyer of its obligations hereunder and the consummation by Buyer of the transactions contemplated herein have been duly authorized pursuant to and in accordance with all Laws governing and/or applicable to Buyer and no other proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance.



(ii)     This Agreement has been duly and validly executed and delivered by Buyer and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

(iii)    Buyer is validly existing and in good standing under the Laws of each respective jurisdiction of formation and has all requisite company power and authority to own, lease, operate or otherwise hold each of its respective assets and to carry on each of its respective businesses as now being conducted.



(b)    Compliant Activities. Buyer shall only sell, transfer, assign or place Financial Accounts with third parties that agree that each will neither undertake, nor cause, nor permit to be undertaken, any activity which either (i) is illegal under any laws, decrees, rules or regulations



**Menjivar Att. M**
**Page 6 of 22**

FTC-SLL-0004345

in any jurisdiction in which the Buyer or any of its affiliates does business, or (ii) would have the effect of causing Seller to be in violation of any Laws, decrees, rules or regulations in effect in any such jurisdiction, including, without limitation, the United States Fair Debt Collections Practices Act, Telephone Consumer Protection Act or any State fair debt collection laws. Buyer agrees not to add any interest, collection fees or any other additional fees to the outstanding balance of each Financial Accounts at any time following the Closing Date.

(c)     Assistance of Third Parties.  Buyer hereby agrees, acknowledges, confirms and understands that Seller shall have no responsibility or liability to Buyer arising out of or related to any failure of any third party to assist or cooperate with Buyer.

(d)     Authority to Sell and Assign. This Agreement is binding upon Seller and Buyer and their respective successors, heirs, and assigns.

(e)     Independent Evaluation.  Buyer is a sophisticated business party, has knowledge and experience in financial and business matters that enables it to evaluate the merits and risks of the transactions contemplated by this Agreement. The Buyer acknowledges that Seller does not represent, warrant or insure the accuracy or completeness of any information or its sources of information contained in the information provided or in any of the Financial Accounts. The Buyer agrees and represents that the summary of Financial Accounts made available to it were an adequate and sufficient basis on which to determine whether and at what price to purchase the Financial Accounts. The Buyer has made such independent investigations as it deems to be warranted into the nature, validity, enforceability, collectability and value of the Financial Accounts, and all other facts it deems material to its purchase and is entering into this transaction solely on the basis of that investigation and the Buyer's own judgment, and is not acting in reliance on any representatives or independent contractors (other than the representations and warranties of the Seller contained herein).

(f)     Economic Risk.  The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Buyer shall create any inference that the transactions involve any "security" or "securities". Buyer acknowledges and agrees that the acquisition of the Financial Accounts involve a high degree of risk and are suitable only for persons or entities of substantial financial means who have no need for liquidity and who can hold the Financial Accounts indefinitely or bear the partial or entire loss of their value.

(g)     Status of Buyer. Buyer is a sophisticated purchaser that is in the business of buying or originating or collecting Financial Accounts of the type being purchased or that otherwise deals in such Financial Accounts in the ordinary course of Buyer's business.

(h)     DTPA Waiver.  Buyer has knowledge and experience in financial and business matters that enables Buyer to evaluate the merits and risks of the transactions contemplated hereby. Further, Buyer is not in a disparate bargaining position relative to Seller. Buyer hereby waives, to the maximum extent permitted by law, any and all rights, benefits and remedies under

FTC-SLL-0004346

any state deceptive or unfair trade practices/consumer protection act, with respect to any matters pertaining to this Agreement and the transactions contemplated hereby.

(i) <u>No Broker</u>. Buyer agrees and acknowledges that it has not dealt with any broker or finder in connection the transactions contemplated under this Agreement and no broker or any other person is entitled to receive any commission, finder's fee or similar compensation as a result of such transactions hereunder. Buyer shall indemnify and hold harmless Seller from and against any and all liability, claim, loss, damage or expense including reasonable attorneys' fees, pertaining to any broker, finder or other person with Buyer has dealt with.

(j) <u>Material Litigation</u>. There is no pending or threatened material litigation (i) that has been commenced by or against Buyer that relates to or may affect Buyer's right to enter into or enforce the underlying transactions which are the basis for the Financial Accounts or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, this Agreement or the transactions contemplated hereby.

(k) <u>Use of Seller's Name</u>. Buyer will not use or refer to the name of Seller (or prior owner or issuer, if applicable) and will not portray itself as Seller's agent, partner, or joint venture with respect to the Financial Accounts, or as the agent, partner or joint venture of prior owner or issuer. However, upon Seller's prior written consent to the form of the communication, Buyer may use the name of Seller for purposes of identifying a Financial Account in communication with the Obligors or in the caption of any litigation against Obligor (so long as it is apparent that Seller is not set forth in such caption as the party plaintiff) in order to collect amounts outstanding on the Financial Accounts. In contacting an Obligor, filing suit, or selling Accounts, Buyer will not state or represent in any way that Buyer is contacting the Obligor, filing suit or selling loans for or on behalf of Seller (or prior owner or issuer, if applicable) or that any of the above will take any action with regard to the Financial Account or Obligor.

(l) <u>Licensing and Registration</u>. Buyer or the third party collection agencies Buyer directly or indirectly contracts with to collect on its consumer receivables are appropriately licensed, bonded, registered, and insured in all jurisdictions requiring licensure, bonding, registration, or insurance to be a passive buyer of debt or to attempt to collect or collect a debt. 

(m) <u>Enforcement/Legal Action</u>. Buyer shall not institute any enforcement or legal action or proceeding in the name of Seller (or issuer or prior owner, if applicable) or any subsidiary, series or affiliate thereof. Buyer shall not make reference to any of the foregoing entities in any correspondence to or discussion with any particular Obligor regarding enforcement or collection of the Accounts. Buyer will comply in all respects with applicable laws including those relating to debt collection practices, in connection with the Financial Accounts. Buyer agrees and understands that there may be no adequate remedy at law for a violation of the terms, provisions, conditions and limitations set forth in this Section and Seller shall have the right to seek the entry of an order by a court of competent jurisdiction enjoining any violation hereof. 

6. REPRESENTATIONS AND WARRANTIES AND COVENANTS OF SELLER. Seller represents and warrants to Buyer that, as of the Closing Date: 

**Menjivar Att. M**
**Page 8 of 22**

FTC-SLL-0004347

(a) <u>Organization: Authority.</u>

(i) Seller has all requisite power and authority (A) to execute and deliver this Agreement and (B) to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by Seller, the performance by Seller of its obligations hereunder and the consummation by Seller of the transactions contemplated herein have been duly authorized pursuant to and in accordance with all Laws governing and/or applicable to Seller and no other proceedings on the part of Seller are necessary to authorize such execution, delivery and performance.

(ii) This Agreement has been duly and validly executed and delivered by Seller and constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

(iii) Seller (A) is validly existing and in good standing under the Laws of each respective jurisdiction of formation and (B) has all requisite power and authority to own, lease, operate or otherwise hold each of its respective assets and to carry on each of its respective businesses as now being conducted.

(iv) The execution, delivery and performance by Seller of this Agreement does not and will not conflict with or result in any violation of, or constitute a breach, right of termination or default (or an event that with notice or lapse of time or both would become a right of termination or default) under, (A) any term of any applicable organizational documents of Seller, (B) any note, bond, mortgage, indenture, loan or indebtedness of Seller, (C) any material agreement, permit or other instrument to which Seller is a party, or (D) any Law to which Seller is subject.

(b) <u>Binding Obligations.</u> This Agreement and all the obligations of Seller hereunder constitute the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at Law).



(c) <u>After-Discovered Information.</u> From and after the Closing Date, Seller shall provide to Buyer written notice of any and all written information or documentation related to any of the Financial Accounts for any reason not previously disclosed to the Buyer that may come to the knowledge of the Seller.



(d) <u>Representations and Warranties of Seller as to the Financial Accounts.</u> Seller represents and warrants to Buyer that, as to each of the Financial Accounts, the following is true and correct as of the Closing Date:

(i) <u>Title.</u> Seller has good, marketable and valid title to, and is the owner of, each of the Financial Accounts, in each case free and clear of all Liens. The

FTC-SLL-0004348

Bill of Sale, when executed and delivered, will be effective to convey to Buyer good, marketable and valid title to the Financial Accounts free and clear of all Liens, which title will, upon the delivery of such Financial Accounts, be effective against all creditors of and purchasers from Seller.

(ii)     <u>Pending Litigation</u>. To the best of Seller's knowledge, no Obligor has initiated any lawsuit, arbitration or governmental proceeding against Seller which would affect Seller's ability to perform its obligations under this Agreement, and to the best knowledge of Seller, no Obligor has any enforceable rights of set-off, counterclaim, cancellation, or claim that such Financial Account suffers from lack of consideration, is a forgery, or contains an alteration of the Obligor's signature, except as otherwise disclosed.

(iii)     <u>Unpaid Balance</u>. To the best of Seller's knowledge, the amount reflected in relevant documents as the unpaid balance of each of the Financial Accounts accurately represents the unpaid balance related to each applicable Financial Account.

(iv)     <u>Authority to Sell and Assign</u>. The Seller has full right and authority to sell and assign its interest in each Financial Account.

(v)     <u>Remittance of Payments</u>. Seller shall remit to Buyer all payments which are received by Seller from any Obligor or prior owner after the Closing Date or received prior to the Closing Date but are not reflected in the balance of each Financial Account. Such remittances shall occur within thirty (30) days of receipt of payments by Seller. Seller agrees to use its best efforts to secure any payments from prior owners or Obligors and remit these payments to Buyer.

(vi)     <u>No Media</u>. The Financial Accounts shall be delivered without any media or financial documentation other than an excel spreadsheet file containing basic information regarding each Obligor and Financial Account.



7.     INDEMNIFICATION.

(a)     <u>Seller Indemnification</u>.  Seller shall fully indemnify Buyer and each of its respective employees, members, managers, officers, agents, and affiliates, and each of their respective successors and assigns (collectively, the "<u>Seller Indemnified Parties</u>") of and from all Claims which any Person ever had, now has or which any such Person hereafter can, shall or may have or claim to have against the Seller Indemnified Parties or any of them for, upon or by reason of any matter, cause or thing whatsoever, whether known or unknown, foreseen or unforeseen, from the beginning of the world and continuing in perpetuity, arising out of, related to or resulting from any breach of any representation or warranty made by Seller in this Agreement or any breach or non-fulfillment of any covenant or agreement made by Seller in this Agreement.



(b)     <u>Buyer Indemnification</u>.  Buyer shall fully indemnify Seller and each of its respective employees, members, managers, officers, agents, and affiliates, and each of their

FTC-SLL-0004349

respective successors and assigns (collectively, the "Buyer Indemnified Parties") of and from all Claims which any Person ever had, now has or which any such Person hereafter can, shall or may have or claim to have against the Buyer Indemnified Parties or any of them for, upon or by reason of any matter, cause or thing whatsoever, whether known or unknown, foreseen or unforeseen, from the beginning of the world and continuing in perpetuity, arising out of, related to or resulting from any breach of any representation or warranty made by Buyer in this Agreement or any breach or non-fulfillment of any covenant or agreement made by Buyer in this Agreement. Additionally, Buyer agrees to indemnify and hold Buyer Indemnified Parties harmless from and against any Claims incurred or suffered by such Buyer Indemnified Party by reason of the misconduct or violation of any applicable law, rule or regulation by Buyer (or its employees, representatives, agents or successors) in connection with the services, collection or enforcement of the Financial Accounts or any New Placement Agreement. At its option, Seller shall have the right to require Buyer to assume the defense of any Claims and to directly pay for all losses, judgments, damages, expenses or other costs (including all fees and disbursements of counsel) which may be imposed.

    (c)    <u>Indemnification Procedures</u>.

        (i)    Any Seller Indemnified Party or Buyer Indemnified Party (an "Indemnified Party") seeking indemnification pursuant to this Section 7 in respect of any Claim brought by a third party (a "Third-Party Claim") shall notify the party from whom indemnification is being sought (an "Indemnifying Party: (i) prompt written notice (but in no event more than ten (10) days after the Indemnified Party acquires knowledge thereof) of such Third-Party Claim; and (ii) copies of all documents and information relating to any such Third-Party Claim within ten (10) days of their being obtained by the Indemnified Party; provided that, the failure by the Indemnified Party to so notify or provide copies to the Indemnifying Party shall not relieve the Indemnifying Party from any liability to the Indemnified Party for any liability hereunder except to the extent that such failure shall have prejudiced the defense of such Third-Party Claim.

        (ii)    The Indemnifying Party shall have thirty (30) days (or such lesser time as may be necessary to comply with statutory response requirements for litigation claims that are included in any Third-Party Claim) from receipt of the notice contemplated in Section 7(c)(i) to notify the Indemnified Party whether or not the Indemnifying Party will, at its sole cost and expense, defend the Indemnified Party against such claim. If the Indemnifying Party timely gives notice that it intends to defend the Third-Party Claim, it shall have the right, except as hereafter provided, but not the obligation, to defend against, negotiate, settle or otherwise deal with the Third-Party Claim and to be represented by counsel of its own choice, and the Indemnified Party will not admit any liability with respect thereto or settle, compromise, pay or discharge the same without the consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed; provided that, the Indemnified Party may participate in, but not control, any proceeding with counsel of the Indemnified Party's choice and at the Indemnified Party's expense; provided, further, that the Indemnifying Party may not enter into a settlement of any such Third-Party Claim without the consent of the Indemnified Party, which consent shall be not unreasonably withheld or delayed, unless





FTC-SLL-0004350

such settlement requires no more than a monetary payment for which the Indemnified Party is indemnified by the Indemnifying Party or involves other matters not binding upon the Indemnified Party; and provided, further, that, in the event the Indemnifying Party does not agree in writing to accept the defense of such Third-Party Claim as provided above in this Section 7(c)(ii), then the Indemnified Party shall have the right to defend against, negotiate, settle or otherwise deal with the Third-Party Claim in such manner as the Indemnified Party deems appropriate, in its sole discretion, and the Indemnified Party shall be entitled to indemnification therefor from the Indemnifying Party to the extent provided under this Section 7(c)(ii). Notwithstanding the foregoing, if there is a conflict of interest in the defense of such action between the Indemnified Party and the Indemnifying Party, the Indemnified Party shall have the right to retain its own counsel and the defense or settlement of any such claim or demand and its reasonable costs and expenses (including reasonable attorneys' fees) shall be included as part of the indemnification obligations of the Indemnifying Party. If the Indemnified Party elects to exercise such right, the Indemnifying Party shall have the right to participate in the defense or settlement of such claim at its sole cost and expense. In any event, no Indemnified Party may compromise or settle any Third-Party Claim for which it is seeking indemnification hereunder without the consent of the Indemnifying party, which shall not be unreasonably withheld or delayed.

8.    ADDITIONAL AGREEMENTS.

(a)    AS IS / WHERE IS.  EXCEPT AS EXPRESSLY STATED HEREIN, THE FINANCIAL ACCOUNTS ARE BEING SOLD "AS IS / WHERE IS," WITH ALL FAULTS, LATENT OR APPARENT.  EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER MAKES NO WARRANTIES OR REPRESENTATIONS OF ANY TYPE, KIND, CHARACTER OR NATURE WHATSOEVER, WHETHER EXPRESSED OR IMPLIED, STATUTORY OR OTHERWISE, IN FACT, AT LAW OR IN EQUITY, OR ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR RELATING TO ANY TERM OR CONDITION OF ANY OF THE DOCUMENTS RELATED TO ANY FINANCIAL ACCOUNTS.  WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, SELLER MAKES NO REPRESENTATION OR WARRANTY, WHETHER EXPRESSED OR IMPLIED, AND ASSUMES NO RESPONSIBILITY REGARDING:  (I) THE COLLECTABILITY OR VALUE OF ANY OF THE FINANCIAL ACCOUNTS, (II) THE CREDITWORTHINESS OR FINANCIAL CONDITION OF ANY OBLIGOR OR THE ABILITY OF ANY OBLIGOR TO PERFORM HIS/HER OBLIGATIONS UNDER THE RELEVANT DOCUMENTS RELATING TO FINANCIAL ACCOUNTS, (III) THE DUE EXECUTION, VALIDITY, SUFFICIENCY, OR THE PERFECTION OR PRIORITY OF ANY LIENS OR SECURITY INTERESTS SECURING OR APPEARING TO SECURE OR RELATING TO ANY OF THE FINANCIAL ACCOUNTS, (IV) THE CONDITION OF ANY OF THE FINANCIAL ACCOUNTS, (V) RIGHTS OF OFFSET, DEDUCTIONS, NEGOTIABILITY, OR HOLDER IN DUE COURSE STATUS, THE ACCURACY OR COMPLETENESS OF THE MATTERS DISCLOSED, REPRESENTED OR WARRANTED BY ANY PARTY IN ANY OF THE DOCUMENTS RELATED TO THE FINANCIAL ACCOUNTS, (VI) THE PERFORMANCE OF THE OBLIGATIONS OF ANY PARTY UNDER ANY OF THE DOCUMENTS RELATED TO





FTC-SLL-0004351

THE FINANCIAL ACCOUNTS, (VII) THE EXISTENCE OR NONEXISTENCE OF ANY DEFAULT OR EVENT OF DEFAULT UNDER ANY OF THE DOCUMENTS RELATING TO THE FINANCIAL ACCOUNTS OR (VIII) THE ACCURACY OR COMPLETENESS OF DATA RELATED TO ANY FINANCIAL ACCOUNT. BUYER EXPRESSLY UNDERSTANDS AND ACKNOWLEDGES THAT EACH OBLIGOR MAY HAVE MULTIPLE FINANCIAL ACCOUNTS DEISGNATED BY THE SAME CUSTOMER NUMBER WITHOUT SEPARATE AND DISTINCT ACCOUNT NUMBERS BUT OTHERWISE DIFFERENTIATED BY LENDER NAME, LOAN DATE, CHARGE-OFF DATE, AND OUTSTANDING BALANCE, AND THAT SOME OF THESE FINANCIAL ACCOUNTS MAY BE OWNED BY OTHER THIRD PARTIES UNKOWN TO SELLER. IN ADDITION, SELLER ACKNOWLEDGES AND BUYER ACKNOWLEDGES AND ACCEPTS THAT SOME OR ALL OF THE FINANCIAL ACCOUNTS MIGHT BE OUT OF BALANCE. SELLER SHALL HAVE NO RESPONSIBILITY FOR THE FINANCIAL CONDITION OF ANY OBLIGOR OR FOR THE ABILITY OF ANY OBLIGOR TO PERFORM ITS OBLIGATIONS UNDER THE DOCUMENTS RELATING TO THE FINANCIAL ACCOUNTS.

    (b)   <u>Confidentiality</u>.

        (i)    For purposes of this Agreement, the term "<u>Confidential Information</u>" shall include, but not be limited to, all data and material developed by or belonging to a Party, or provided to such Party by a third party, in any form, tangible or intangible, and provided to a receiving Party which is confidential, proprietary, non-public or a trade secret, including, without limitation, trade secrets, confidential records or confidential data; computer software programs or any portions or logic comprising said programs; client, customer, consultant, lender or equity partner lists; information about client, customer, lender or equity partner requirements; terms of contracts with clients, customers, consultants, lenders or equity partners; production, programming, development, engineering and distribution processes or techniques; methods of doing business; advertising, promotions or marketing information; planning and financial information concerning either Party; business opportunities; business plans; target markets; pricing formulas; financial models or projections; working methods; profit formulas; studies; servicing plans; portfolio information or management strategies; or lists of actual or potential borrowers or loan program participants; notes, analyses, compilations, studies, interpretations or other documents which contain, in whole or in part, any information relating to this Agreement, and the terms and conditions of this Agreement. The term "<u>Confidential Information</u>" shall not include any information which the receiving party can demonstrate (A) was, is or becomes, generally available to the public or any industries in which the receiving party does business other than as a result of a disclosure by the receiving party, (B) was within the receiving party's possession prior to its being furnished to the receiving party by or on behalf of the disclosing party pursuant hereto, provided that the source of such information was not known by the receiving party to be bound by an obligation of confidentiality to the disclosing party with respect to such information, (C) is or becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party, provided that such source is not known by the receiving party to be bound by an





**Menjivar Att. M**
**Page 13 of 22**

FTC-SLL-0004352

obligation of confidentiality to the disclosing party with respect to such information or (D) was independently developed without the use of the Confidential Information by the receiving party.

(ii)     Each of Buyer and Seller shall (A) maintain the confidentiality of all Confidential Information and (B) except as otherwise provided herein, not disclose any of such Confidential Information to any person or entity other than to those of its officers, managers, members, employees, agents, affiliates, advisors, consultants, financial partners, and representatives, and any other related Persons or prospective purchasers (collectively, "Representatives"), that need to know such Confidential Information in connection with such Party implementation of the transactions contemplated hereby (it being understood that each Representative to which any such Confidential Information is disclosed shall be informed of the confidential nature of such Confidential Information and directed to keep such Confidential Information confidential). The Parties shall be liable for any breach of this agreement that results from the actions or omissions of any of their respective Representatives.

(iii)     Notwithstanding the foregoing, the Parties shall be permitted to disclose the Confidential Information: to the extent required by any subpoena or similar legal process issued by any Governmental Entity having authority over the receiving party and/or its Representatives; provided, however, that prior to any such disclosure (except in connection with any regulatory examination and unless prohibited by applicable Law or legal process), the receiving party shall forthwith notify the disclosing party of any such subpoena or similar legal process so that the disclosing party may seek a protective order or take other appropriate action. The receiving party shall also reasonably cooperate with the disclosing party's efforts to obtain a protective order or other reasonable assurance that confidential treatment will be accorded any Confidential Information so disclosed. If, in the absence of a protective order, the receiving party or any of its Representatives is compelled as a matter of Law or regulation to disclose the Confidential Information, the receiving party shall disclose to the party compelling disclosure only that part of the Confidential Information as is required by Law or regulation to be disclosed (in which case, prior to such disclosure, unless prohibited by applicable Law or regulation, the receiving party will reasonably advise and consult with the disclosing party and its counsel as to such disclosure and the nature and wording of such disclosure), and the receiving party shall use all reasonable efforts to ensure confidential treatment of any Confidential Information so disclosed.







(iv)     Except as may be required by Law (A) neither Party may make any public announcement of this Agreement or provide any information concerning this Agreement or the subject matter hereof to any other Person, including but not limited to any representative of the news media, without the prior written approval of the other Party, and (B) neither Party may respond to any inquiry from any Governmental Entity concerning this Agreement without prior consultation and coordination with the other Party.

(c)    Notification of Claims. Each of the Parties shall promptly notify the other in writing on or before the tenth (10th) day after such Party's discovery of any real or threatened Claim which relates to or arises out of any of the Financial Accounts or this Agreement that might affect either Party or the value of any of the Financial Accounts or enforceability of any of the Financial Accounts.

(d)    Ordinary Course. Up and to the Closing Date, the Seller has conducted its operations and administered its affairs only in the ordinary course of business with respect to the Financial Accounts and any collection agreements relating to the Financial Accounts.

9.    GENERAL PROVISIONS.

(a)    Severability: Validity: Parties in Interest.  The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any provision within a single section, paragraph or sentence) are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by Law. Furthermore, to the fullest extent possible, the provisions of this Agreement (including, without limitations, each portion of this Agreement containing any provision held to be invalid, void or otherwise unenforceable that is not itself invalid, void or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

(b)    Waiver.  At any time prior to the Closing Date, any Party may (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the conditions, representations, warranties, undertakings, covenants or agreements (or any portion thereof) contained herein. Any agreement on the part of a Party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.  If any Party expressly waives in writing an unsatisfied condition, representation, warranty, undertaking, covenant or agreement (or portion thereof) set forth herein, the waiving Party shall thereafter be barred from recovering, and thereafter shall not seek to recover, any damages, claims, losses, lliabilities or expenses, including legal and other expenses, from the other Parties in respect of the matter or matters so waived.  Except as expressly stated therein, any such waiver shall not constitute a covenant to waive any such matter or matters in the future.



(c)    Headings. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.



(d)    Notices.  All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed given upon (i) confirmed delivery by a standard overnight carrier or when delivered by hand, or (ii) the expiration of 5 Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective parties at the following addresses (or such other address for a Party as shall be specified by like notice):



FTC-SLL-0004354

If to Buyer, to:       Prudent Investimentos LTDA
145 Avenida Fagundes, Filho 15
Vila Monte Alegre, Sao Paulo, SP 04304-010
Brazil
Attention: Edivaldo L. Albuquerque
edivaldo@prudentbrazil.com

If to Seller, to:       Mainbrook Asset Partners I, LLC
5477 Main Street
Amherst, NY 14221
Attn: Andrew J. Shaevel, Managing Partner
andrew.shaevel@bobalcw.com

(e)    Certain Rules of Construction.

    (i)    Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural of such noun or pronoun and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

    (ii)    When used herein, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

    (iii)    When used herein, the terms "include," "includes," and "including" are not limiting.



    (iv)    Unless the context requires otherwise, derivative forms of any term defined herein shall have a comparable meaning to that of such term.

(f)    Survival of Representations, Warranties, and Covenants. All representations and warranties made by any of the Parties in this Agreement and in any instrument delivered pursuant to this Agreement shall survive the Closing Date and the consummation of the contemplated transactions; provided, however, that the covenants contained in this Agreement and in any instrument delivered pursuant to this Agreement shall survive the date of this Agreement, the Closing Date and the consummation of the contemplated transactions, in accordance with their terms. 



(g)    Entire Agreement; Assignment. This Agreement (including the exhibits hereto) (i) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between Buyer and Seller, with respect to the subject matter hereof, including any transaction between Buyer and Seller, and (ii) shall not be assigned by operation of Law or otherwise without the prior written consent of each of Buyer and Seller except that Buyer may assign its right and interest in and to any of the Financial Accounts or its purchase rights

FTC-SLL-0004355

hereunder to any affiliate but any such assignment shall not relieve Buyer of any of its respective duties and obligations contained in this Agreement.

(h) Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by each of Buyer and Seller.

(i) Counterparts; Effectiveness. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or electronic transmission shall be deemed to be their original signatures for all purposes.

(j) Governing Law. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware and Brazil, without regard to the choice or conflict of laws principles thereof or of any other jurisdiction. The Parties hereby agree that all disputes arising out of or relating to this Agreement shall be resolved in the state or federal courts located in the State of New York, County of Erie, and the Parties hereby consent to the jurisdiction of such courts in connection with any action or proceeding initiated concerning or arising from this Agreement. In the event there is any conflict of law between the Laws of the State of Delaware and the Country of Brazil, the Laws of the State of Delaware shall prevail.

(k) WAIVER OF JURY TRIAL. EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT. 

(l) No Third-Party Beneficiaries. This Agreement is for the benefit of, and may be enforced only by Seller and Buyer, and each of their respective successors and permitted transferees and assignees, and is not for the benefit of, and may not be enforced by, any third party. 

(m) Attorney's Fees. If any action at law or in equity is brought to enforce or interpret the terms of this Agreement, then the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which it may be entitled. 

(n) Remedies Cumulative. No remedy by the terms of this Agreement conferred upon or reserved to any Party is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and in addition to every other remedy given under this Agreement or existing at Law (including, without limitation, the right to such equitable relief by way of injunction), or by statute on or after the date of this Agreement.

FTC-SLL-0004356

(o)     Further Assurances.  From time to time, as and when requested by any Party, the other Party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions (subject to any limitations set forth in this Agreement), as such other Party may reasonably deem necessary or desirable to consummate the transactions contemplated by this Agreement and/or effectuate the intent of this Agreement and Buyer's ownership and responsibility for the Financial Accounts, all at the sole cost and expense of the requesting Party.

(p)     Successors and Assigns.  This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and each of their respective legal representatives, successors and permitted assigns, including any trustee appointed under chapters 11 or 7 of the Bankruptcy Code and any responsible officer or examiner appointed for any of the Parties.

*[Remainder of page intentionally blank; Signature page follows]*

**Menjivar Att. M
Page 18 of 22**

FTC-SLL-0004357

*[Signature page to Receivables Purchase and Sale Agreement]*

      IN WITNESS WHEREOF, the Parties have executed this Receivables Purchase and Sale Agreement, to be effective as of the date first set forth above.

SELLER:                         BUYER:

MAINBROOK ASSET PARTNERS I, LLC   PRUDENT INVESTIMENTOS LTDA

By: _____    By: _____
     Hirsh Mohindra, Managing Partner       Edivaldo Lacerda de Albuquerque,
                                Managing Partner

**Menjivar Att. M**
**Page 19 of 22**

FTC-SLL-0004358

EXHIBIT A

PURCHASE STATEMENT

FINANCIAL ACCOUNTS:

| | | |
|---|---|---|
| 1. | Cut-off Date | November 27, 2015 |
| 2. | Closing Date | November 27, 2015 |
| 3 | Description of Financial Accounts: | BMG Warehouse Debt |
| 4. | Number of Financial Accounts: | To Be Determined |
| 5. | Aggregate Original Balance of Financial Accounts: | Approximately $166,666,667.00 |
| 6. | Average Purchase Rate | 1.2% |
| 7. | Purchase Price | $2,000,000.00 |

FTC-SLL-0004359

EXHIBIT B

## WIRE INSTRUCTIONS:

| | |
|---|---|
| Beneficiary: | Mainbrook Asset Partners I, LLC<br>5477 Main St<br>Williamsville, NY 14221 |
| Account Name: | Mainbrook Asset Partners I, LLC |
| Bank Name: | Bank of America |
| ABA Routing: | 026 009 593 |
| Account Number: | ███████ 4472 |
| SWIFT CODE: | ███████ |
| Bank Address: | 100 W. 33rd Street<br>New York, NY 10001 |

**Menjivar Att. M**
**Page 21 of 22**

FTC-SLL-0004360

EXHIBIT C

FORM OF BILL OF SALE AND ASSIGNMENT

WHEREAS, Mainbrook Asset Partners I, LLC, a Delaware limited liability company ("Seller") and Prudent Investimentos LTDA, a Brazilian limited liability company ("Buyer") have entered into that certain Receivables Purchase and Sale Agreement made effective as of November 27, 2015 (each as defined in the Agreement) upon the terms and conditions set forth in that Agreement,

NOW, THEREFORE, for good and valuable consideration, and pursuant to the terms and provisions of the Agreement, Seller hereby sells, assigns, quitclaims, transfers and conveys to Buyer all of Seller's right, title and interest in and to the Financial Accounts as set forth in the Agreement, provided however such transfer is made without any representations, warranties or recourse, except as provided in the Agreement.

Any sales tax resulting from the terms of such Agreement is the sole and exclusive responsibility of Buyer.

THE FINANCIAL ACCOUNTS TRANSFERRED PURSUANT HERETO ARE TRANSFERRED AS IS AND WHERE IS, AS MORE FULLY SET FORTH IN THE AGREEMENT.

IN WITNESS WHEREOF, Seller has signed and delivered this instrument on the 27th day of November, 2015.

MAINBROOK ASSET PARTNERS I, LLC

By: _____
        Hirsh Mohindra, Managing Partner

FTC-SLL-0004361

# Menjivar Attachment N



ORIGINAL

## OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

| | |
|---|---|
| MATTER NO. | X160030 |
| TITLE | STARK LAW, LLC |
| DATE | RECORDED: DECEMBER 21, 2015<br>TRANSCRIBED: APRIL 12, 2016 |
| PAGES | 1 THROUGH 17 |

TELEPHONE CONVERSATION BETWEEN MALE REPRESENTATIVE AND
MRS. ▮▮▮▮▮▮
2015_21_12_02_20PM_408_1732▮▮▮▮

2

1                       FEDERAL TRADE COMMISSION

2                           I N D E X

3

4    RECORDING:                                    PAGE:

5    Telephone conversation between Male Representative

6    and Mrs. ████████                              4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    FEDERAL TRADE COMMISSION

2

3       In the Matter of:              )

4       Stark Law, LLC                 )   Matter No. X160030

5                                      )

6       ------------------------------)

7                                      December 21, 2015

8

9

10

11          The following transcript was produced from a

12      digital recording provided to For The Record, Inc. on

13      April 11, 2016.

14

15

16

17

18

19

20

21

22

23

24

25

4

```
1                    P R O C E E D I N G S
2                    -    -    -    -    -
3        TELEPHONE CONVERSATION BETWEEN MALE REPRESENTATIVE AND
4                         MRS. ██████
5             FEMALE REPRESENTATIVE:  Good afternoon, Legal
6     Department.  How may I help you?
7             MRS. ██████ :  Yeah, somebody just called here
8     and I tried to get through, but it didn't go through.
9             MALE REPRESENTATIVE:  Give me one second,
10    ma'am.  One second.  They was trying to get in contact
11    with a Mr. Seth ██████.
12            MRS. ██████ :  Correct.  This is Mrs. ██████.
13    Can I help you?
14            MALE REPRESENTATIVE:  Well, yes, ma'am.  We're
15    trying to get in contact with your husband, Ms. ██████,
16    regarding some pending matters here.  Would you have a
17    good number where we can reach him at?
18            MRS. ██████ :  This is the best number, and I
19    can help you.  Is this regarding claim number 4309415?
20            MALE REPRESENTATIVE:  4300415, but, yes, ma'am,
21    Ms. ██████ .
22            MRS. ██████ :  Okay.  Well, a Leslie Fox has
23    been leaving messages and also calling another number
24    that should not be called.  I don't know where you're
25    getting other numbers from, but this is the only number
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1    that should be called or my cell phone because Seth is

2    not available during the day.

3             MALE REPRESENTATIVE:  Okay.  Okay.

4             MRS. ██████:  And he left a message on

5    Saturday at 866-307-2679.  Is that one of your numbers?

6             MALE REPRESENTATIVE:  Yes, it is, ma'am.

7             MRS. ██████:  Well, he left a message for

8    Leslie Fox and I left a message for Leslie Fox this

9    morning, giving --

10            MALE REPRESENTATIVE:  Okay.

11            MRS. ██████:  -- me authorization to speak

12   with you and to get whatever information is needed

13   because he doesn't know what this is all about.

14            MALE REPRESENTATIVE:  Okay, then, ma'am.  Well,

15   ma'am, we're contacting Mr. ██████, ma'am.  I'm giving

16   him a call back here, ma'am.  This is in reference to a

17   default payment that didn't come out of here -- of our

18   office on December 11th for $307.50.

19            MRS. ██████:  I'm sorry, for how much?

20            MALE REPRESENTATIVE:  $307.50.

21            MRS. ██████:  I'm sorry, you keep getting cut

22   off.  Sir, you keep getting cut off.  What is the amount?

23            MALE REPRESENTATIVE:  $307.50, Ms. ██████.

24            MRS. ██████:  Okay.  And is that the payment

25   that he made with his debit card?

6

```
1           MALE REPRESENTATIVE:  Yes, ma'am.  He posted
2   one payment here on December 7th for that amount.  He had
3   a final payment coming out on December 11th for the same
4   amount.  And when they tried to run their payment -- run
5   that payment, they were unsuccessful.  So, at this,
6   ma'am, we're giving him a call back to let him know that,
7   at this point, we do have to escalate legal action.
8   Prior to doing so, we'll give him a call back to --
9           MRS.         :  Okay, okay, okay, all right.
10          MALE REPRESENTATIVE:  -- see if this is
11  something he want to take care of.
12          MRS.        :  Yeah, listen, listen, listen,
13  listen, listen.
14          MALE REPRESENTATIVE:  Hmm.
15          MRS.        :  The $307.50, I believe his bank
16  contacted him and charged him for an out-of-the-country
17  charge.  Where was this payment made to?
18          MALE REPRESENTATIVE:  Okay, then, ma'am, when
19  they set him up on this arrangement, ma'am, we do advise,
20  ma'am, that these transactions will appear as a foreign
21  transaction and (inaudible) make it --
22          MRS.        :  Really?  Okay.  Well, then you
23  know what --
24          MALE REPRESENTATIVE:  Mrs.        would
25  you --
```

7

```
 1                    MRS.          :  -- this is -- this is what --
 2               MALE REPRESENTATIVE:  -- would you allow me to
 3         finish speaking, Ms.        ?  I mean, because you don't
 4         have to cut me off, ma'am.
 5                    MRS.          :  No, because I've -- I've been
 6         through this and --
 7               MALE REPRESENTATIVE:  I'm listening, Ms.
 8               .
 9                    MRS.          :  And there have been too many
10         scams going on where money has been paid and it's not
11         even -- there's no verification of any charges that are
12         outstanding.  If you can email him or myself --
13               MALE REPRESENTATIVE:  Ma'am, we have already
14         sent out an authorization form to his email address
15         stating who we are and payment arrangements that we set
16         up with him in regards to his case.  Now, once his final
17         payment would have cleared, we would have automatically
18         mailed him out or emailed him out a release letter, under
19         his Social with the original creditor's name that
20         financed this loan at first stating that he holds no more
21         obligation.  When he defaulted on this payment on the
22         11th, we have been trying to reach out to him.  Nobody --
23                    MRS.          :  Fine.  So, you know what, you
24         don't want the payment?
25               MALE REPRESENTATIVE:  Ms.          ?
```

8

1        MRS. ▮▮▮▮▮: If you don't want the payment,

2  that's fine.

3        MALE REPRESENTATIVE: Ms. ▮▮▮▮▮, you do not

4  have to scream, ma'am.

5        MRS. ▮▮▮▮▮: No, no, no, I'm really tired of

6  all of this. I am really tired.

7        MALE REPRESENTATIVE: Okay. Well, Ms. ▮▮▮▮▮,

8  I don't know what else --

9        MRS. ▮▮▮▮▮: I want to see proof.

10       MALE REPRESENTATIVE: Okay, then, Ms. ▮▮▮▮▮,

11  I don't know what proof that you want us to send you,

12  ma'am. We don't validate debt, ma'am, when it reaches

13  our legal department through our discovery process on

14  your husband's case. His Social Security number is

15  linked to this Capital One account that he gave back then

16  for remitting of his payments. When they tried to do

17  that, they were unsuccessful. So, if --

18       MRS. ▮▮▮▮▮: Right, because he put a stop

19  payment with his bank --

20       MALE REPRESENTATIVE: Mm-hmm.

21       MRS. ▮▮▮▮▮: -- when he saw an out-of-the-

22  country charge for this.

23       MALE REPRESENTATIVE: Okay. I'm not talking

24  about the Capital One account that -- I don't know what

25  information that he used this time with us. That was the

9

1      information that he gave back then to the original

2      creditor for them to remit the --

3                MRS. ▇▇▇▇▇: I don't know what you're --

4                MALE REPRESENTATIVE: -- payment back then.

5                MRS. ▇▇▇▇▇: Wait a minute, wait, wait, wait

6      a minute.

7                MALE REPRESENTATIVE: Okay. Ms. ▇▇▇▇ --

8                MRS. ▇▇▇▇▇: What are you calling about?

9                MALE REPRESENTATIVE: -- the bottom line -- I

10     am calling about his default payment that did not come

11     out of here on the 11th for $307.50?

12               MRS. ▇▇▇▇▇: On what charge, sir? If you

13     don't tell me --

14               MALE REPRESENTATIVE: Ms. ▇▇▇▇, why are you

15     screaming, ma'am? Okay, you don't have to scream --

16               MRS. ▇▇▇▇: Because I --

17               MALE REPRESENTATIVE: -- to express yourself,

18     ma'am. Okay. Now, if you're going to continue to

19     scream, ma'am, we can disconnect the call, Ms. ▇▇▇▇

20     Okay.

21               MRS. ▇▇▇▇: Okay. You --

22               MALE REPRESENTATIVE: Please don't scream at

23     me, ma'am.

24               MRS. ▇▇▇▇: Okay. Then I want information.

25               MALE REPRESENTATIVE: Okay.

10

1        MRS.      : I will get this payment made if

2    I get verification of this final payment that's due and

3    you will get your payment.

4        MALE REPRESENTATIVE: Okay then.

5        MRS.     : Okay?

6        MALE REPRESENTATIVE: Again, Ms.    , we

7    have sent out the authorization form to the email already

8    regarding these two payments that we set up with him.

9    One was on the 7th, one was supposed to be on the 11th.

10   It did not clear.

11        MRS.     : Right.

12       MALE REPRESENTATIVE: The only reason why we're

13   calling -- right. The only reason why we're calling back

14   because, at this point, ma'am, we have to determine if

15   we're escalating legal action today.

16       MRS.     : Okay. So, what --

17       MALE REPRESENTATIVE: Prior to doing so, ma'am,

18   we're just calling back --

19       MRS.     : So, what I --

20       MALE REPRESENTATIVE: Go ahead, Ms.    .

21   Go ahead, Ms.    .

22       MRS.     : Thank you. The payment that

23   came out on the 7th, his bank took out an out-of-the-

24   country charge. He contacted his bank and they told him

25   that this could be a scam, we will look into it. So, no

11

```
 1      further payments to you --
 2              MALE REPRESENTATIVE:  No, ma'am, this is not --
 3              MRS. ████:  -- until we figured out what we
 4      going on.  If you --
 5              MALE REPRESENTATIVE:  Okay, I understand that.
 6              MRS. ████:  -- can send proof --
 7              MALE REPRESENTATIVE:  I understand that.  I
 8      understand.
 9              MRS. ████:  Well, you don't because this is
10      what I keep trying to tell you.
11              MALE REPRESENTATIVE:  Okay then.
12              MRS. ████:  Is that when the first payment
13      came out --
14              MALE REPRESENTATIVE:  Yes, ma'am.
15              MRS. ████:  -- he was charged a $10 charge
16      going to London, and he thought that these --
17              MALE REPRESENTATIVE:  Okay.
18              MRS. ████:  -- payments were going to
19      California.
20              MALE REPRESENTATIVE:  Okay, ma'am.
21              MRS. ████:  And now -- now, you're asking
22      for another payment.
23              MALE REPRESENTATIVE:  Okay.
24              MRS. ████:  If you want the final payment,
25      he will be glad --
```

1     MALE REPRESENTATIVE: Mm-hmm.

2     MRS. ████████: -- to make it.

3     MALE REPRESENTATIVE: Mm-hmm.

4     MRS. ████████: I will be glad to make it --

5     MALE REPRESENTATIVE: Yes, ma'am.

6     MRS. ████████: -- if I get some kind of

7 verification.

8     MALE REPRESENTATIVE: Okay.

9     MRS. ████████: Where it's going to. And I

10 could show it to my legal counsel.

11     MALE REPRESENTATIVE: Okay.

12     MRS. ████████: Okay? Because that's how

13 everything is being handled right now.

14     MALE REPRESENTATIVE: Now, let me -- now -- now

15 -- now, well, ma'am, let me explain this to you one more

16 time, ma'am. When they set your husband up on these

17 arrangements, we informed him that these transactions

18 will appear as a foreign transaction on your credit card

19 statement. No, you may get --

20     MRS. ████████: Okay, well, he doesn't remember

21 that.

22     MALE REPRESENTATIVE: Ma'am --

23     MRS. ████████: He doesn't even remember these

24 charges.

25     MALE REPRESENTATIVE: Can I finish -- can I

13

1    finish speaking, ma'am?  Now, if you don't want me to

2    speak, Ms. ▓▓▓▓, please let's disconnect the call, Ms.

3    ▓▓▓▓.

4            MRS. ▓▓▓▓:  If you don't want your money,

5    then disconnect it.  If you want the money then speak to

6    me and I will make sure that it gets taken care of.

7            MALE REPRESENTATIVE:  Okay.  Now, you may

8    get --

9            MRS. ▓▓▓▓:  I will be more than happy to

10   make sure --

11           MALE REPRESENTATIVE:  Okay, now --

12           MRS. ▓▓▓▓:  -- that it gets taken care of --

13           MALE REPRESENTATIVE:  Okay.

14           MRS. ▓▓▓▓:  -- when I know what it's for and

15   that it's getting into the right hands and not some kind

16   of scam artist that's out there to keep getting money.

17   Okay?

18           MALE REPRESENTATIVE:  Okay.

19           MRS. ▓▓▓▓:  That's all that we're asking for

20   at this point.

21           MALE REPRESENTATIVE:  Okay.

22           MRS. ▓▓▓▓:  That's it.

23           MALE REPRESENTATIVE:  Okay, okay, now --

24           MRS. ▓▓▓▓:  You're talking about $300, not

25   $3,000.

14

1             MALE REPRESENTATIVE:  Again, Ms. ▉▉▉ -- Ms.

2    ▉▉▉ --

3        MRS. ▉▉▉ :  Give us --

4        MALE REPRESENTATIVE:  Ms. ▉▉▉ --

5        MRS. ▉▉▉ :  -- what we need and you'll get

6    it and it's off your back.

7        MALE REPRESENTATIVE:  Ms. ▉▉▉ , I understand

8    what you're stating, Ms. ▉▉▉ .  Okay.  We have already

9    sent out the authorization form.  The only thing that we

10    sent out from --

11        MRS. ▉▉▉ :  How many more times are you

12    going to tell me that?  How many more times are you --

13        MALE REPRESENTATIVE:  How many more times are

14    you going to tell me, ma'am, that you need something --

15        MRS. ▉▉▉ :  I haven't seen it.

16        MALE REPRESENTATIVE:  Okay, ma'am.

17        MRS. ▉▉▉ :  I need to see it and he needs to

18    see it because he says he doesn't have it.  So --

19        MALE REPRESENTATIVE:  Okay.

20        MRS. ▉▉▉ :  -- if you want this paid --

21        MALE REPRESENTATIVE:  That authorization form

22    was sent out on December 7th --

23        MRS. ▉▉▉ :  Great.  You're going to tell me

24    again.

25        MALE REPRESENTATIVE:  -- to an email address --

15

1   ma'am, I'm letting you know, ma'am.

2           MRS. ▢: So, why can't you send it again?

3   Why can't you send it again?

4           MALE REPRESENTATIVE: Okay. It was sent to

5   ▢.com, which is the email address that he

6   provided for us to send out the authorization form. If

7   you would check your email --

8           MRS. ▢ Okay. And why don't --

9           MALE REPRESENTATIVE: If you would check your

10  email --

11          MRS. ▢: It's not my email, it's his.

12          MALE REPRESENTATIVE: Okay, ma'am --

13          MRS. ▢: If you want to send it to my

14  email --

15          MALE REPRESENTATIVE: Well, then -- well, then

16  maybe he needs to check --

17          MRS. ▢: It's ▢

18          MALE REPRESENTATIVE: Okay, then maybe he needs

19  to check his email and I cannot send you out that letter

20  again until we set you back up on arrangements.

21          MRS. ▢: You know what?

22          MALE REPRESENTATIVE: All our letters are

23  specially generated, ma'am.

24          MRS. ▢: You know what? Why don't you

25  people -- why don't you people listen --

16

1          MALE REPRESENTATIVE:  Good luck to you, Ms.

2

3          (The call was concluded.)

4          (The recording was concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17

1        C E R T I F I C A T I O N   O F   T Y P I S T

2

3    MATTER NUMBER: X160030

4    CASE TITLE: STARK LAW, LLC

5    TAPING DATE: DECEMBER 21, 2015

6    TRANSCRIPTION DATE: APRIL 12, 2016

7

8        I HEREBY CERTIFY that the transcript contained

9    herein is a full and accurate transcript of the tapes

10    transcribed by me on the above cause before the FEDERAL

11    TRADE COMMISSION to the best of my knowledge and belief.

12

13                    DATED:  APRIL 12, 2016

14

15    _____

16                    ELIZABETH M. FARRELL

17

18        C E R T I F I C A T I O N   O F   P R O O F R E A D E R

19

20        I HEREBY CERTIFY that I proofread the transcript for

21    accuracy in spelling, hyphenation, punctuation and

22    format.

23

24    _____

25                    SARA J. VANCE

ORIGINAL

## OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

MATTER NO.    X160030

TITLE    STARK LAW, LLC

DATE    RECORDED:  DECEMBER 24, 2015
        TRANSCRIBED: APRIL 12, 2016

PAGES    1 THROUGH 32

TELEPHONE CONVERSATION BETWEEN TAMMY HILL AND REBA AND
MIKE ▆▆▆▆
2015_24_12_09_44AM_462_1732▆▆▆▆

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

2

1                    FEDERAL TRADE COMMISSION

2                         I N D E X

3

4    RECORDING:                                      PAGE:

5    Telephone conversation between Tammy Hill and

6    Reba and Mike ████████                              4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          FEDERAL TRADE COMMISSION

2

3        In the Matter of:              )

4        Stark Law, LLC                 )   Matter No. X160030

5                                        )

6        ------------------------------)

7                                        December 24, 2015

8

9

10

11              The following transcript was produced from a

12       digital recording provided to For The Record, Inc. on

13       April 11, 2016.

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2                   --    -    -    -    -

3    TELEPHONE CONVERSATION BETWEEN TAMMY HILL AND REBA

4                   AND MIKE ▓▓▓▓

5          TAMMY HILL:  May I help you?

6          REBA ▓▓▓▓:  Yes, somebody called yesterday

7    and left a message regarding reference number 430 --

8          TAMMY HILL:  Okay.

9          REBA ▓▓▓▓:  -- 0415.

10         TAMMY HILL:  Okay.  Can you repeat that one

11   more time, ma'am?  I'm sorry.

12         REBA ▓▓▓▓:  430 --

13         TAMMY HILL:  Mm-hmm.

14         REBA ▓▓▓▓:  -- 0415.

15         TAMMY HILL:  Oh, okay.  One moment.

16         (Pause)

17         TAMMY HILL:  Yes, we were calling to get in

18   contact with Seth ▓▓▓▓.

19         REBA ▓▓▓▓:  Yes.  And -- and I spoke with

20   Elizabeth yesterday.  Is there an Elizabeth there?  And

21   we tried to do a conference with Seth because --

22         TAMMY HILL:  Okay, well --

23         REBA ▓▓▓▓:  -- he has given me authority to

24   speak.  Now, you know what, this is what's been going on.

25   She disconnected us.  We are trying to get this resolved.

5

1    Seth cannot speak --
2              TAMMY HILL:  Ma'am, ma'am, ma'am --
3              REBA          :  -- during the hours that you're
4    available.
5              TAMMY HILL:  Ma'am?
6              REBA          :  Yes.
7              TAMMY HILL:  Ma'am, I'm trying to pull up the
8    account.  That's all I was trying to do.
9              REBA          :  Okay, great.  Okay.
10             TAMMY HILL:  I'm so sorry.  One moment.
11             (Pause)
12             TAMMY HILL:  Hello, ma'am, what was your name?
13   I'm sorry.
14             REBA          :  My name is Reba          .
15             TAMMY HILL:  Okay.
16             REBA          :  And Seth has left messages while
17   I was sitting there on your voicemail or somebody's
18   voicemail stating that I have authority to speak to you
19   because if there is a debt that needs to be paid, I am
20   handling all of his payments.
21             TAMMY HILL:  Okay, all right.  Okay, Reba, I do
22   apologize.  I don't want to get you upset or anything
23   like that.
24             REBA          :  Well, everybody has been for the
25   past three days.  So, I'm a little frustrated --

6

1          TAMMY HILL:  (Inaudible).

2          REBA ▮▮▮▮:  -- and I want this resolved.

3          TAMMY HILL:  Okay, Reba, my name is Tammy.  My

4     name is Tammy Hill.  Okay?

5          REBA ▮▮▮▮:  Okay.

6          TAMMY HILL:  So, I'll be the one that will -- I

7     can assist you.  Just let me see.  Okay, I see that your

8     name is on the account for Seth ▮▮▮▮.  It is okay to

9     speak with you.

10         REBA ▮▮▮▮:  Oh, finally, thank you.

11         TAMMY HILL:  I have the Social, XXX-XX-XXXX.

12    Okay.  Yes, I see that it is okay to speak with you.  I'm

13    just opening my notes and going through my notes, okay?

14         REBA ▮▮▮▮:  Okay.

15         TAMMY HILL:  Because you're -- you're Reba

16    ▮▮▮▮  All right?

17         REBA ▮▮▮▮:  Yes, yeah.

18    TAMMY HILL:  Okay.

19         REBA ▮▮▮▮:  I really am.

20         TAMMY HILL:  Okay, all right.  Let's see.

21    Yeah, so --

22         REBA ▮▮▮▮:  Can I just ask you a question?

23    TAMMY HILL:  Yes, ma'am.

24         REBA ▮▮▮▮:  I have one question that I need

25    to clear up, I need to clarify this right now.  My

1    daughter has been getting harassing phone calls from your
2    company.  My home has been getting harassing phone calls
3    from your company and I want the numbers taken off.
4         TAMMY HILL:  I do -- I don't --
5         REBA          :  I will give you two numbers that
6    you can call and that's it.
7         TAMMY HILL:  All right.  Reba, the reason why
8    we were calling, I apologize, usually we -- we usually
9    don't leave messages as far as harassing anyone.  But I
10   will --
11        REBA          :  Let me ask you, do you consider
12   it harassing when you get a message left saying that we
13   will track you down in your employment or residence and
14   have you arrested?
15        TAMMY HILL:  No, we never say anything about
16   being arrested.
17        REBA          :  Oh, ma'am, yes, you -- not you,
18   but a gentleman has left messages on my daughter's
19   voicemail, on my home -- and I have them and my lawyer
20   has them now.  And they will be going to the Better
21   Business Bureau as well.  So, let's get this resolved
22   once and for all --
23        TAMMY HILL:  Okay, all right.  Well --
24        REBA          :  -- and stop all this nonsense.
25        TAMMY HILL:  Okay.  Well, I -- I'm not the one.

8

1     I do apologize --

2           REBA      : It's your company.

3           TAMMY HILL: -- (inaudible).

4           REBA      : It's your company.

5           TAMMY HILL: Okay, okay, all right.

6           REBA      : It's your company that you're

7     representing that's doing --

8           TAMMY HILL: Well, Reba, what I want to do

9     is -- well, why we were contacting you is because the

10    payment -- your final payment which you would have been

11    finished was reversed for $307 (inaudible) --

12          REBA      : Right. And I'll tell -- can I

13    tell you why? Can I tell you why? That's why we're not

14    making any payments until we get some kind of

15    verification of who your company is and what this is for

16    because when Seth made the payment previous to that, that

17    went to a bank in London and he was charged an overseas

18    fee. He was never told that it was going out of the

19    country. His bank told him that this could be a scam and

20    looked into it and reversed the payment for him.

21          So, what we --

22           TAMMY HILL: Well, the --

23          REBA      -- have been trying to do

24    numerous, numerous times is to get written verification

25    from your company who you are, where we can mail a check

9

```
 1    to --
 2              TAMMY HILL:  We don't --
 3              REBA            -- and what this balance is for.
 4    If you can't provide that, then --
 5              TAMMY HILL:  Yeah.  If you -- if you give --
 6              REBA        :  -- let me know how (inaudible).
 7              TAMMY HILL:  If you can give me a chance --
 8    chance to explain, I don't want to be rude and cut you
 9    off, okay?
10              REBA          Okay, go right ahead.
11              TAMMY HILL:  Now, like I was going to say this
12    is truly not a scam.  The legal process has already been
13    started on this case.  Once again, like we do have the
14    Social attached to it and the Social was linked to the
15    bank account we need to recover.
16              REBA        :  Could you lower your music in
17    the background because I really can't hear you that well?
18              TAMMY HILL:  Can you hear me better now?
19              REBA        :  Yeah, but I still hear the music
20    really loud.
21              TAMMY HILL:  Okay.  Well, Ms.          if
22    on  -- like I understand that you did make the payment of
23    $307.50 and I'm pretty sure you spoke with someone
24    previously and they explained to you the information, but
25    I'll let you know that the original creditor was Archway
```

10

```
1    Holding, but we do have rightful ownership of this
2    account.  We are located in Bakersfield, California.  But
3    the payment does -- when the first transaction was done,
4    like the person explained to you, that a -- the
5    transaction will show up as a foreign transaction, but we
6    do ensure people that our location is here in California,
7    ma'am.
8              REBA          :  Well, then I'll send the check
9    to you in California if you give me the information.  And
10   what is Archway Holding?  Is that --
11             TAMMY HILL:  We were -- you already have the --
12             REBA          :  Is that the --
13             TAMMY HILL:  What we can do, if you wanted, you
14   know, you have the option of we can just go ahead and set
15   the payment up now.  We can write it now when you're on
16   the phone and get it took -- like squared away.
17             REBA          No, I'm not giving you any
18   credit card information or checking account information
19   over the phone.  Absolutely not.
20             TAMMY HILL:  Well, I'll just have to --
21             REBA          :  Absolutely not.  I will get
22   it -- I will get a cashier's check from the bank and have
23   it sent to you.  And if that's not acceptable, I don't
24   understand why that can't be done.
25             TAMMY HILL:  We take credit or debit.  Just the
```

11

1    same way how you did the first payment, you will have to

2    do it this time, okay?

3              REBA          :  No, absolutely not, not when I'm

4    seeing this (inaudible) --

5              TAMMY HILL:  Okay.  Well, you don't --

6              REBA          -- and I'm getting harassing

7    phone calls.

8              TAMMY HILL:  I'll go ahead and just --

9              REBA          :  I'm really trying to --

10             TAMMY HILL:  You know what, Reba, because I'm

11    not trying to be rude to you anyway, ma'am.  I have been

12    nothing but respectful to you.

13             REBA          :  Oh, absolutely, you have been.

14             TAMMY HILL:  Okay.

15             REBA          :  And I app -- and I have been,

16    too, I think.

17             TAMMY HILL:  And -- yeah, okay.  So, like I

18    stated before, we can just go ahead and set the payment

19    up like you previously did.

20             REBA          :  No.

21             TAMMY HILL:  And I could --

22             REBA          :  No, no.

23             TAMMY HILL:  Okay, if you don't -- all right,

24    all right.  If that's --

25             REBA          :  But -- but I want it --

12

```
 1              TAMMY HILL:  -- if that's not what you want to
 2       do --
 3              REBA        :  But I want it --
 4              TAMMY HILL:  I'm telling you -- I'm explaining
 5       to you the way that we take the payment here.  Now, if
 6       that's not what you want to do, what I'll go ahead and do
 7       is go ahead and forward your bill and we'll seek a
 8       judgment of $2,307.50.
 9              REBA        :  I need to know the name of your
10       company.  What is the name of your company?
11              TAMMY HILL:  Stark Recovery.
12              REBA        :  And where are you located?
13              TAMMY HILL:  Bakersfield, California, ma'am.
14              REBA        :  What is the address?
15              TAMMY HILL:  4900 California --
16              REBA        :  Mm-hmm.
17              TAMMY HILL:  -- Avenue --
18              REBA        :  Mm-hmm.
19              TAMMY HILL:  Tower B, Second Floor,
20       Bakersfield, California.
21              REBA        :  Okay.  What I need to do first
22       and --
23              TAMMY HILL:  The zip code --
24              REBA        :  Mm-hmm.
25              TAMMY HILL:  The zip code is 93309.
```

13

```
 1            REBA           :   Okay.  You are the first person
 2      that's given me more information.  Now -- now, I need to
 3      ask you a few more questions.  You said that the original
 4      claim was through Archway?
 5            TAMMY HILL:  Holdings, yes.  But if you were
 6      trying to contact them, they're going to send you right
 7      back here because --
 8            REBA           :   No, no, no, I'm not -- I am not
 9      trying to contact them.  I am trying to find out what
10      this payment is for.  Is it a credit card?  Was it a loan
11      done online?
12            TAMMY HILL:  This was for a payday -- this was
13      for a payday loan that was done online.
14            REBA           :   Okay.  Okay.  So, and how much
15      was the original loan for and when was it from?
16            TAMMY HILL:  The original was $450, but you
17      also accrue penalties and interest, Ms.          -- Mrs.
18               , I apologize.
19            REBA           :   That's okay.  That's okay.
20      So -- so -- and when was this from?
21            TAMMY HILL:  March 13th of 2013.
22            REBA           :   And is there any written or
23      acceptance on --
24            TAMMY HILL:  We don't have that --
25            REBA           :   Okay.
```

14

1              TAMMY HILL:  -- we don't have that information.

2              REBA █████:  Please, I'm trying --

3              TAMMY HILL:  Now, that --

4              REBA █████  Okay.  I'm just trying to get

5  all of my facts.  I would hope that you would understand

6  that if you were getting phone calls like this and --

7              TAMMY HILL:  Yeah.

8              REBA█████:  -- your son is telling you --

9              TAMMY HILL:  This is what --

10             REBA █████  -- he doesn't remember doing

11  this, that -- and he's been scammed before, that we

12  are --

13             TAMMY HILL:  Like I -- and I understand your

14  concern, Reba, but like I stated to you, this is not a

15  scam.  And if I had someone that called me, okay, I know

16  that this happened in 2013, it's going on 2016, maybe you

17  would -- could have forgot about it or he could have

18  forgot about it.

19             REBA █████:  Absolutely.

20             TAMMY HILL:  Yeah.

21             REBA █████:  Oh, I agree with you, I agree

22  with you 100 percent.

23             TAMMY HILL:  But --

24             REBA █████:  And that's why I'm asking, there

25  has to be -- Archway has to have something in writing or

15

1     electronic that Seth agreed with this.

2                TAMMY HILL:  The credit in --

3                REBA ████████:  And that's what we're looking

4     for.

5                TAMMY HILL:  I -- okay, well, let's -- I don't

6     want to cut you off, but that's what I was about to say

7     next.  That the creditor would have been listed and the

8     contract that was agreed to was that when the loan was

9     accepted.  And our evidence -- like, yeah, so it would

10    have been there.  So, that's what --

11               REBA ████████:  Now, so I need to get that from

12    Archway or if you could get that from Archway and produce

13    that for me because --

14               TAMMY HILL:  Archway --

15               REBA ████████:  -- I will tell you --

16               TAMMY HILL:  Archway --

17               REBA ████████:  -- we've -- we've --

18               TAMMY HILL:  -- Archway financed the loan for

19    the creditor.

20               REBA ████████:  Mm-hmm.

21               TAMMY HILL:  It's many different payday loans

22    online.

23               REBA ████████:  Okay.  And he --

24               TAMMY HILL:  Now, Archway -- so, Archway --

25               REBA ████████  Go ahead, I'm sorry.

16

1                TAMMY HILL:   -- Holdings -- Archway Holdings is

2      the one that financed.  Now, the creditor has tried to

3      get payment, but what we're doing -- that's why you set

4      up payments with us.  We have rightful ownership right

5      now.

6                REBA          And what is the balance of --

7                TAMMY HILL:  So, all of the --

8                REBA          -- (inaudible) $307?

9                TAMMY HILL:  And you'll be finished, $307.50.

10     That was your last payment.

11             REBA          And how am I going to get some

12     kind of verification that this is going to be the final

13     payment?

14             TAMMY HILL:  Because, like I stated, we'll be

15     on the phone and I'll let you know and I can give you a

16     confirmation number.

17             REBA          And I want something in -- could

18     I get an email in writing?

19             TAMMY HILL:  Yes, you can.

20             REBA          Because if I don't get an email

21     in writing within 24 hours, then I'll just cancel it with

22     my credit card.  I will tell you that because I'm -- this

23     is -- this is where I'm at with all of these phone calls

24     and nobody wanted to give me any information.

25             TAMMY HILL:  Reba, Reba?

Menjivar Att. N
Page 33 of 49

17

1       REBA ▓▓▓▓: Yes.

2       TAMMY HILL: You've spoken with previous

3    people, but I believe --

4       REBA ▓▓▓▓: Mm-hmm.

5       TAMMY HILL: -- that I have tried to assist you

6    the best way that I can because I would want someone to

7    do me the same way. I can't explain --

8       REBA ▓▓▓▓: Mike, come here a minute.

9       TAMMY HILL: I can't --

10      REBA ▓▓▓▓: No, I just want -- I just want

11   to discuss this with my husband and see if we can just

12   get this resolved once and for all.

13      TAMMY HILL: Okay. Because I don't -- I'm not

14   trying to be rude or (inaudible), I'm trying to get it

15   tooken care of. I can't -- I can't speak for anyone

16   else. I can only speak for (inaudible) --

17      REBA ▓▓▓▓: No, you're not being rude at

18   all. You're being very, very accommodating. I just need

19   to make sure that -- that --

20      TAMMY HILL: Okay.

21      REBA ▓▓▓▓: How -- do you know how much he's

22   paid previous to this already?

23      TAMMY HILL: This -- previous -- we have a

24   payment that you all made of $307.50. Now, this would be

25   the last payment, and you'll be finished.

18

1        REBA ▇▇▇▇▇ :   So, for --

2            TAMMY HILL:  I couldn't hear you.  What you

3    say, Reba?

4        REBA ▇▇▇▇▇    So, for the final payment -- for

5    the $450, you're accepting $614?

6            TAMMY HILL:  The last payment -- yeah, the last

7    payment will be for $307.50.

8        REBA ▇▇▇▇▇ :   Okay, hold on one second.  I

9    just want to explain this to my husband.

10           TAMMY HILL:  Okay.

11       REBA ▇▇▇▇▇ :   The name of the company that has

12   been harassing us is Stark Recovery.  This is their

13   address, this is who they are.  (Inaudible) to Archway

14   Holdings.  It's another one of those pay loan online.  He

15   took out a loan for $450; it's now up to $2,000 between

16   late fees and everything else.  They're accepting

17   $307.50.  He already made one payment of $307.50.

18       MIKE ▇▇▇▇▇ :   I thought he canceled that.

19       REBA ▇▇▇▇▇    He canceled the second one, and

20   that's why this is going on.  She said that --

21           Now, why do the payments go to London?

22           TAMMY HILL:  Well, because it shows up as a

23   foreign transaction, ma'am.

24       REBA ▇▇▇▇▇ :   Why?

25           TAMMY HILL:  It just shows up that way, as a

19

1    foreign transaction and --

2             REBA ▓▓▓▓▓: But we get charged $10 for a

3    foreign transaction. So, can I give you $300 and -- $295

4    because my bank charges me $10?

5             TAMMY HILL: Well, I -- that's the first I ever

6    heard of that.

7             REBA ▓▓▓▓▓  I'm supposed to be paying -- I'm

8    supposed to be paying California, not London.

9             TAMMY HILL: Ms. ▓▓▓▓▓, now, look, as far as

10   that goes, I guess -- that's the first that I've heard of

11   that. But like I stated, if you want to get this squared

12   away, we can all go ahead and square it away. But as far

13   as --

14            REBA ▓▓▓▓▓: (Inaudible). Should I just put

15   this on the credit card?

16            TAMMY HILL: Ms. ▓▓▓▓▓ I would just get it

17   over with.

18            REBA ▓▓▓▓▓: Yeah, I know you're -- I know

19   you're telling me to just get it over with.

20            TAMMY HILL: No, I'm not telling you to just

21   get it over -- I didn't mean it like that. Like I'm not

22   saying to just get it over with, but --

23            REBA ▓▓▓▓▓ She can't give me an answer why

24   it's going to London. I don't know.

25            TAMMY HILL: It -- it just shows us as a

20

1    foreign transaction.  I gave you all the information.

2              REBA ▮▮▮▮:  They probably have their bank

3    accounts in London.  I don't know.  So, what do you want

4    to do?  Do you want to keep getting --

5              Hold on one minute.  Don't hang up.  Just hold

6    on.

7              TAMMY HILL:  Yes, ma'am.

8              (Pause)

9              REBA ▮▮▮▮   I don't think they take American

10   Express.

11             MIKE ▮▮▮▮   (Inaudible).

12             REBA ▮▮▮▮:  Do you take American Express?

13             TAMMY HILL:  Uh, let me see.  One moment.

14   First, I have to get -- I have to -- I have to ask my

15   supervisor because I have to get the account unlocked,

16   okay?  So, I'm going to place you on a brief hold, okay,

17   Ms. ▮▮▮▮?

18             REBA ▮▮▮▮:  What do you mean you have to get

19   the account unlocked?

20             TAMMY HILL:  I have to go into the account to

21   see what payments because I don't remember, so -- because

22   it's not like we -- it shows --

23             REBA ▮▮▮▮:  Just (inaudible) --

24             TAMMY HILL:  I have to -- so, I'm going to

25   place you on a brief hold, Ms. ▮▮▮▮, and then I'm

21

```
1     going to speak to my supervisor and I'm going to come
2     right back, okay?  All right?  Thank you.
3                REBA              Oh, boy, this is sounding more
4     and more legitimate as we talk.
5                TAMMY HILL:  One moment, Ms.
6                (On hold)
7                REBA              They may not take American
8     Express.
9                MIKE              (Inaudible).
10               REBA              I don't know.  I don't know.  Do
11    you think I shouldn't -- I don't know.  I don't know what
12    -- you know, these are all online --
13               MIKE              (Inaudible) was different and
14    when they gave us the information (inaudible).
15               REBA              She said she gives me a
16    confirmation number and then I told her that I want an
17    email within 24 hours, otherwise I'm going to -- I'm
18    going to cancel it.  Otherwise, I'm going to --
19               MIKE              (Inaudible).
20               REBA              Well --
21               MIKE              (Inaudible).
22               REBA              This is from 2013.
23               MIKE              (Inaudible).
24               REBA              Mm-hmm.
25               (Pause)
```

22

1        TAMMY HILL:  Hello, Ms. ▓▓▓▓▓?

2        REBA ▓▓▓▓  Yeah.

3        TAMMY HILL:  I do apologize for having you on

4    hold so long.  Okay.  Now, yes, we do take American

5    Express.

6        REBA ▓▓▓▓  Okay, very good.

7        TAMMY HILL:  Okay.  I'm ready when you are for

8    that 16-digit card number.

9        REBA ▓▓▓▓  XXXX XXX XXX XXXXX.

10       TAMMY HILL:  XXXX XXXX XXXX XXX.

11       REBA ▓▓▓▓:  Mm-hmm.

12       TAMMY HILL:  Okay.  One moment.

13       (Pause)

14       TAMMY HILL:  Okay.  And then name as it appears

15   on the card?

16       REBA ▓▓▓▓    Reba ▓▓▓▓

17       TAMMY HILL:  Is there a middle initial?

18       REBA ▓▓▓▓:  No, there isn't.

19       TAMMY HILL:  Okay.  Okay.  And the three-digit

20   security code on the back of the card?

21       REBA ▓▓▓▓:  XXX.

22       TAMMY HILL:  XXX.  And the card billing

23   address?

24       REBA ▓▓▓▓    ▓▓▓▓▓▓▓

25       TAMMY HILL:  Can you spell that for me?

23

1      REBA ▓▓▓▓: ▓▓▓ capital ▓▓▓.

2      TAMMY HILL: Capital -- okay, ▓▓▓-capital?

3      REBA ▓▓▓▓: ▓▓▓.

4      TAMMY HILL: Okay, ▓▓▓.

5      REBA ▓▓▓▓: ▓▓▓.

6      TAMMY HILL: Okay. And the zip code?

7      REBA ▓▓▓▓: ▓▓▓.

8      TAMMY HILL: You said ▓▓▓?

9      REBA ▓▓▓: ▓▓▓.

10     TAMMY HILL: ▓▓▓.

11     REBA ▓▓▓: ▓▓▓.

12     TAMMY HILL: Okay, I'm sorry, Ms. ▓▓▓. I

13     just was -- the expiration date?

14     REBA ▓▓▓: Well, if would lower the music

15     in the back, you might be able to hear me.

16     TAMMY HILL: Okay.

17     REBA ▓▓▓: Expiration is ▓▓▓. I mean,

18     your company is so unprofessional, it's unbelievable.

19     Between your voicemails and the music.

20     TAMMY HILL: Have I been unprofessional?

21     REBA ▓▓▓: It doesn't matter. I'm just --

22     yes, you know what, with music in the background, it's

23     pretty unprofessional.

24     TAMMY HILL: Okay.

25     REBA ▓▓▓ And I hope you have a merry

1    Christmas taking my money from me.

2             TAMMY HILL:  I hope you have a very merry

3    Christmas and a happy new year as well.  Now, I'm going

4    to --

5             REBA          :  I don't celebrate Christmas.

6             TAMMY HILL:  Okay, all right.  Now, what I'm

7    going to need from you, the arrangement has been

8    scheduled.  Let's see.  The arrangement has been

9    scheduled, Ms.          , okay?

10            REBA          :  Mm-hmm.

11            TAMMY HILL:  Our office provides a courtesy

12   call -- well, you're on the phone right now, so we're

13   going to go ahead and run a payment for today.  And just

14   to put down a number -- let me see.  Okay, I have the

15   number (732)          .

16            REBA          :  No, take a different number.

17            TAMMY HILL:  Okay.

18            REBA          :  Oh, no, you know what, yeah,

19   keep that number.  That's my home number.  Fine.

20            TAMMY HILL:  Okay.

21            REBA          :  That's the only number to be

22   called.  I want all the other numbers taken off.

23            TAMMY HILL:  Oh, once -- once this -- once this

24   payment goes through, you won't receive any more calls.

25            REBA          :  I sure hope not.

25

1    TAMMY HILL:  Okay, all right.  Now, we will

2    send you out an authorization form, which will list all

3    of the payments that you have authorized for us to

4    process.  Please verify the information in this letter

5    and e-sign.  You will be sent a copy of the signed letter

6    for your records.  Now, what is your current email

7    address?

8        REBA ▆▆▆▆▆:  ▆▆▆▆▆ like boy-▆like ▆▆▆▆▆

9    ▆▆▆▆.net.

10       TAMMY HILL:  Okay.  And then I must advise you

11   that this transaction will appear as a foreign

12   transaction on your credit card statement.  You may get

13   notified by your bank or credit card company that a

14   foreign transaction took place.  Please be assured that

15   this is our company, Ms. ▆▆▆▆▆, and the charges are

16   verified.  There are no additional fees associated with

17   this transaction.

18       Now, I'm going to place you on a hold so that

19   my supervisor can go ahead and run the payment and I'll

20   be back shortly.  One moment.

21       REBA ▆▆▆▆:  Thank you.

22       (On hold)

23       REBA ▆▆▆▆:  (Inaudible) with this now.

24       MIKE ▆▆▆▆:  What are they doing now?

25       REBA ▆▆▆▆:  They're running the payment.  I

26

```
 1      have to speak to the supervisor.
 2                  MIKE ████: (Inaudible) $307.50 for
 3      (inaudible).
 4                  REBA ████: Mm-hmm. And they're going to be
 5      sending us an authorization showing what charges they're
 6      putting through. They're mailing it to us. We're going
 7      to get an email (inaudible). (Inaudible).
 8                  MIKE ████: (Inaudible).
 9                  REBA ████: I saw it on somebody else's
10      door.
11                  (On hold)
12                  MIKE ████: (Inaudible).
13                  REBA ████: I don't know, Mike. I'm not
14      going to the outlets today (inaudible).
15                  What are you walking away for? I don't know.
16      The same reason why I'm sitting on the phone because I
17      got to go in and take a shower. Because I didn't know it
18      was going to take an hour.
19                  (On hold)
20                  REBA ████: Mike, what's all this stuff on
21      the steps?
22                  MIKE ████: (Inaudible).
23                  REBA ████: (Inaudible) while I was on the
24      phone with them.
25                  (On hold)
```

1          TAMMY HILL:  Hello, Ms. ▇▇▇.

2          REBA ▇▇▇:  Yeah.

3          TAMMY HILL:  We ran the payment and it didn't

4  go through.

5          REBA ▇▇▇:  What?

6          TAMMY HILL:  We ran the payment and it didn't

7  go through.

8          REBA ▇▇▇:  My husband said that it's not --

9  the number that you asked for as the code is not the one

10  on the back; it's the one on the front.

11         TAMMY HILL:  What do you mean, like the card

12  number, the security --

13         REBA ▇▇▇:  No.  You know what, this card is

14  perfect.  So, if you're telling me that it doesn't go

15  through, then you --

16         TAMMY HILL:  Hello, Ms. ▇▇▇?

17         REBA ▇▇▇:  (Inaudible) supervisor.  Let me

18  speak to your supervisor.

19         TAMMY HILL:  One moment.

20         REBA ▇▇▇:  No, you have one minute, and

21  then I'm done.

22         (On hold)

23         REBA ▇▇▇:  You know what, either they

24  (inaudible) that I gave you from the back, my husband

25  said should be on the front.

28

1          MIKE ▓▓▓▓: Mm-hmm.

2          REBA ▓▓▓▓: She put me on hold again. I

3  said, let me speak to the supervisor. So, she goes, you

4  mean the card number? Fuck her. I'm (inaudible). I'm

5  done.

6          (On hold)

7          TAMMY HILL: Hello, Ms. ▓▓▓▓?

8          MIKE ▓▓▓▓: Hello?

9          TAMMY HILL: Hello, Mr. ▓▓▓▓?

10          MIKE ▓▓▓▓: Yeah.

11          TAMMY HILL: Yeah, I was just previously

12  speaking with Ms. ▓▓▓▓. I don't know if you heard,

13  but she wanted to speak to my supervisor, but she is

14  unavailable at the moment. But if you --

15          MIKE ▓▓▓▓: Well, that's not my problem.

16          TAMMY HILL: Okay. Well, we were wondering,

17  could you contact your bank because the card, it didn't

18  go through, it declined.

19          MIKE ▓▓▓▓: Well, try this number instead of

20  the card number on the back because that's not what

21  American Express uses, the card number. The card number

22  should be XXXX. It's a four -- the three-digit code you

23  put in.

24          TAMMY HILL: Okay. Oh, that's what -- because

25  she gave me a different code. So, I'm going to have to

1      re --
2                      MIKE              Because that's what you asked
3      for.
4                      TAMMY HILL:  I asked for the three-digit --
5      well, the security code.
6                      MIKE              That's not what you put in for
7      American Express.
8                      TAMMY HILL:  Okay, all right.  Well, I
9      apologize.
10                     MIKE          :  (Inaudible) code.
11                     TAMMY HILL:  Okay.  Well, what I'm going to
12     have to do, because we don't save anything.  I'm going to
13     have to put the card information in again.
14                     MIKE          :  Yeah, it figures.
15                     TAMMY HILL:  So, could you -- could you read it
16     to me?
17                     MIKE          :  XXXX -- wait, XXXX XXXX XX
18     XXXXX.
19                     TAMMY HILL:  XXXX XXXX --
20                     MIKE          :  No, XXXXXX, three Xs.
21                     TAMMY HILL:  Okay.  XXXXXX.
22                     MIKE          :  Yeah.
23                     TAMMY HILL:  Okay.
24                     MIKE          :  And the four-digit code is XXXX.
25                     TAMMY HILL:  Okay.  And it was Reba          ?  I

30

1     do apologize, Mr.        . I'm just trying to get this

2     squared away. Could you give me that -- the billing

3     address to the card again?

4            MIKE      :         ,    space-     

5         , East Brunswick, New Jersey,     .

6            TAMMY HILL: Okay, you went a little bit too

7     fast for me.       ,    space-    ?

8            MIKE      : Yep.

9            TAMMY HILL: Okay.

10           MIKE-     :     ,    .

11            TAMMY HILL: Okay. All right. And the billing

12     zip code?

13            MIKE     :     .

14            TAMMY HILL: Okay. And the expiration date?

15            MIKE     : And your company, this is a

16     legal company? Because I'm going to call the --

17            TAMMY HILL: Yes, sir.

18            MIKE     : Okay.

19            TAMMY HILL: Yes, sir.

20            MIKE     : I'm going to report your

21     company. I just want (inaudible).

22            TAMMY HILL: Expiration date?

23            MIKE     :     . I'm going to report your

24     company to the Better Business Bureau because you

25     shouldn't be doing stuff like this.

31

```
1              REBA        :  You know what, Mike, tell them
2       we'll send them a check.  I don't want them to use my
3       credit card.
4              TAMMY HILL:  Okay, now, I'm going ahead -- I'm
5       about to give the information and we're going to run the
6       payment, okay?
7              MIKE       :  Okay.
8              TAMMY HILL:  I'm going to place you on a brief
9       hold.  One moment.
10             (On hold)
11             TAMMY HILL:  Hello.
12             MIKE       :  Yeah.
13             TAMMY HILL:  Okay, well, I found out what the
14      problem is, sir.  We don't take American Express.
15             MIKE       :  Well, I'm sorry, there's no
16      other card I have.
17             TAMMY HILL:  Okay, all right.  Well --
18             REBA       :  Tell them to (inaudible).
19             MIKE       :  We'll send you a check to the
20      address on the -- the address you gave us.
21             TAMMY HILL:  Okay, yep.  Thank you.
22             MIKE       :  Okay.
23             (The call was concluded.)
24             (The recording was concluded.)
25
```

32

1    C E R T I F I C A T I O N    O F    T Y P I S T

2

3    MATTER NUMBER: X160030

4    CASE TITLE: STARK LAW, LLC

5    TAPING DATE:  DECEMBER 24, 2015

6    TRANSCRIPTION DATE:  APRIL 12, 2016

7

8        I HEREBY CERTIFY that the transcript contained

9    herein is a full and accurate transcript of the tapes

10   transcribed by me on the above cause before the FEDERAL

11   TRADE COMMISSION to the best of my knowledge and belief.

12

13                      DATED:  APRIL 12, 2015

14

15   _____

16                      ELIZABETH M. FARRELL

17

18   C E R T I F I C A T I O N    O F    P R O O F R E A D E R

19

20       I HEREBY CERTIFY that I proofread the transcript for

21   accuracy in spelling, hyphenation, punctuation and

22   format.

23

24   _____

25                      SARA J. VANCE

# Menjivar Attachment O



ORIGINAL

## OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

MATTER NO.       X160030

TITLE            STARK LAW, LLC

DATE             RECORDED:   OCTOBER 26, 2015
                 TRANSCRIBED:   APRIL 12, 2016

PAGES            1 THROUGH 13

TELEPHONE CONVERSATION BETWEEN JORDAN COLEMAN AND HICKS

2015_26_10_02_34PM_406_1843

2

1                    FEDERAL TRADE COMMISSION

2                        I N D E X

3

4      RECORDING:                                    PAGE:

5      Telephone conversation between Jordan Coleman

6      and Hicks ████████                                  4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:            )

4    Stark Law, LLC               )   Matter No. X160030

5                                 )

6    ------------------------------)

7                                     October 26, 2015

8

9

10

11          The following transcript was produced from a

12   digital recording provided to For The Record, Inc. on

13   April 11, 2016.

14

15

16

17

18

19

20

21

22

23

24

25

4

```
1                    P R O C E E D I N G S

2                  -    -    -    -    -

3        TELEPHONE CONVERSATION BETWEEN JORDAN COLEMAN AND

4                         HICKS

5              JORDAN COLEMAN:  Legal (inaudible), how may I

6        help you?

7              HICKS        :  Who is this?

8              JORDAN COLEMAN:  Legal Department of Stark

9        Recovery.  Do you have a reference number or a name that

10       I could reference for you?

11             HICKS        :  I just got a call that I had a

12       claim for 866-209-8167, and I don't know anything about

13       it.

14             JORDAN COLEMAN:  Okay.  Am I speaking with

15       Hicks       ?

16             HICKS        :  Yes, ma'am.

17             JORDAN COLEMAN:  Okay, one moment here.  All

18       right.  My name is Jordan Coleman.  I am a litigation

19       specialist here with Stark Recovery.  To ensure that I am

20       speaking with the right party, your Social Security

21       number is XXX-XX-XXXX?

22             HICKS           Correct.

23             JORDAN COLEMAN:  All right.  There is a matter

24       pending against you in our legal department.  Allow me to

25       explain the details.  Please hold your questions until
```

5

```
 1      the end.  We have a cause of action --
 2                HICKS          :  Can you slow down just a little
 3      bit?
 4                JORDAN COLEMAN:  Sure, I'm sorry.  We have a
 5      cause of action arising from a breach of contract when
 6      you defaulted on a loan.  You authorized a draft from
 7      your checkings account and that draft had insufficient
 8      funds.  Now, sir, was it your intent to breach your
 9      contract?
10                HICKS          :  I don't understand what this is
11      about.  Would you start over from the beginning again?
12                JORDAN COLEMAN:  Yes.
13                HICKS          :  Am I being sued or do I owe
14      somebody something or what?
15                JORDAN COLEMAN:  Yes.  You took out a loan
16      for $300 and you didn't pay it back, so that caused you
17      to breach your contract.  Now, let's see here.  You do
18      have --
19                HICKS          :  Who -- who did I take -- who
20      did I take --
21                JORDAN COLEMAN:  I didn't hear you.
22                HICKS          :  -- the loan out with?
23                JORDAN COLEMAN:  The creditor is Pack
24      Management Group.  They would have been listed in the
25      contract you agreed to when you accepted the loan.
```

6

```
 1          HICKS          :  Who -- who is the loan with?
 2          JORDAN COLEMAN:  The creditor is Pack
 3    Management Group.  That is who funded the loan, not the
 4    actual payday loan service.  I'm not sure what payday
 5    loan service you went through, but the creditor is who
 6    gave you the money so that is who the loan was owed back
 7    to.  Now --
 8          HICKS          I don't know anything about
 9    this.
10          JORDAN COLEMAN:  Okay.  It was taken out, let's
11    see here, March of 2013 for $300.  And the current
12    balance on the account is $480.  Now, you do have two --
13          HICKS          :  Why did --
14          JORDAN COLEMAN:  Mm-hmm.
15          HICKS          :  Why did they wait so long to
16    get in touch with me if I borrowed it in 2013 or 2011?
17          JORDAN COLEMAN:  Yes.  They would have tried to
18    get in contact with you to give you notice of the
19    defaulted loan.  I have an address here which is
20                        .  I'm not sure if I'm pronouncing
21    that right,
22          HICKS          :                  , yes, I lived
23    there, but I don't live there anymore and I have a -- I
24    sold that house.
25          JORDAN COLEMAN:  Mm-hmm.  So, maybe that is why
```

1    you haven't received the notice of the defaulted loan.

2    Now, they weren't able to get in contact with you to pay

3    this off, so they sent it to your legal department where

4    now you have two options.  The first option would be for

5    us to escalate legal action and seek a judgment against

6    you in court for $2,480, which would include attorney

7    fees and court costs.

8            Now, if you want to avoid that, we have a

9    second option which permits you to make a reduced one-

10   time settlement payment of $480, and this will avoid a

11   potential lawsuit and we will not escalate legal action.

12   So, how would you like to proceed with this matter, sir?

13           HICKS �a▬▬▬▬▬▬: I don't even know who you are

14   or what this loan is about and I would like an

15   explanation.  This is the first I've ever heard of it and

16   I like to pay my bills, but I don't want to pay something

17   I don't owe.

18           JORDAN COLEMAN:  Mm-hmm.  So, like I told you,

19   sir, the creditor is Pack Management Group.  They would

20   have been --

21           HICKS ▬▬▬▬▬▬: The creditor is who?

22           JORDAN COLEMAN:  The creditor is Pack

23   Management Group.  They would have been --

24           HICKS ▬▬▬▬▬▬: Why would --

25           JORDAN COLEMAN:  They would have been listed in

8

1    the contract you agreed to when you accepted the loan.

2    So, when you go to a payday loan place and you -- they

3    give you a contract.  Now, the creditor --

4              HICKS          :  When was this -- when was this

5    taken out?

6              JORDAN COLEMAN:  March of 2013.

7              HICKS          :  Oh, I think somebody's made a

8    mistake because I don't recall borrowing money in 2013.

9              JORDAN COLEMAN:  (Inaudible) --

10             HICKS          :  And this is 2015.  That's two

11   years ago.

12             JORDAN COLEMAN:  Correct.  Because they would

13   have -- the creditor would have tried to contact you to

14   get you the pay -- this loan off before it became a --

15             HICKS          :  Who is the creditor again?

16             JORDAN COLEMAN:  Pack Management Group.

17             HICKS          :  Tax Management Group?

18             JORDAN COLEMAN:  Correct.

19             HICKS          :  And who are you with?

20             JORDAN COLEMAN:  Stark Recovery.

21             HICKS          :  What is it again?

22             JORDAN COLEMAN:  Stark Recovery.

23             HICKS          :  Spell that first name for me.

24             JORDAN COLEMAN:  Yes, S-T-A-R-K.

25             HICKS          :  Sparks Recovery?

9

```
1              JORDAN COLEMAN:  Correct.

2              HICKS        :  And where are you located?

3              JORDAN COLEMAN:  We -- our office is located in

4    California, sir.

5              HICKS        :  In California?

6              JORDAN COLEMAN:  Correct.

7              HICKS        :  Where is Tax Management

8    located?

9              JORDAN COLEMAN:  Let's see here.  They have

10   many different locations, sir.

11             HICKS        :  Where is the one that I

12   borrowed from or supposedly borrowed from?

13             JORDAN COLEMAN:  In Charleston, South Carolina.

14   I'm not sure of the exact location.  All I have is the

15   city and the state.

16             HICKS        :  Do you have the street?

17             JORDAN COLEMAN:  No.  I just -- all I have is

18   the city and the state where the loan was taken out.

19             HICKS        :  Tax Management Group, huh?

20             JORDAN COLEMAN:  Correct.

21             HICKS        :  In Charleston, South Carolina.

22   Well, I'm going to have to speak with them.  I live in

23   Charleston, South Carolina.

24             JORDAN COLEMAN:  Okay.  So, how would you like

25        --
```

**Menjivar Att. O
Page 9 of 45**

10

1        HICKS       : (Inaudible) -- do what?

2        JORDAN COLEMAN: Okay. How would you like to

3 proceed with this matter?

4        HICKS       : Well, I would like to talk with

5 them first. I don't know anything about this.

6        JORDAN COLEMAN: All right. So, they no longer

7 have rightful ownership over this debt.

8        HICKS       : Do what?

9        JORDAN COLEMAN: They -- Pack Management Group

10 no longer has rightful ownership over this debt because

11 they would have tried to contact you to get you to pay

12 the loan off before they sent it to your legal

13 department.

14        HICKS       : Well, I have --

15        JORDAN COLEMAN: They --

16        HICKS       : I'm going to have to call

17 Charleston Tax Management Group because I don't recall

18 ever borrowing any money from them.

19        JORDAN COLEMAN: Okay. So --

20        HICKS       : What is your number?

21        JORDAN COLEMAN: 866-209-8167.

22        HICKS       : And you're Tax --

23        JORDAN COLEMAN: I didn't hear you.

24        HICKS       : You're -- you're Sparks

25 Recovery, is that right?

1    JORDAN COLEMAN:  Yes, yes.

2    HICKS         :  And you're located whereabouts

3    in California?

4    JORDAN COLEMAN:  In Bakersfield, California.

5    HICKS         :  Well, I'll have to get back

6    with you.

7    JORDAN COLEMAN:  Okay.  So, I do want to stress

8    the importance of this matter and that your inaction will

9    result in us seeking a judgment --

10    HICKS         :  Well, I know the importance of

11    it.

12    JORDAN COLEMAN:  -- against you.

13    HICKS         :  And I -- I know the importance

14    and I will get back with you, but I -- I've got to talk

15    with these people and find out exactly what it is.  I'm

16    90 years old.

17    JORDAN COLEMAN:  All right.

18    HICKS         :  And I just don't like this kind

19    of stuff.

20    JORDAN COLEMAN:  Okay, not a problem.  Good

21    luck to you.

22    HICKS         :  If you -- do you have the Tax

23    Management Group's telephone number?

24    JORDAN COLEMAN:  No, I do not have their phone

25    number.

12

1          HICKS          :  Do you have their address?

2          JORDAN COLEMAN:  No.  I have a city and a

3     state, which is Charleston, South Carolina.

4          HICKS          :  But you don't have a street

5     address and you don't have a telephone number?

6          JORDAN COLEMAN:  No.

7          HICKS          :  Well, I'm going to check it

8     out.

9          JORDAN COLEMAN:  All right.

10          HICKS          :  I have your number, 866-269 --

11     or 209-8167.

12          JORDAN COLEMAN:  Correct.

13          HICKS          :  Okay.  I will get back in touch

14     with you.

15          JORDAN COLEMAN:  All right, thank you.

16          **(The call was concluded.)**

17          **(The recording was concluded.)**

18

19

20

21

22

23

24

25

13

C E R T I F I C A T I O N   O F   T Y P I S T

MATTER NUMBER: X160030

CASE TITLE: STARK LAW, LLC

TAPING DATE: OCTOBER 26, 2015

TRANSCRIPTION DATE: APRIL 12, 2016

I HEREBY CERTIFY that the transcript contained
herein is a full and accurate transcript of the tapes
transcribed by me on the above cause before the FEDERAL
TRADE COMMISSION to the best of my knowledge and belief.

DATED: APRIL 12, 2016

ELIZABETH M. FARRELL

C E R T I F I C A T I O N   O F   P R O O F R E A D E R

I HEREBY CERTIFY that I proofread the transcript for
accuracy in spelling, hyphenation, punctuation and
format.

SARA J. VANCE

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Menjivar Att. O
Page 13 of 45

# ORIGINAL

## OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

MATTER NO.      X160030

TITLE           STARK LAW, LLC

DATE           RECORDED:  OCTOBER 26, 2015
                     TRANSCRIBED:  APRIL 12, 2016

PAGES         1 THROUGH 9

TELEPHONE CONVERSATION BETWEEN FEMALE REPRESENTATIVE AND
HICKS ▮▮▮▮▮▮
2015_26_10_03_06PM_452_1843 ▮▮▮▮▮▮

2

1                 FEDERAL TRADE COMMISSION

2                     I N D E X

3

4   RECORDING:                           PAGE:

5   Telephone conversation between Female Representative

6   and Hicks  █████                    4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

3

```
1                    FEDERAL TRADE COMMISSION

2

3       In the Matter of:          )

4       Stark Law, LLC             )   Matter No. X160030

5                                  )

6       -----------------------------)

7                                   October 26, 2015

8

9

10

11              The following transcript was produced from a

12       digital recording provided to For The Record, Inc. on

13       April 11, 2016.

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1              P R O C E E D I N G S

2               -    -    -    -    -

3    TELEPHONE CONVERSATION BETWEEN FEMALE REPRESENTATIVE AND

4                        HICKS

5           HICKS          :   To whom am I speaking with?

6           FEMALE REPRESENTATIVE:  This is the Legal

7    Department of Stark Recovery, sir.  How could I help you?

8           HICKS          :   Yes.  My name is          and I

9    just got a call from your office saying that I owed

10   them so much money and if I don't pay them it's going to

11   get -- to increase up to -- I don't know, I think she

12   said 8 -- or he said $8,000 or something like that.

13          FEMALE REPRESENTATIVE:  Is this Hicks          ?

14          HICKS          :   Yes, it is.

15          FEMALE REPRESENTATIVE:  Okay.  To ensure that I

16   do have the correct party, your Social is XXX-XX-XXXX?

17          HICKS          :   Where did you get that?

18          FEMALE REPRESENTATIVE:  Okay, sir, that

19   information was verified in our discovery process.

20          HICKS          :   Mm-hmm.  And when would I

21   supposedly have made a loan from you people?

22          FEMALE REPRESENTATIVE:  That loan was taken out

23   in March of 2013, and the loan was not from us, it --

24          HICKS          :   Well, wait a minute, March of

25   what year?

5

```
1            FEMALE REPRESENTATIVE:  2013, sir.
2       HICKS        :   Okay.  And how much was it?
3       FEMALE REPRESENTATIVE:  For $300.
4       HICKS        :  $300?
5       FEMALE REPRESENTATIVE:  That is correct.
6       HICKS        :  Now, what's it?
7       FEMALE REPRESENTATIVE:   The current balance is
8   $480.
9           HICKS        :  Current balance is 400 --
10  current balance, $480.
11          FEMALE REPRESENTATIVE:  That is correct.
12          HICKS        :  Well, I -- you know, I have
13  never -- don't even know where your place is and I don't
14  remember ever borrowing any money.
15          FEMALE REPRESENTATIVE:  Well, we're not the
16  original creditor.
17          HICKS        :  You're in California, aren't
18  you.  You're in --
19          FEMALE REPRESENTATIVE:  Yes.
20          HICKS        :  -- California, right?
21          FEMALE REPRESENTATIVE:  Yes, we are in
22  California.
23          HICKS        :  And who did you do business
24  with in Charleston?
25          FEMALE REPRESENTATIVE:  Excuse me?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Menjivar Att. O
Page 18 of 45

6

1       HICKS        :  I say, who did you do business

2   with in Charleston, South Carolina?

3       FEMALE REPRESENTATIVE:  Sir, the original

4   creditor who funded you the money was Pack Management.

5   It is an online payday loan.

6       HICKS        :  Tax Management?

7       FEMALE REPRESENTATIVE:  Yes.

8       HICKS        :  You have their address?

9       FEMALE REPRESENTATIVE:  No, sir, we do not have

10   their address.

11       HICKS        :  You don't have their address,

12   but they turned in a claim to you people that I owed them

13   $300?

14       FEMALE REPRESENTATIVE:  It's an online payday

15   loan, sir, correct.

16       HICKS        :  It's an -- what is it, an

17   online what?

18       FEMALE REPRESENTATIVE:  Payday loan.

19       HICKS        :  Online payday loan?

20       FEMALE REPRESENTATIVE:  That is correct.  And I

21   see here that you did speak with someone and you were

22   given options.  So, how did you want to proceed today?

23       HICKS        :  You talk too fast for me.

24   Would you please slow down?

25       FEMALE REPRESENTATIVE:  I see that you did

7

1    speak with someone in our office. So, how would you like

2    to proceed?

3           HICKS ███████: How would I like to proceed?

4    I'm going to check it out. I -- I just don't pay out

5    $300 or $480 -- current balance you said is $480. I just

6    don't like to pay out that kind of money unless I know

7    that I owe it, and I don't think I do owe it.

8           FEMALE REPRESENTATIVE: Okay, sir, well, your

9    Social Security number is linked to a bank account used

10    to cover the loan payment.

11          HICKS ███████: Would you send me a statement

12    in the mail?

13          FEMALE REPRESENTATIVE: Sir, all of our

14    information has already been verified during the

15    discovery process. So, there's nothing I can provide you

16    in writing that I have not already --

17          HICKS ███████: There's nothing you can send

18    me?

19          FEMALE REPRESENTATIVE: No, sir. The only

20    thing that I can send out to you --

21          HICKS ███████: I want it in -- I want it in

22    writing that I owe you.

23          FEMALE REPRESENTATIVE: Sir, the only thing --

24          HICKS ███████: And I want your name -- I want

25    your name and addresses and telephone number.

8

1              FEMALE REPRESENTATIVE:  I can give you our name

2      and address and phone number.

3              HICKS          :  I want it in writing.  I

4      want -- this address that I'm supposed to send it to, I

5      want you to send me a statement --

6              **(The call was concluded.)**

7              **(The recording was concluded.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

1    C E R T I F I C A T I O N   O F   T Y P I S T

2

3    MATTER NUMBER: X160030

4    CASE TITLE: STARK LAW, LLC

5    TAPING DATE: OCTOBER 26, 2015

6    TRANSCRIPTION DATE: APRIL 12, 2016

7

8         I HEREBY CERTIFY that the transcript contained

9    herein is a full and accurate transcript of the tapes

10   transcribed by me on the above cause before the FEDERAL

11   TRADE COMMISSION to the best of my knowledge and belief.

12

13                          DATED:  APRIL 12, 2016

14

15   _____

16                          ELIZABETH M. FARRELL

17

18   C E R T I F I C A T I O N   O F   P R O O F R E A D E R

19

20        I HEREBY CERTIFY that I proofread the transcript for

21   accuracy in spelling, hyphenation, punctuation and

22   format.

23

24   _____

25                          SARA J. VANCE



## OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

MATTER NO.    X160030

TITLE    STARK LAW, LLC

DATE    RECORDED:  OCTOBER 26, 2015
        TRANSCRIBED:  APRIL 12, 2016

PAGES    1 THROUGH 6

TELEPHONE CONVERSATION BETWEEN FEMALE REPRESENTATIVE AND
HICKS
2015_26_10_03_25PM_427_1843

2

1                    FEDERAL TRADE COMMISSION

2                         I N D E X

3

4    RECORDING:                                          PAGE:

5    Telephone conversation between Female Representative

6    and Hicks ▇▇▇▇▇                                        4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                           FEDERAL TRADE COMMISSION

2

3        In the Matter of:              )

4        Stark Law, LLC                 )   Matter No. X160030

5                                        )

6        ------------------------------)

7                                       October 26, 2015

8

9

10

11              The following transcript was produced from a

12       digital recording provided to For The Record, Inc. on

13       April 11, 2016.

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    P R O C E E D I N G S

 2                    -    -    -    -    -

 3      TELEPHONE CONVERSATION BETWEEN FEMALE REPRESENTATIVE AND

 4                         HICKS

 5            HICKS         :   Hello.

 6            FEMALE REPRESENTATIVE:  Yes.

 7            HICKS         :   Is this the police department?

 8            FEMALE REPRESENTATIVE:  Excuse me?

 9            HICKS         :   Is this the dispatcher?

10            FEMALE REPRESENTATIVE:  No.  May I ask who's

11      calling?

12            HICKS         :   My name is         and I'm

13      actually talking to the police department and he gave me

14      this number, 843-743-7300.  I wanted to report what I

15      think is a scam.

16            FEMALE REPRESENTATIVE:  Okay.

17            HICKS         :   Now, is this the right one?

18            FEMALE REPRESENTATIVE:  Yes, it is.

19            HICKS         :   Now, who do I speak with?

20            FEMALE REPRESENTATIVE:  Excuse me, sir, your

21      name is Hicks         ?

22            HICKS         :   My first name is Hicks,

23      H-I-C-K-S, my last name is          ,

24            FEMALE REPRESENTATIVE:  Okay.  Who are you

25      trying to reach?
```

5

1     HICKS  : What?

2     FEMALE REPRESENTATIVE: Who are you trying to

3 reach, sir?

4     HICKS  : I was trying to reach somebody

5 in the police department to report a scam.

6     FEMALE REPRESENTATIVE: Well, you have the

7 wrong number.

8     HICKS  : Oh, Lord.

9     **(The call was concluded.)**

10     **(The recording was concluded.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1  C E R T I F I C A T I O N   O F   T Y P I S T

2

3  MATTER NUMBER: X160030

4  CASE TITLE: STARK LAW, LLC

5  TAPING DATE: OCTOBER 26, 2015

6  TRANSCRIPTION DATE: APRIL 12, 2016

7

8    I HEREBY CERTIFY that the transcript contained

9  herein is a full and accurate transcript of the tapes

10  transcribed by me on the above cause before the FEDERAL

11  TRADE COMMISSION to the best of my knowledge and belief.

12

13            DATED:  APRIL 12, 2016

14

15

16            ELIZABETH M. FARRELL

17

18  C E R T I F I C A T I O N   O F   P R O O F R E A D E R

19

20    I HEREBY CERTIFY that I proofread the transcript for

21  accuracy in spelling, hyphenation, punctuation and

22  format.

23

24

25            SARA J. VANCE

ORIGINAL

## OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

MATTER NO.        X160030

TITLE             STARK LAW, LLC

DATE              RECORDED:   OCTOBER 30, 2015
                  TRANSCRIBED:  APRIL 12, 2016

PAGES             1 THROUGH 17

TELEPHONE CONVERSATION BETWEEN ALANI SANCHEZ AND
HICKS ████████
2015_30_10_12_34PM_403_1843 ████████

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Menjivar Att. O
Page 29 of 45

2

```
 1                    FEDERAL TRADE COMMISSION

 2                         I N D E X

 3

 4    RECORDING:                              PAGE:

 5    Telephone conversation between Alani Sanchez

 6    and Hicks ████████                          4

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    FEDERAL TRADE COMMISSION

 2

 3      In the Matter of:          )

 4      Stark Law, LLC             )   Matter No. X160030

 5                                 )

 6      ------------------------------)

 7                            October 30, 2015

 8

 9

10

11              The following transcript was produced from a

12      digital recording provided to For The Record, Inc. on

13      April 11, 2016.

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                    P R O C E E D I N G S

2                    -    -    -    -    -

3        TELEPHONE CONVERSATION BETWEEN ALANI SANCHEZ AND

4                    HICKS

5            ALANI SANCHEZ:  Legal Department, how may I

6    help you?

7            HICKS          :  Who is this?

8            ALANI SANCHEZ:  This is Stark Recovery Legal

9    Department.  How can I help you, sir.

10           HICKS          :  My name is          .  I wanted

11   to get -- they gave me a call and I want to know what

12   it's for.

13           ALANI SANCHEZ:  Sure, give me one second.  I

14   can pull it up by your phone number.  Is your name Hicks

15         ?

16           HICKS          :  Yes.

17           ALANI SANCHEZ:  That's your name, sir?

18           HICKS          :  Yes, ma'am.

19           ALANI SANCHEZ:  Okay.  Give me one second.

20           HICKS          :  And yours is what?  What is

21   yours?

22           ALANI SANCHEZ:  My name is Alani Sanchez.

23           HICKS          :  What's the first name?

24           ALANI SANCHEZ:  Alani.  A-L-A-N-I.

25           HICKS          :  Alani?

5

```
1              ALANI SANCHEZ:  Yes.
2              HICKS        :  A-O-N-A --
3              ALANI SANCHEZ:  No, A-L-A-N-I.
4              HICKS        :  Okay.
5              ALANI SANCHEZ:  How can I help you, sir?
6              HICKS        :  Well, I want to know what -- I
7       had a call from you people and I want to know what it's
8       for.
9              ALANI SANCHEZ:  Okay, give me one second.  Let
10      me look at the hard...
11              (Pause)
12              ALANI SANCHEZ:  Okay.  To ensure that I have
13      the right party, does your Social Security -- is your
14      Social Security XXX-XX-XXXX?
15              HICKS        :  Yes, ma'am.
16              ALANI SANCHEZ:  Okay.  Let me -- there is a
17      cause of action in our -- in our computer.  Let me
18      reference the hard copy, okay?
19              HICKS        :  What is it now?
20              ALANI SANCHEZ:  Give me one moment.  I'm
21      looking at -- hmm, give me a second.
22              (Pause)
23              ALANI SANCHEZ:  Hmm.  Okay.  Well, we have a
24      cause of action arising from a breach of contract when
25      you defaulted on a loan.  The loan was taken out with
```

6

1    Pack Management Group.

2                HICKS ▮▮▮▮ :   What?

3                ALANI SANCHEZ:   You authorized a -- you

4    authorized a draft from your checking account and the

5    draft had insufficient funds.   Now, sir, was it in your

6    intent to breach your contract?

7                HICKS ▮▮▮▮ :   Tax Group?   What Tax Management

8    Group was it?

9                ALANI SANCHEZ:   No, it wasn't a -- it wasn't a

10   tax management.   It was an online payday loan with Pack

11   Management, P-A-C-K, Pack.

12               HICKS ▮▮▮▮ :   Pack?

13               ALANI SANCHEZ:   Yes, Pack Management Group,

14   which is an online payday loan that was connected to your

15   bank account, Discover Bank.   Your default is severely

16   delinquent and we will pursue this cause of action to the

17   fullest extent of the law.   You currently have two

18   options.   The first is for us to escalate legal action

19   and seek judgment for $2,480, which includes attorney

20   fees and court costs.   Now, sir, do you understand option

21   one?

22               HICKS ▮▮▮▮ :   What?   What was the cost?

23               ALANI SANCHEZ:   The cost -- your current

24   balance is $480, but if you do not --

25               HICKS ▮▮▮▮ :   $480?

1              ALANI SANCHEZ:  It's $480, yes.  Your original

2     balance was $300.

3              HICKS         :  What is -- what is -- what is

4     this for?

5              ALANI SANCHEZ:  It's an online payday loan,

6     sir, that was connected to your Discover Bank.

7              HICKS         :  Who is it -- who was it with

8     with Discover?

9              ALANI SANCHEZ:  Yeah, you have a bank with

10    Discover Bank -- a banking account with Discover Bank.

11             HICKS         :  That's my -- that's my credit

12    card.

13             ALANI SANCHEZ:  Okay.  Well, it was associated

14    with that -- that card.  Now, your second option for this

15    is to make a reduced one-time settlement payment of $480.

16    This will avoid a potential lawsuit and we will not

17    escalate legal action.  If you have an -- if you accept

18    the option two, a payment of $480 will be due today, sir.

19    Now, how would you like to proceed?

20             HICKS         :  Well, I can't get it to you

21    today.

22             ALANI SANCHEZ:  Okay.  Well, what is your

23    current situation, sir?

24             HICKS         :  I am in an old folks' home and

25    I've got to find someplace --

8

1        ALANI SANCHEZ:  Pardon?

2        HICKS          :  What?

3        ALANI SANCHEZ:  What was -- I'm trying to hear

4    you, sir.  It cut off a little bit.

5        HICKS          :  Well, I am in an old folks'

6    home and --

7        ALANI SANCHEZ:  Oh, okay.

8        HICKS          :  -- I don't have access to a

9    bank or any -- I don't know where to go to mail you $480.

10       ALANI SANCHEZ:  You don't have any of your

11   cards with you, sir?  You can make a payment through us.

12       HICKS          :  What's the $480 for?  You say

13   it was with Discover?

14       ALANI SANCHEZ:  It was an online payday loan

15   with Discover, yes.

16       HICKS          :  But you don't know what the

17   items were that I charged to Discover?

18       ALANI SANCHEZ:  No, sir.  No, sir.  It was a

19   loan.

20       HICKS          :  It was a loan?

21       ALANI SANCHEZ:  Yes, sir.  (Inaudible) --

22       HICKS          :  Do you have the Discover -- do

23   you have the Discover number on here that I could get in

24   touch with?

25       ALANI SANCHEZ:  No, I do not.  But it was from

9

```
1    March of 2013, sir, when the loan was taken out.
2              HICKS        :  What was the date?
3              ALANI SANCHEZ:  March --
4              HICKS        :  What was the date?
5              ALANI SANCHEZ:  -- 28th.  March 28th, 2013.
6              HICKS        :  And the loan was for $480?
7              ALANI SANCHEZ:  Well, the loan was for $300;
8    your current balance is $480.  If you decide not to
9    resolve this today, we will take charge and exceed with
10   legal action and charge $2,480, sir.  So, we're trying to
11   resolve this before you get the $2,000 charge.
12             HICKS        :  Well, I'm trying to figure out
13   how I'm going to get you the money.
14             ALANI SANCHEZ:  Okay.  You don't have any
15   access to any of your cards, sir?  We can process a card
16   payment through a Visa or a Mastercard.
17             HICKS        :  Well, let me see what I've got.
18   Hold on.
19             ALANI SANCHEZ:  Okay.
20             (Pause)
21             HICKS        :  You say you -- you say you
22   don't take Discover card?
23             ALANI SANCHEZ:  We don't, unfortunately, take
24   Discover.
25             HICKS        :  That's the only one I have
```

**Menjivar Att. O
Page 37 of 45**

10

1    right now.  I don't have my other credit card with me.

2              ALANI SANCHEZ:  Okay.  That's -- and you have

3    no Mastercard, e-check, Visa?

4              HICKS ▮▮▮▮:  I got a -- what is this?  I got

5    -- I've got American Express.

6              ALANI SANCHEZ:  Yeah, unfortunately, we don't

7    accept American Express either.

8              HICKS ▮▮▮▮:  Hold on just a minute.

9              ALANI SANCHEZ:  Okay.

10             (Pause)

11             HICKS ▮▮▮▮:  (Inaudible) wait a minute, wait

12   a minute.

13             ALANI SANCHEZ:  No problem, sir.

14             (Pause)

15             HICKS ▮▮▮▮:  You say you don't take Visa?

16             ALANI SANCHEZ:  No, we do accept Visa.

17             HICKS ▮▮▮▮:  Can you tell me what this $480

18   is for?

19             ALANI SANCHEZ:  It was for a loan, sir, with

20   Discover.

21             HICKS ▮▮▮▮:  A loan?

22             ALANI SANCHEZ:  Yes.

23             HICKS ▮▮▮▮:  With -- with Discover?

24             ALANI SANCHEZ:  Yes.  It was associated to your

25   Discover account.

```
 1              HICKS        :  Oh.  I've got a Discover credit
 2       card.
 3              ALANI SANCHEZ:  Right.
 4              HICKS        Well, how come it didn't go
 5       through Discover and didn't -- why didn't they send me a
 6       bill?
 7              ALANI SANCHEZ:  The original creditor sent you
 8       the notice of the defaulted loan, sir.
 9              HICKS        :  I never got any notice of it.
10              ALANI SANCHEZ:  It was -- like I said, it was
11       in March 28, 2013, sir.  We're -- we're not the -- the
12       original creditor.  We're the people who take care --
13       we're litigation specialists here, and we take care of
14       the files before taking action, sir.
15              HICKS        :  That doesn't tell me much.  All
16       right, I would like to pay the bill, but I would like to
17       know what it's for.
18              ALANI SANCHEZ:  It was for an online payday
19       loan, Pack Management Group, and it was -- like I said,
20       it was with your Discover.
21              HICKS        :  Well, why -- why does -- or can
22       I get Discover to tell me what that's for?
23              ALANI SANCHEZ:  I mean, you could.  I gave you
24       the date.
25              HICKS        You gave me the date March
```

```
 1      28th, 2013.
 2              ALANI SANCHEZ:  Correct.
 3              HICKS        :  And it was for $300.
 4              ALANI SANCHEZ:  It was $300, yes.  Do you have
 5      a Discover bank account?
 6              HICKS        :  Discover?
 7              ALANI SANCHEZ:  With Discover Bank.
 8              HICKS        :  Yeah, I do.  Why didn't -- why
 9      didn't -- why didn't they pay it?
10              ALANI SANCHEZ:  I'm not sure, sir.
11              HICKS        :  Well, I've got to find out.  Do
12      you have Discover's number that I could call?
13              ALANI SANCHEZ:  No, unfortunately, we don't.
14      We're just trying to handle the case like we said.
15              HICKS        :  Oh.
16              ALANI SANCHEZ:  You know, we're not the
17      original creditor.
18              HICKS        :  I thought this (inaudible) --
19              ALANI SANCHEZ:  We're litigation specialists
20      here.
21              HICKS        :  Well, give me a chance to call
22      Discover, will you?
23              ALANI SANCHEZ:  Okay.
24              HICKS        :  1-800 --
25              ALANI SANCHEZ:  So, I have --
```

13

```
1           HICKS        :   -- 347-2683.
2           ALANI SANCHEZ:  Okay, sir, and did you reside
3    at                   ?
4           HICKS        :   That's been a long time ago.
5           ALANI SANCHEZ:  Yeah.
6           HICKS        :   What was the date on -- what
7    was the date on this?
8           ALANI SANCHEZ:  The date -- well, I guess since
9    you had your address associated with your bank account
10   there, that's when it's from.  And then your email
11   address --
12          HICKS        :   Can I --
13          ALANI SANCHEZ:  --
14   .com?
15          HICKS        :   No, I never used that.  That
16   was not -- I never used an address like that.
17          ALANI SANCHEZ:  No, it's email address.
18          HICKS        :   I never used email.  I've never
19   used email, not for anything.  I haven't used it for the
20   first time.
21          ALANI SANCHEZ:  Okay, sir.  Okay, sir.
22          HICKS        :   I've got to call Discover to
23   find out what this problem is about.  I just can't throw
24   $300 away.  I'm in an old folks' home now.
25          ALANI SANCHEZ:  Of course.
```

1              HICKS      :  And --

2              ALANI SANCHEZ:  And you have a Discover Bank,

3    right?

4              HICKS      :  I have a Discover card.  I have

5    a Discover credit card.

6              ALANI SANCHEZ:  You don't have a Discover bank

7    account?

8              HICKS      :  Not -- not to my knowledge.

9              ALANI SANCHEZ:  Really?

10             HICKS      :  What?

11             ALANI SANCHEZ:  What was that?  I couldn't hear

12    you, sir.

13              HICKS      :  I said I do not have a Discover

14    bank account.  I have a Discover --

15             ALANI SANCHEZ:  Okay.

16             HICKS      :  -- credit card.

17             ALANI SANCHEZ:  Yes, sir.  It says here a

18    Discover bank card.  You might want to call them and see

19    what's going on.

20              HICKS      :  Do you have their number?

21             ALANI SANCHEZ:  I do not, sir.  But I can look

22    up the routing number and provide you with a little bit

23    of detail.

24              HICKS      :  I've got -- I've got one here,

25    1-800-347-2683.  Is that your number?  The same number?

15

```
 1                   (Pause)
 2              HICKS         :   What is your number again?
 3              Hello?
 4              ALANI SANCHEZ:   Okay, sir?
 5              HICKS         :   Yeah.
 6              ALANI SANCHEZ:   Hello?
 7              HICKS         :   What is your number again?
 8              ALANI SANCHEZ:   Our number is 86 --
 9              HICKS             Hello, hello?
10              ALANI SANCHEZ:   Hello?
11              HICKS             Alani?  Yes, okay, give me your
12      number.
13              ALANI SANCHEZ:   It's 866-292 --
14              HICKS         :   Okay.  How much?
15              ALANI SANCHEZ:   Seven --
16              HICKS         :   492?
17              ALANI SANCHEZ:   No, 292.
18              HICKS         :   292.
19              ALANI SANCHEZ:   Seven -- yes, 7207.
20              HICKS         :   7207.
21              ALANI SANCHEZ:   Right.
22              HICKS         :   And your name is what?
23              ALANI SANCHEZ:   Alani Sanchez.
24              HICKS             Alani what?
25              ALANI SANCHEZ:   Alani Sanchez.
```

16

1              HICKS ▆▆▆▆: Alani, that's all I got down

2   here. Let me call you back.

3             ALANI SANCHEZ: Okay, no problem.

4             HICKS ▆▆▆▆: All right, bye.

5             ALANI SANCHEZ: Bye-bye.

6             **(The call was concluded.)**

7             **(The recording was concluded.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17

1               C E R T I F I C A T I O N    O F    T Y P I S T

2

3     MATTER NUMBER: X160030 _____

4     CASE TITLE: STARK LAW, LLC _____

5     TAPING DATE: _OCTOBER 30, 2015_____

6     TRANSCRIPTION DATE: _APRIL 12, 2016_____

7

8       I HEREBY CERTIFY that the transcript contained

9    herein is a full and accurate transcript of the tapes

10   transcribed by me on the above cause before the FEDERAL

11   TRADE COMMISSION to the best of my knowledge and belief.

12

13                  DATED:   APRIL 12, 2016

14

15

16                ELIZABETH M. FARRELL

17

18     C E R T I F I C A T I O N   O F   P R O O F R E A D E R

19

20       I HEREBY CERTIFY that I proofread the transcript for

21   accuracy in spelling, hyphenation, punctuation and

22   format.

23

24                    

25                SARA J. VANCE

# Menjivar Attachment P

ORIGINAL

# OFFICIAL TRANSCRIPT PROCEEDING

# FEDERAL TRADE COMMISSION

| | |
|---|---|
| MATTER NO. | X160030 |
| TITLE | STARK LAW, LLC |
| DATE | RECORDED: DATE UNKNOWN<br>TRANSCRIBED: APRIL 12, 2016 |
| PAGES | 1 THROUGH 8 |

TELEPHONE CONVERSATION BETWEEN ASHLEY HILL AND AARON
Tashia Live jiggle 0201

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

2

1                      FEDERAL TRADE COMMISSION

2                           I N D E X

3

4     RECORDING:                                      PAGE:

5     Telephone conversation between Ashley Hill and Aaron    4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:              )

4    Stark Law, LLC                 )   Matter No. X160030

5                                   )

6    ------------------------------)

7                                     Date Unknown

8

9

10

11           The following transcript was produced from a

12   digital recording provided to For The Record, Inc. on

13   April 11, 2016.

14

15

16

17

18

19

20

21

22

23

24

25

4

1               **P R O C E E D I N G S**

2                  -   -   -   -   -

3      **TELEPHONE CONVERSATION BETWEEN ASHLEY HILL AND AARON**

4           (Phone ringing.)

5           AARON:  Hello.

6           ASHLEY HILL:  Ah, yeah, hi.  Can I speak to

7  Aaron?

8           AARON:  This is him.

9           ASHLEY HILL:  Hi, Aaron.  My name is Ashley

10  Hill.  I was calling because I need to verify an address

11  and present you with your formal claim, sir.

12          AARON:  Okay.

13          ASHLEY HILL:  Okay?  Okay, I need to give you

14  some documents addressing some charges against you.  Are

15  you aware of what's going on?

16          AARON:  From what?  From --

17          ASHLEY HILL:  Okay.  Aaron, okay (inaudible) as

18  somebody that you knew what's going on.  You honestly

19  stating you have no clue what this is regarding, correct?

20          AARON:  Yeah.

21          ASHLEY HILL:  Okay, that's fine.  Grab a pen.

22  I'm going to give you the information that I have here.

23          AARON:  Okay.

24          ASHLEY HILL:  Let me know when you're ready.

25          AARON:  I'm ready.

5

1          ASHLEY HILL:  I'm going to give you the number

2      to the firm that's handling your charges.  I'm going to

3      give you about 30 minutes to get in contact with them now

4      prior to you receiving the documents to appear for this

5      matter.  That number is 877 --

6          AARON:  Mm-hmm.

7          ASHLEY HILL:  -- 209 --

8          AARON:  Mm-hmm.

9          ASHLEY HILL:  -- 0578.

10          AARON:  Okay.  What's it for?  I don't --

11          ASHLEY HILL:  It's regarding -- it looks like

12      somebody's pursuing you.  You got some charges and a

13      claim against you.  Now, I've been scheduled to locate

14      you there and present you your documents to appear for

15      it.  But if you don't know what's going on, I can let

16      you, you know, get in contact with them first prior to

17      your receiving the documents and see if it's something

18      you want to settle outside of you receiving these

19      documents.

20          AARON:  So, you can't tell me what it was for?

21          ASHLEY HILL:  Well, the documents are legally

22      sealed documents at this time.  That's why I asked you

23      are you aware of the charges because they are legally

24      sealed now.  So, I don't even know what your charges are.

25      I've just been retained to locate you at whatever address

6

1   they have on file and present you your documents to

2   appear for it.

3           AARON:  And what -- what company or what --

4   what --

5           ASHLEY HILL:  Well, it's a pre -- it says it's

6   a pre-litigation firm that's handling them.  I'll give

7   you their number.  Did you write down that number?

8           AARON:  Uh-huh.

9           ASHLEY HILL:  The 877.

10          AARON:  Yeah, that's the number you gave me?

11  Yes.

12          ASHLEY HILL:  Yeah, 877-209-0578.

13          AARON:  Okay.

14          ASHLEY HILL:  And when you contact that number,

15  you're going to reference your claim number and that

16  claim number is A as in apple, 10 -- 109.

17          AARON:  Mm-hmm.

18          ASHLEY HILL:  210.  Okay.  Now, give them a

19  call now, figure out what's going on, get this resolved

20  immediately.  If I don't receive that release order, I

21  will have to follow up with you today to present you your

22  documents to appear in court for this.  Do you know how

23  quickly you can give them a call?

24          AARON:  I won't be able to until later.  I'm at

25  work right now.

7

1          ASHLEY HILL:  Okay.  Yeah, I'm trying to -- I'm

2     trying to give you time, so I won't have to come there

3     and present you your documents.  I don't want to

4     interrupt your workplace, so that's why I'm trying to

5     give you about 30 -- I can give you about 30 minutes to

6     get in contact with them.  Are you able to get in contact

7     with them as soon as possible?

8          AARON:  I -- it won't be until after 4:00 when

9     I can do it.

10          ASHLEY HILL:  Yeah, they'll be closed by then.

11     So, if I don't receive that release order within the next

12     hour, I will have to follow up with you there and present

13     you your documents, okay?  At this time, I will have to

14     (inaudible) --

15          AARON:  Well (inaudible).

16          ASHLEY HILL:  -- at your place of employment.

17     At this time, I will have to consider you officially

18     notified, sir.

19               **(The call was concluded.)**

20               **(The recording was concluded.)**

21

22

23

24

25

8

1         **C E R T I F I C A T I O N    O F    T Y P I S T**

2

3    MATTER NUMBER: <u>X160030</u>

4    CASE TITLE: <u>STARK LAW, LLC</u>

5    TAPING DATE: <u> DATE UNKNOWN</u>

6    TRANSCRIPTION DATE: <u> APRIL 12, 2016</u>

7

8      I HEREBY CERTIFY that the transcript contained

9    herein is a full and accurate transcript of the tapes

10   transcribed by me on the above cause before the FEDERAL

11   TRADE COMMISSION to the best of my knowledge and belief.

12

13                DATED: APRIL 12, 2016

14

15                _Elizabeth M Farrell_

16                ELIZABETH M. FARRELL

17

18     **C E R T I F I C A T I O N   O F   P R O O F R E A D E R**

19

20      I HEREBY CERTIFY that I proofread the transcript for

21   accuracy in spelling, hyphenation, punctuation and

22   format.

23

24                _Sara J. Vance_

25                SARA J. VANCE

# Menjivar Attachment Q

ORIGINAL

## OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

MATTER NO.          X160030

TITLE               STARK LAW, LLC

DATE                RECORDED:  JULY 1, 2015
                    TRANSCRIBED:  APRIL 12, 2016

PAGES               1 THROUGH 19

TELEPHONE CONVERSATION BETWEEN BRUCE GREEN AND
ADRIENNE ▮▮▮▮
2015_01_07_01_04PM_425_446

2

1                  FEDERAL TRADE COMMISSION

2                        I N D E X

3

4     RECORDING:                                      PAGE:

5     Telephone conversation between Bruce Green and

6     Adrienne ███                                        4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                    FEDERAL TRADE COMMISSION

 2

 3      In the Matter of:              )

 4      Stark Law, LLC                 )  Matter No. X160030

 5                                     )

 6      ------------------------------)

 7                                     July 1, 2015

 8

 9

10

11              The following transcript was produced from a

12      digital recording provided to For The Record, Inc. on

13      April 11, 2016.

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                    P R O C E E D I N G S

2              -    -    -    -    -

3        TELEPHONE CONVERSATION BETWEEN BRUCE GREEN AND

4                    ADRIENNE ▮▮▮

5            BRUCE GREEN:  Yes, ma'am?

6            UNIDENTIFIED FEMALE:  Please get this lady off

7    my mother fucking line before I have to (inaudible).

8            BRUCE GREEN:  What's the reference number?

9            UNIDENTIFIED FEMALE:  4074380.

10            BRUCE GREEN:  Is she talking shit?

11            UNIDENTIFIED FEMALE:  Oooh.  I'm like, who am I

12    speaking with?  I'm like what's your last name?  You

13    should tell me, you -- look, ma'am, you know what, let me

14    get you over to the litigation specialist who contacted

15    you.

16            BRUCE GREEN:  Okay, you can drop her.

17            UNIDENTIFIED FEMALE:  Three, two, one, drop

18    her.

19            BRUCE GREEN:  Ms. ▮▮▮?

20            ADRIENNE ▮▮▮:  Yes.

21            BRUCE GREEN:  Hello, my name is Bruce Green.  I

22    called from Stark Law.  I'm a litigation specialist

23    (break in recording).  To ensure I have the right

24    party --

25            ADRIENNE ▮▮▮:  I'm sorry, I'm sorry, you're

**Menjivar Att. Q**
**Page 4 of 19**

5

1    breaking up.  So, I'm having trouble -- you're a

2    litigation specialist from where?

3             BRUCE GREEN:  From Stark Law Firm, S-T-A-R-K.

4    Stark Law Firm.

5             ADRIENNE ███: Okay.

6             BRUCE GREEN:  To ensure that I have the right

7    person I'm looking for, your Social Security number is

8    XXX-XX-XXXX, correct?

9             ADRIENNE ███: That's correct.

10            BRUCE GREEN:  Okay.  Ms. ███ there is a case

11   pending against you in our firm.  Allow me to explain the

12   details.  Please hold your questions until the end.

13            Now, I show two complaints (break in recording)

14   case, Ms. ███.  The first is (break in recording) bad

15   check.  The second is for an attempted defrauding of a

16   financial institution.  Both complaints stem from a loan

17   taken out with Vista Creditor.  It's through a payday

18   loan.  You authorized a draft from your check -- from

19   your Dollar Bank checking account to pay the loan back.

20   That draft you authorized had insufficient funds.

21            Now, Ms. ███, was it your intent to breach

22   your contract?

23            ADRIENNE ███: First of all, I don't know

24   where -- what that payday loan is.  When was this taken

25   out?

6

```
1          BRUCE GREEN:  December of 2000- (break in
2     recording) for $300, and the defaulted loan --
3               ADRIENNE ████:  I'm sorry, you're break --
4          BRUCE GREEN:  Can you hear me?
5               ADRIENNE ███:  December of when?
6          BRUCE GREEN:  December 2013 for $300.  That --
7     the defaultated [sic] loan documents were sent to ████
8     (inaudible) ██████████, Ohio, █████████.  And they
9     also sent defaulted loan documents to █████████
10    ██████.com.
11          Now, I'm the step before legal action
12    escalates.
13               ADRIENNE ███:  Okay.  Okay.
14          BRUCE GREEN:  Let me explain to you some
15    options at this time.  The first option is for me to
16    forward this file to one of our lead attorneys and have
17    them escalate legal action against you, seek judgment on
18    fraud charges and look to obtain a judgment of $2,000
19    plus $690, which includes attorney fees and court costs.
20    Do you understand option one, Ms. █████?
21               ADRIENNE ███:  Yes.
22          BRUCE GREEN:  Your second option (break in
23    recording) to make a reduced one-time settlement payment
24    of $690.  This will avoid me from (break in recording)
25    with the lawsuit and we (break in recording) the fraud
```

7

```
1    charges.  If you accept option two, payment of $690 is
2    due today.
3              ADRIENNE ███: You're breaking up.
4              BRUCE GREEN:  How would you like to proceed?
5              ADRIENNE ███: You're -- I can't hear -- I
6    can't hear a thing you're saying right now because you're
7    breaking up.
8              BRUCE GREEN:  Okay.  Did you hear option one?
9              ADRIENNE ███: I did hear option one.
10             BRUCE GREEN:  Okay.
11             ADRIENNE ███: I heard part -- the beginning
12   of option two.
13             BRUCE GREEN:  Okay.  Your second option allows
14   you to make a reduced one-time settlement payment of
15   $690.  This will avoid me from continuing with a lawsuit.
16   We will not pursue the fraud charges against you.  If you
17   accept option two (break in recording) of $690 is due
18   today.  How would you like to proceed, Ms. ███?
19             ADRIENNE ███: Well, what I -- first of all,
20   I'm saying that I never had this payday loan.  So, I'm
21   going to need someone to send me this information again
22   because I never received (break in recording) thing
23   telling me that there was a payday loan due from my
24   Dollar Bank account.
25             BRUCE GREEN:  Yeah, this was -- it was tooken
```

8

1      out in December of 2013.

2                    ADRIENNE ████: I don't ever recall --

3                    BRUCE GREEN: And --

4                    ADRIENNE ████: -- taking a payday loan out in

5      any time, in December of 2013 or any other time.

6                    BRUCE GREEN: Well, ma'am, it's linked to your

7      name --

8                    ADRIENNE ████: So, you're going to have to --

9                    BRUCE GREEN: -- your address, your Social

10     Security number, your bank account to repay the loan.

11                   ADRIENNE ████: Okay, I under --

12                   BRUCE GREEN: So, the fact that you didn't take

13     this out --

14                   ADRIENNE ████: I understand --

15                   BRUCE GREEN: -- Ms. ████, is invalid. I'm

16     here to give you your two options.

17                   ADRIENNE ████: Okay. Well, first of all, sir,

18     now, I listened to you, I need you to listen to me.

19                   BRUCE GREEN: Okay.

20                   ADRIENNE ████: If I owe money to someone, I

21     would be more than willing to pay it.

22                   BRUCE GREEN: Okay.

23                   ADRIENNE ████: However, someone is going to

24     have to send something to me to show me that I owe money.

25                   BRUCE GREEN: Okay. Well --

9

1    ADRIENNE ███: Now, I would be more than happy

2    to pay --

3            BRUCE GREEN: -- the original creditor --

4            ADRIENNE ███: -- make any payments that are

5    due if someone can show me that I owe money. As I stated

6    to you, I never took a payday loan out. So, if you can

7    send me or someone can send me paperwork that has (break

8    in recording) on it or that I (break in recording) and I

9    will go to my bank to see if that money was ever

10   deposited into my account in December of 2013, then I

11   would be more than happy to pay that back.

12           BRUCE GREEN: It doesn't necessarily --

13           ADRIENNE ███: But I am not going to -- I am

14   not going to just hand you over $690 for something that I

15   never received to begin with.

16           BRUCE GREEN: It didn't have to necessarily be

17   deposited into the bank that you put on your application

18   for the payday loan, Ms. ███.

19           ADRIENNE ███: Okay. Then I need --

20           BRUCE GREEN: This was --

21           ADRIENNE ███: -- to have a copy of the check

22   that I signed to --

23           BRUCE GREEN: The original creditor already

24   sent you documentations to your email and your home.

25           ADRIENNE ███: I did not receive any

**Menjivar Att. Q**
**Page 9 of 19**

10

1  documentation from any -- what was the name of this place

2  again?

3          BRUCE GREEN:  It's Vista.  It says here in my

4  file that the original creditor is named Vista.  It's

5  through a payday loan.

6          ADRIENNE ▮▮▮▮:  Okay.  I don't know what Vista

7  -- I have no idea.  So, again, I'm going to state that I

8  need something showing me that I received a loan, which I

9  know for a fact I did not.

10         BRUCE GREEN:  Well, I'm just the step before

11  the lead attorneys handle your case, Ms. ▮▮▮▮.

12         ADRIENNE ▮▮▮▮:  Okay, I understand you're doing

13  your job.  But if someone called you at your home --

14         BRUCE GREEN:  I understand.

15         ADRIENNE ▮▮▮▮:  -- and said to you, you took a

16  loan out almost two years ago that you never paid back,

17  you have no recollection of doing that, you're fairly

18  certain you did not, and they're telling you you can

19  either pay us -- wait for legal action and pay $2,000 or

20  pay us $690 right now, and you have nothing to show that

21  you did -- you took this loan out, wouldn't you want

22  something?  Wouldn't you want papers?  Wouldn't you want

23  something, sir?

24         BRUCE GREEN:  Of course.  Of (break in

25  recording).

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Menjivar Att. Q**
**Page 10 of 19**

11

1          ADRIENNE ▇▇▇: Okay. That's all I'm asking.

2    I'm asking you to either -- someone needs to email me

3    something or send something showing that I took this loan

4    out. Show me a copy of the check because, obviously, if

5    it wasn't direct deposited into my account, it had to

6    have been cashed somewhere. It had to be a paper check,

7    correct?

8          BRUCE GREEN: Yes, ma'am.

9          ADRIENNE ▇▇▇ So, if there is a paper check

10   with my signature on it and you can -- and someone can

11   provide me with that, a copy of that, then I would be

12   more than happy to pay back whatever I owe, plus interest

13   due.

14         BRUCE GREEN: Well, ma'am, what I'm here to do

15   is just to give you your option.

16         ADRIENNE ▇▇▇: Well, okay, sir --

17         BRUCE GREEN: What we send is resolution

18   letters.

19         ADRIENNE ▇▇▇: -- then we are definitely at a

20   disagreement. Because what I'm about to do is I'm going

21   to walk next door where I work and I'm going to go over

22   to the FBI building and I will give them the information

23   and perhaps they can come to find out what this is all

24   about.

25         BRUCE GREEN: Well --

12

1            ADRIENNE ███: But I'm not paying you $690

2    until I have proof in my hand that I took this loan out.

3    And I guarantee you, sir (break in recording) took this

4    loan out. I have no idea what Vista payday loan is.

5            BRUCE GREEN: Okay. I understand.

6            ADRIENNE ███: And, so, I -- I -- this is --

7            BRUCE GREEN: Everything you're telling me, I

8    understand you want documentation. But the documentation

9    was already sent --

10           ADRIENNE ███: Okay, sir, what I'm saying

11    is --

12           BRUCE GREEN: -- by the original creditor.

13           ADRIENNE ███: -- you're telling me that this

14    creditor is telling you that they sent me documentation.

15    I am telling you that I received no documentation. So,

16    if your law firm wants money from me, they're -- someone

17    is going to have to provide (break in recording) with

18    documentation. I never received it. They never sent it

19    or they -- they claim they did, but I never received

20    anything.

21         So, if you can go to the creditor, go to

22    whoever it is, email it to me, send it to me in the mail,

23    whatever, then I will take care of the matter if I owe

24    the money, which as I've stated several times --

25           BRUCE GREEN: We send a resolution letter --

13

| | |
|---|---|
| 1 | ADRIENNE ███: I know. |
| 2 | BRUCE GREEN: -- after we resolve this matter. |
| 3 | If we come to an agreement of setting up biweekly |
| 4 | payments, monthly payments to resolve this matter, |
| 5 | that -- of the $690 -- |
| 6 | ADRIENNE ███: Sir, I -- |
| 7 | BRUCE GREEN: -- accumulated -- |
| 8 | ADRIENNE ███: -- you're -- this is -- |
| 9 | BRUCE GREEN: Just let me talk, let me talk. |
| 10 | ADRIENNE ███: I am not -- |
| 11 | BRUCE GREEN: Let me talk. |
| 12 | ADRIENNE ███: Until you give me something in |
| 13 | writing, I'm not going to give you my -- my account |
| 14 | number to take money out. |
| 15 | BRUCE GREEN: The voluntarily resolution |
| 16 | letter -- |
| 17 | ADRIENNE ███: I'm not authorizing -- |
| 18 | BRUCE GREEN: -- that we send to you has |
| 19 | everything from the original creditor. |
| 20 | ADRIENNE ███: Where is -- where is this |
| 21 | voluntarily -- then you need to send that again because I |
| 22 | don't have it. |
| 23 | BRUCE GREEN: Ma'am -- |
| 24 | ADRIENNE ███: You send that to me again -- |
| 25 | BRUCE GREEN: -- it's a -- listen to me. |

```
 1                    ADRIENNE     :  -- and I will have it in my --
 2                    BRUCE GREEN:  I don't want to get you upset or
 3         anything.  I'm --
 4                    ADRIENNE     :  I will look for it.
 5                    BRUCE GREEN:  I'm here to help you.  I'm not
 6         here against you.  I'm trying to make the best
 7         arrangement that's suitable for you.  The voluntarily
 8         resolution letter that we send out to resolve this
 9         matter, if we do come into an agreement, has everything
10         listed from the original creditor that you would need.
11         Now, I can talk --
12                    ADRIENNE     :  Okay.  Well, here --
13                    BRUCE GREEN:  -- to my lead attorney to see if
14         we can send it a little earlier or a courtesy letter or
15         something just to (break in recording) since you want
16         information.  I can ask the lead attorney if that is
17         possible.  Would you like me to do that, Ms.      ?
18                    ADRIENNE     :  That would be helpful because
19         I'm -- yes.  I'm not -- I'm going to be honest with you,
20         sir -- I'm sorry, and I have forgotten your name, and I
21         apologize.
22                    BRUCE GREEN:  It's Bruce.
23                    ADRIENNE     :  Okay, Bruce.  I'm not going to
24         send you any money.  I'm not sending anybody any money
25         until I have something in my hand showing (break in
```

15

1    recording) where this came from, what it was, when the
2    money was deposited.  I need something.  I just -- I am
3    sorry.  I am a skeptical person.
4              BRUCE GREEN:  I understand.
5              ADRIENNE ███:  And I know I didn't take this
6    loan out.  So, either -- I'm not saying you're not
7    legitimate, but this loan company may not be.  I don't
8    know who's legitimate and who is not.
9              BRUCE GREEN:  Okay.  (Inaudible).
10             ADRIENNE ███:  And I'm not going to give any
11   money to anybody until I have some proof in my hand
12   showing where -- when this money was deposited, where it
13   was deposited, how it was deposited and --
14             BRUCE GREEN:  Et cetera, et cetera, okay.
15             ADRIENNE ███:  -- if it was -- yes, exactly.
16   And if I owe the money --
17             BRUCE GREEN:  Okay.
18             ADRIENNE ███:  -- which I'm sure I don't, I
19   will be more than happy to pay it back.
20             BRUCE GREEN:  Okay.  Just a second.  Let me
21   talk to the lead attorney and see what I can for you, Ms.
22   ███.
23             ADRIENNE ███:  Thank you.
24             (On hold)
25             BRUCE GREEN:  Ms. Adrienne?

16

1       ADRIENNE ███: Yes.

2       BRUCE GREEN: Ms. Adrienne?

3       ADRIENNE ███: Yes.

4       BRUCE GREEN: The attorney said that it's

5       automatically in the system. All of that will be listed

6       in the payment schedule that we send to your email once

7       we come to a resolution. He said that it's automatically

8       generated into the system, so you will automatically get

9       that once we come to an agreement, if we come to an

10      agreement. And I would like to remind you --

11      ADRIENNE ███: Sure.

12      BRUCE GREEN: -- that if we cannot come to an

13      agreement, once legal action starts, there's nothing that

14      I will be able to do to assist you.

15      ADRIENNE ███: Okay. Well, then you're going

16      to have to take legal action because I'm not going to

17      send you any money, nor am I going to make any kind of

18      an agreement, verbal or any otherwise, to pay you money

19      for something that I don't know what it is. So, if you

20      can -- if you have proof and you can take me to court,

21      then so be it.

22      BRUCE GREEN: I definitely have proof, Ms.

23      ███. Everything in my file --

24      ADRIENNE ███: Okay. Well, if you --

25      BRUCE GREEN: -- and I'm reading --

17

1          ADRIENNE ███: Sir, if you have proof --

2          BRUCE GREEN: (Inaudible).

3          ADRIENNE ███: -- then there is no reason why

4   you shouldn't be able to send it to me.

5          BRUCE GREEN: I can't like just send it to you

6   from my email.

7          ADRIENNE ███: If you have proof in your

8   files, then there's no reason why I shouldn't be able to

9   get copies of proof. You're trying to bring legal action

10   against me and you're asking me just to take your word

11   for it.

12          BRUCE GREEN: I asked the legal attorney to

13   come and talk to you. He's busy.

14          ADRIENNE ███: Mm-hmm.

15          BRUCE GREEN: He has to make other files. I'm

16   just relaying the message to you, Ms. ███ --

17          ADRIENNE ███: Okay.

18          BRUCE GREEN: -- for your option one and your

19   option two. If option one is what you agree to, good

20   luck.

21          ADRIENNE ███: Well, it isn't what I'm

22   agreeing (break in recording) what's going to have to

23   happen because I'm not giving you any money. So, if your

24   lead attorney, when he gets freed up, would like to call

25   me back, and if he can authorize some information to come

18

1    my way, then more power to me.  Up until then, what I'm

2    going to do is I'm going to take your number, this case

3    number, I'm going to walk next door to the FBI building.

4    It's right next door to where I work.  I'll give them all

5    that information and I'll deal with it that (break in

6    recording).

7            Bruce?

8            BRUCE GREEN:  Okay, ma'am.

9            **(The call was concluded.)**

10           **(The recording was concluded.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19

1              C E R T I F I C A T I O N   O F   T Y P I S T

2

3     MATTER NUMBER: X160030

4     CASE TITLE: STARK LAW, LLC

5     TAPING DATE:  JULY 1, 2015

6     TRANSCRIPTION DATE:  APRIL 12, 2016

7

8          I HEREBY CERTIFY that the transcript contained

9     herein is a full and accurate transcript of the tapes

10    transcribed by me on the above cause before the FEDERAL

11    TRADE COMMISSION to the best of my knowledge and belief.

12

13                    DATED:  APRIL 12, 2016

14

15                    _____

16                    ELIZABETH M. FARRELL

17

18         C E R T I F I C A T I O N   O F   P R O O F R E A D E R

19

20         I HEREBY CERTIFY that I proofread the transcript for

21    accuracy in spelling, hyphenation, punctuation and

22    format.

23

24                    _____

25                    SARA J. VANCE

**Menjivar Att. Q**
**Page 19 of 19**