# Menjivar Attachment X

ORIGINAL

## OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

| | |
|---|---|
| MATTER NO. | X160030 |
| TITLE | STARK LAW, LLC |
| DATE | RECORDED:  APRIL 22, 2015<br>TRANSCRIBED:  MAY 9, 2016<br>REVISED:  MAY 25, 2016 |
| PAGES | 1 THROUGH 16 |

TELEPHONE CONVERSATION BETWEEN MS. JOHNSON AND ROBERT
CZARNIK
2015_22_04_03_47PM_401_415

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Menjivar Att. X
Page 1 of 16

2

```
1                    FEDERAL TRADE COMMISSION

2                         I N D E X

3

4    RECORDING:                                    PAGE:

5    Telephone conversation between Ms. Johnson and

6    Robert Czarnik                                   4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                    FEDERAL TRADE COMMISSION

2

3       In the Matter of:              )

4       Stark Law, LLC                 )   Matter No. X160030

5                                      )

6       ------------------------------)

7                               April 22, 2015

8

9

10

11            The following transcript was produced from a

12      digital recording provided to For The Record, Inc. on

13      May 5, 2016.

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                    P R O C E E D I N G S

2                    -    -    -    -    -

3        TELEPHONE CONVERSATION BETWEEN MS. JOHNSON AND

4                        ROBERT CZARNIK

5              ROBERT CZARNIK:  Yeah.

6              FEMALE REPRESENTATIVE:  All right.  It's ███

7        ███.  Okay.  And I think if you look at the support

8        notes --

9              ROBERT CZARNIK:  (Inaudible) my monitor went

10       off.

11             FEMALE REPRESENTATIVE:  Oh, this email, oh.

12             ROBERT CZARNIK:  Oh, there we go.

13             FEMALE REPRESENTATIVE:  Can you see this email?

14             ROBERT CZARNIK:  This is from ███████?

15             FEMALE REPRESENTATIVE:  Yes.

16             ROBERT CZARNIK:  She received a letter in the

17       mail from another company that says that she's already

18       paying this.  She wants a refund and wants to cancel

19       payments that she has -- okay.

20             FEMALE REPRESENTATIVE:  Okay.  So, do you want

21       me to (inaudible)?

22             ROBERT CZARNIK:  Yeah.

23             FEMALE REPRESENTATIVE:  Three, two.

24             ROBERT CZARNIK:  Hello, Ms. Johnson, this is

25       attorney Robert Czarnik.

5

```
 1              MS. JOHNSON:  Hi.  I'm in the process of paying

 2     off a loan through you guys and I did my research and I

 3     don't -- I was not given any information about the

 4     original loan.  I don't know what exactly I'm paying off.

 5              ROBERT CZARNIK:  Okay.  I mean, I can give you

 6     the info -- I can give you the information that we have.

 7     This was a loan that was taken out on 5 -- or, I'm sorry,

 8     on 9/4/2012 with GTI Holdings.  It was taken out online.

 9     It was in your name, your social.  The address that was

10     used for the loan was ████████████████████ in --

11              MS. JOHNSON:  Yeah, I know all my information.

12     I need the information of the lender.  Who am I paying?

13              ROBERT CZARNIK:  Well, so, this loan was taken

14     out with GTI Holdings.  They were the original creditor.

15     Once you defaulted on the loan, they have now sold this

16     loan to my client, Pacific, and --

17              MS. JOHNSON:  GTI is not the original lender.

18              ROBERT CZARNIK:  Yes, it is, ma'am.

19              MS. JOHNSON:  Well, what -- I didn't take a

20     loan out through GTI Lenders.

21              ROBERT CZARNIK:  Yes, ma'am, this was taken out

22     online.  So, the website you went to, you know, they own

23     a large number of websites, but they were the name who

24     was on your contract.

25              MS. JOHNSON:  Mm-hmm.  So, where is all of this
```

1       information?  I mean, you can tell me everything you

2       want, but I've never seen anything in writing.  Where is

3       -- where is --

4              ROBERT CZARNIK:  Everything -- everything was

5       provided by --

6              MS. JOHNSON:  -- the contract or --

7              ROBERT CZARNIK:  -- the original contract -- by

8       the original creditor, ma'am.

9              MS. JOHNSON:  To who?

10             ROBERT CZARNIK:  To you, ma'am.

11             MS. JOHNSON:  How come I have no information on

12      this.  Nobody sent me anything on this -- on what I owe

13      and what my original loan was and all of that.  How do I

14      get that information?

15             ROBERT CZARNIK:  Ma'am, I don't know what you

16      want -- well, the -- I've told you all the information we

17      have.  I can give -- again, I can give you the date of

18      the loan, when it was taken out, with who it was taken

19      out.  I've given you all that information.

20             MS. JOHNSON:  Well, you can say whoever you

21      want.  Why don't you have the amount?  What was the

22      amount that I took out?

23             ROBERT CZARNIK:  It was 3 -- it was $300,

24      ma'am.

25             MS. JOHNSON:  And then, so, you guys are

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

7

1    charging me $810 --

2                ROBERT CZARNIK:  That was the current balance

3    when we bought the loan.

4                MS. JOHNSON:  -- for a $300 loan --

5                ROBERT CZARNIK:  Yes.

6                MS. JOHNSON:  -- that you probably bought the

7    loan for $50, like 10 cents of a dollar.

8                ROBERT CZARNIK:  Well, ma'am -- but, ma'am, the

9    -- but, ma'am, you took out a $300 loan.  The payday

10   loans are high-interest, high-fee loans.  It doesn't

11   matter what we bought it for, you owe 800 -- you owed

12   $810.  You currently owe $540 because you've made

13   payments.  You have an agreement with our law firm to

14   make those payments.  We have delayed litigation in

15   Broward County and we did not proceed with litigation

16   because you had that agreement with us.

17               MS. JOHNSON:  I -- there's no -- you can't --

18   you -- that's the thing.  You don't -- you're not giving

19   me enough information.  You cannot charge $500 interest.

20               ROBERT CZARNIK:  Yes.

21               MS. JOHNSON:  $300 is the max.  I've already

22   contacted the Attorney General in Florida.  So, $300 is

23   the max interest.  So, if it's a $300 loan, it's $600 --

24   turns into $600 if it's not paid.

25               ROBERT CZARNIK:  No, ma'am, that's incorrect.

8

1        MS. JOHNSON:  So, how did I get the $810?  No,

2    I just --

3        ROBERT CZARNIK:  That is incorrect, ma'am.

4        MS. JOHNSON:  I just contacted the Attorney

5    General.

6        ROBERT CZARNIK:  Ma'am, that is incorrect.

7        MS. JOHNSON:  You should know the law.

8        ROBERT CZARNIK:  There is interest that builds

9    -- yes, ma'am, I do know the law.  There is interest that

10   builds as you -- as you decline your payments.  Due to

11   the severe delinquency of the account, this has rose from

12   $300 to $810.

13       MS. JOHNSON:  You cannot charge more than $300.

14       ROBERT CZARNIK:  Yes, we can.  I mean, ma'am,

15   first of all, we didn't charge --

16       MS. JOHNSON:  No, it's the law.  I just -- I

17   just --

18       THE COURT:  Ma'am, first -- ma'am, ma'am,

19   ma'am, first of all, we didn't charge the interest.  That

20   was the original creditor that -- and it was on your

21   contract when you took out the loan --

22       MS. JOHNSON:  But this is --

23       ROBERT CZARNIK:  -- how much of your

24   interest --

25       MS. JOHNSON:  But this is money that you're

9

1        getting, so you're trying to make an extra $510 off a

2        $300 loan.

3              ROBERT CZARNIK:  Ma'am, that is your balance.

4        Your balance was $800 -- no, ma'am.  Ma'am, did you

5        expect to take out a loan and not have to pay any

6        interest?

7              MS. JOHNSON:  Of course I did, but it wasn't

8        $510.

9              ROBERT CZARNIK:  Ma'am, the payday loans are

10       high-interest, high-fee loans.

11             MS. JOHNSON:  Well, I already put a stop

12       payment on this because unless you give me more

13       information, I want --

14             ROBERT CZARNIK:  (Inaudible).

15             MS. JOHNSON:  -- I need something in writing.

16             ROBERT CZARNIK:  If you stop the payment,

17       ma'am, then we will not only pursue -- ma'am, if you stop

18       the payment --

19             MS. JOHNSON:  That's fine.

20             ROBERT CZARNIK:  -- we will not only pursue you

21       for the original payday loan --

22             MS. JOHNSON:  Why --

23             ROBERT CZARNIK:  -- and seek a judgment for

24       $2,540 for that.

25             MS. JOHNSON:  You can't.  I've -- you can't.

10

1      I've already --

2           ROBERT CZARNIK:  We will seek you for the

3      second breach of contract as well, ma'am, and we will

4      recoup a judgment --

5           MS. JOHNSON:  Bullshit.

6           ROBERT CZARNIK:  -- for (inaudible), ma'am.

7           MS. JOHNSON:  Why can't you -- listen, why

8      can't you send me something in writing?  What are you

9      afraid of?

10          ROBERT CZARNIK:  Ma'am, what -- ma'am, what --

11         MS. JOHNSON:  (Inaudible) supposed to to set

12     this up.

13         ROBERT CZARNIK:  Because, ma'am, what -- ma'am,

14     what do you want us --

15         MS. JOHNSON:  You need to send me something

16     in --

17         ROBERT CZARNIK:  What do you want me to send

18     you?

19         MS. JOHNSON:  You need to send me my contract.

20     You need to show me what I paid --

21         ROBERT CZARNIK:  We do not, ma'am.

22         MS. JOHNSON:  -- what I paid and what's in

23     interest.  Yes, you do.  You can't just expect me to say,

24     you're right.

25         ROBERT CZARNIK:  Ma'am, we -- ma'am, we sent

1      you --

2                  MS. JOHNSON:  I just paid -- I just paid this

3      account.

4                  ROBERT CZARNIK:  Ma'am --

5                  MS. JOHNSON:  $810 with Pier One.

6                  ROBERT CZARNIK:  -- you set up the payments

7      with us.  We sent you the payment schedule.

8                  MS. JOHNSON:  You sent me the payment

9      schedule --

10                 ROBERT CZARNIK:  We sent you the payment

11     schedule.

12                 MS. JOHNSON:  -- that's it.

13                 ROBERT CZARNIK:  Okay, ma'am.

14                 MS. JOHNSON:  And I was naive enough to accept

15     it.  But now I'm not because I did my research.

16                 ROBERT CZARNIK:  Okay.  And like I said, if you

17     -- if you default on this loan, we will seek you for both

18     defaults, ma'am.

19                 MS. JOHNSON:  Why can't you send me something?

20     What are you afraid of?

21                 ROBERT CZARNIK:  Because we -- I'm not afraid

22     of anything, ma'am.  We don't need to send this to you.

23     You came to --

24                 MS. JOHNSON:  You sound like a ten-year-old.

25                 ROBERT CZARNIK:  -- an agreement --

1           MS. JOHNSON:  I don't think you're a lawyer.

2           ROBERT CZARNIK:  Ma'am, you -- ma'am, you

3    signed --

4           MS. JOHNSON:  I know you (inaudible) that.

5           ROBERT CZARNIK:  Ma'am, you signed a

6    contract -- you signed a contract --

7           MS. JOHNSON:  I didn't sign anything.

8           ROBERT CZARNIK:  -- for a payday loan.  You

9    breached that contract.  Now, you agreed to a contract

10   with us, you want to breach that contract as well.

11          MS. JOHNSON:  I didn't sign anything with you.

12          ROBERT CZARNIK:  Ma'am, I said you came to an

13   agreement with us.

14          MS. JOHNSON:  Nothing was sent --

15          ROBERT CZARNIK:  Ma'am --

16          MS. JOHNSON:  Nothing was sent to me in

17   writing.

18          ROBERT CZARNIK:  Ma'am, I said you came to an

19   agreement with us.  Ma'am, I said you came to an

20   agreement with us.

21          MS. JOHNSON:  No, you said sign, but I didn't.

22          ROBERT CZARNIK:  Okay, ma'am.

23          MS. JOHNSON:  So, I didn't sign anything.

24          ROBERT CZARNIK:  Okay, ma'am.

25          MS. JOHNSON:  Unless you send me something --

13

1     unless you send me an email with all of my information

2     that you have, I'm not paying anymore.

3          ROBERT CZARNIK:  Okay.  Then we will send you

4     for both breaches of contracts and we will seek a

5     judgment --

6          MS. JOHNSON:  Why can't you send me --

7          ROBERT CZARNIK:  -- for 4,000 --

8          MS. JOHNSON:  Why can't you send me --

9          ROBERT CZARNIK:  We'll seek a judgment for

10    $4,500, ma'am.

11         MS. JOHNSON:  Bullshit.  Are you insane?  Are

12    you insane?

13         ROBERT CZARNIK:  Why, ma'am?

14         MS. JOHNSON:  Why don't you send me what you

15    just told me?

16         ROBERT CZARNIK:  Ma'am, that -- what I just

17    told you --

18         MS. JOHNSON:  Because you want my money.

19         ROBERT CZARNIK:  Ma'am, what I just told you --

20         MS. JOHNSON:  If you want my money, just show

21    me proof of what I did.

22         ROBERT CZARNIK:  Ma'am, what I just told you,

23    that information was included in the payment schedule.

24         MS. JOHNSON:  No, it is not.

25         ROBERT CZARNIK:  It said GTI Holdings on there.

14

1     I have the date.

2           MS. JOHNSON:  What about -- no, I said --

3     that's exactly what you just told me.  Where is the rest

4     of the information on this contract?

5           ROBERT CZARNIK:  Ma'am, that is what we need to

6     provide to you.  As I said, I don't need to provide any

7     more documents.  I didn't need to make this call to you.

8     We tried to make this call to work this out before we

9     brought this to litigation.  As I said, if you want to

10    breach this contract like you breached your first

11    contract, we'll seek a judgment for $4,540 because you've

12    breached two contracts now.

13          MS. JOHNSON:  And that's -- what's the $4,000

14    for?

15          ROBERT CZARNIK:  Because you breached your

16    original contract and you breached your new contract and

17    we can seek attorney's fees and court costs for both

18    contracts, and we'll do it separately so it will be two

19    separate attorney's fees and two separate court costs.

20          MS. JOHNSON:  Let's see, let's try it.

21          ROBERT CZARNIK:  Okay.

22          MS. JOHNSON:  Yeah, why don't you go ahead and

23    try that.

24          ROBERT CZARNIK:  We will.

25          MS. JOHNSON:  We'll see how this goes down.

15

1          ROBERT CZARNIK:  And we will get -- okay.  And

2    we'll get a judgment --

3          MS. JOHNSON:  I don't think so, buddy.

4          ROBERT CZARNIK:  -- for 2,000 -- for $4,500.

5          MS. JOHNSON:  Yea.

6          ROBERT CZARNIK:  Have a good day.

7          MS. JOHNSON:  Thank --

8          **(The call was concluded.)**

9          **(The recording was concluded.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16

# C E R T I F I C A T I O N   O F   T Y P I S T

MATTER NUMBER: <u>X160030</u>

CASE TITLE: <u>STARK LAW, LLC</u>

TAPING DATE: <u>APRIL 22, 2015</u>

TRANSCRIPTION DATE: <u>MAY 9, 2016</u>

REVISION DATE: <u>MAY 25, 2016</u>


     I HEREBY CERTIFY that the transcript contained

herein is a full and accurate transcript of the tapes

transcribed by me on the above cause before the FEDERAL

TRADE COMMISSION to the best of my knowledge and belief.


                    DATED:  MAY 25, 2016

                    _____

                    ELIZABETH M. FARRELL


# C E R T I F I C A T I O N   O F   P R O O F R E A D E R


     I HEREBY CERTIFY that I proofread the transcript for

accuracy in spelling, hyphenation, punctuation and

format.

                    _____

                    SARA J. VANCE


For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# Menjivar Attachment Y

ORIGINAL

# OFFICIAL TRANSCRIPT PROCEEDING

# FEDERAL TRADE COMMISSION

MATTER NO.      X160030

TITLE          STARK LAW, LLC

DATE          RECORDED:  MAY 19, 2015
                TRANSCRIBED: MAY 9, 2016
                REVISED: MAY 25, 2016

PAGES        1 THROUGH 18

TELEPHONE CONVERSATION BETWEEN CHRISTINA ████ AND
ZOHAIB ALI
2015_19_05_01_03PM_460_402

2

1                    FEDERAL TRADE COMMISSION

2                        I N D E X

3

4      RECORDING:                                    PAGE:

5      Telephone conversation between Christina ████

6      and Zohaib Ali                                    4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    FEDERAL TRADE COMMISSION

2

3       In the Matter of:             )

4       Stark Law, LLC                )   Matter No. X160030

5                                     )

6       ------------------------------)

7                                 May 19, 2015

8

9

10

11            The following transcript was produced from a

12      digital recording provided to For The Record, Inc. on

13      May 5, 2016.

14

15

16

17

18

19

20

21

22

23

24

25

Menjivar Att. Y
Page 3 of 18

4

1                    P R O C E E D I N G S

2                  -     -     -     -     -

3     TELEPHONE CONVERSATION BETWEEN CHRISTINA █████ AND

4                         ZOHAIB ALI

5              ZOHAIB ALI:  Hello.

6              FEMALE REPRESENTATIVE:  I wouldn't trouble you,

7     but she keeps calling in --

8              ZOHAIB ALI:  Yeah.

9              FEMALE REPRESENTATIVE:  -- her and her husband.

10             ZOHAIB ALI:  Mm-hmm.

11             FEMALE REPRESENTATIVE:  I closed --

12             ZOHAIB ALI:  Okay.

13             FEMALE REPRESENTATIVE:  Blah, blah, blah.

14    They're stating that she paid it back, da, da, da.

15             ZOHAIB ALI:  Uh-huh.

16             FEMALE REPRESENTATIVE:  She wants proof of the

17    bad check.  So, I gave the rebuttals.  Again, this is

18    prior to any court action --

19             ZOHAIB ALI:  Uh-huh.

20             FEMALE REPRESENTATIVE:  -- on your case, da,

21    da, da.  She wants to know which court she will appear

22    in.  Again, this is prior to any court action on your

23    case.  She just won't get off the phone.  They keep

24    calling in, her and the husband.

25             ZOHAIB ALI:  Uh-huh.

5

 1                  FEMALE REPRESENTATIVE:  So, she gave us
 2      permission to speak with her husband, Richard.  I believe
 3      they might be on three-way together.
 4                  ZOHAIB ALI:  Okay.
 5                  FEMALE REPRESENTATIVE:  But they're both on the
 6      phone.  Just -- they want to speak with the lead
 7      attorney, they want to know which court they will have to
 8      appear in.  Court, you're not having -- this is prior to
 9      any court action.
10                  ZOHAIB ALI:  Yeah.
11                  FEMALE REPRESENTATIVE:  I don't know how to
12      stress that enough.
13                  ZOHAIB ALI:  Okay.
14                  FEMALE REPRESENTATIVE:  They just won't get off
15      the phone.
16                  ZOHAIB ALI:  Okay.
17                  FEMALE REPRESENTATIVE:  It's ████████.
18                  ZOHAIB ALI:  One second.  ██ -- ███.
19                  FEMALE REPRESENTATIVE:  ████.
20                  ZOHAIB ALI:  ████.
21                  FEMALE REPRESENTATIVE:  Mm-hmm.
22                  ZOHAIB ALI:  Christina ████?
23                  FEMALE REPRESENTATIVE:  Yeah, it's her husband,
24      Richard, as well.
25                  ZOHAIB ALI:  Okay.

6

```
 1              FEMALE REPRESENTATIVE:  I'm going to drop it.
 2              ZOHAIB ALI:  Thank you for holding.  This is
 3      attorney Zohaib Ali.
 4              CHRISTINA      :  Yes.
 5              ZOHAIB ALI:  Hello?
 6              CHRISTINA      :  I need to find out -- yes,
 7      hello?
 8              ZOHAIB ALI:  Yes.  How can I help you?
 9              CHRISTINA      :  So, I'm trying to find out
10      what paperwork, proof or evidence or whatever it is you
11      have against me that I can have, because I haven't been
12      given any paperwork.  I haven't been shown anything.  And
13      all I've been, you know, vomited upon is pay now, pay
14      now, pay now or we're going to sue you.
15              ZOHAIB ALI:  Okay, ma'am.  Well, the
16      information that we've provided you, we have your
17      information here linked to your Social Security number,
18      your name,                       .com, and your address.
19      The loan that was taken out was related to all of your
20      information.  You were working with
21              at the time and your bank account that you agreed
22      to repay the loan from was the
23              Now, as for paperwork, that would have to be
24      presented in court if they were to go ahead and escalate
25      this and seek judgment in Duvall County.  If that is to
```

7

1    occur, they would have to send you a summons.  You would

2    have to be properly served and that would give you all of

3    the information on where to appear, what -- that has not

4    occurred at this time, but this is -- we're trying to

5    either see if we can resolve this or let the client know

6    that we weren't able to resolve this and you can proceed,

7    if you want, to go ahead and seek judgment in Duvall

8    County.

9          So, that's where we are at today.  All I have

10    is the information that was provided you.  If you're

11    willing to contest it, you know, that's your right and

12    you can go ahead and contest that in Duvall County.

13          CHRISTINA ▮▮▮:  Okay.  I don't have a problem

14    with that, but I do have a problem without receiving any

15    of the litigation paperwork against me.  That I have a

16    problem with.  Can you send me --

17          ZOHAIB ALI:  Well --

18          CHRISTINA ▮▮▮:  -- the litigating paperwork so

19    that I can review it and give me a few days to get my

20    side together so that I can either confirm or deny and

21    fight the things being charged against me.

22          ZOHAIB ALI:  Well, I can send you a validation

23    of debt, ma'am.  That has all of the information on it.

24    And if you want to contest that, you can just -- you can

25    do it in writing.  But I can get that sent out.  That's

1     all the -- that's the only thing that I have, either that

2     or a demand letter. And I can get that sent out to you.

3             CHRISTINA ███: Okay. And it shows the date

4     that the funds were completed as insufficient and that

5     the debt was not paid in full?

6             ZOHAIB ALI: So, it -- it has the information.

7     I mean, the only reason we're contacting you is because

8     the debt wasn't paid in full. That's why my law firm has

9     been retained at this point and that's why we're

10    contacting you. It has the information about the

11    original -- well, it has the original creditor's name.

12    It has the current creditor's name. It has your

13    applicant ID. It has an open date. It has the original

14    amount that the loan was taken out for and it has the

15    current balance.

16            CHRISTINA ███: Okay.

17            ZOHAIB ALI: Okay?

18            CHRISTINA ███: (Inaudible) I don't know who

19    the Quality Group whatever people are and I've never

20    taken a loan out by them.

21            ZOHAIB ALI: Well, Paragon Funding is the

22    company --

23            CHRISTINA ███: Nor did I ever take out loans

24    for --

25            ZOHAIB ALI: -- that originated the loan. They

1    were -- it was a -- you know, it's an online payday loan,

2    so you might not have went to Paragon Funding, but you

3    could have went to like a PaydayLoans.com or

4    CashAdvance.com or CashNet.com, and when you put in your

5    information on one of these sites, what they do is they

6    reach out to one of these payday loan companies that's

7    willing to fund the loan.  And they -- they're not

8    actually the company that's funding the loan; it's one of

9    these companies that they contact that's funding the

10    loan.

11          So, if you go to like PaydayLoans.com, you're

12    not really getting the loan from PayDayLoans.com.  You're

13    getting the loan from one of the companies that they work

14    with that funds the loan.  Paragon Funding is that

15    company.

16          CHRISTINA ▮▮▮▮:  So, does it say anywhere on

17    any of the paperwork which affiliate of these Paragon

18    people that I used to go through?

19          ZOHAIB ALI:  Unfortunately, I do not have that

20    information.  I just have the name as Paragon Funding is

21    the company that originated the loan.  I have the date as

22    August 25th, 2011, in the amount of $450.  And it was

23    charged off on January 16th, 2012, for the amount of

24    $730.

25          CHRISTINA ▮▮▮▮:  So, does it state anywhere in

10

1    there when the insufficient funds happened?

2              ZOHAIB ALI:  Well, it had to be in between that

3    time because that's when they tried to collect it, and

4    when they weren't able to collect it from August 25th to

5    January 16th, then they charged the loan off.

6              CHRISTINA ▆▆▆:  Well, I'm pretty sure you use

7    a bank, and if you ever had any insufficient funds --

8              ZOHAIB ALI:  Right.

9              CHRISTINA ▆▆▆:  -- there would be a paper

10   trail leading to you saying, on this date, this amount

11   tried to come out, it did not clear.

12             ZOHAIB ALI:  Mm-hmm, right.

13             CHRISTINA ▆▆▆:  It was to these people.

14             ZOHAIB ALI:  And you haven't received anything

15   like that?

16             CHRISTINA ▆▆▆:  You were charged -- I never

17   received anything.  And if you guys don't have anything

18   to say that, look, our bank tried to withdraw this money,

19   it did not go through, we were charged insufficient

20   funds, you know, that would be something to go off of.

21             ZOHAIB ALI:  But, see, that was -- that was

22   Paragon Funding who did that and they might have had that

23   information.  Unfortunately, that wasn't provided to me.

24   I've given you all the information I have --

25             CHRISTINA ▆▆▆:  But isn't that the pertinent

11

1       information --

2                 ZOHAIB ALI:  Well, if they have --

3                 CHRISTINA ████:  -- for a law firm to come at

4       me?

5                 ZOHAIB ALI:  -- if they do have it, if -- see,

6       we're -- I'm trying to -- I'm in the pre-litigation.  If

7       it gets escalated and I go back to the client and they

8       actually want to go ahead and pursue a judgment, they

9       would have to get all of that information ready to

10      actually go ahead and contest it or go ahead and take it

11      to court and seek a judgment.  And that's something that

12      I don't handle.  I don't do.  I'm just here in the pre-

13      litigation process to try to work this out.

14                CHRISTINA ████:  Okay.  So, being an attorney

15      in the pre-litigation process --

16                ZOHAIB ALI:  Mm-hmm.

17                CHRISTINA ████:  -- can I ask you --

18                ZOHAIB ALI:  Mm-hmm.

19                CHRISTINA ████:  -- a very basic question?

20                ZOHAIB ALI:  Yes.

21                CHRISTINA ████:  Right now, it's he said/she

22      said.

23                ZOHAIB ALI:  Mm-hmm.

24                CHRISTINA ████:  Would you not -- before

25      calling somebody and telling them they owe money, first

12

1    confirm with proof that that was indeed the situation?

2                ZOHAIB ALI:  Well, they would -- during our

3    discovery process --

4                CHRISTINA ████:  Because, technically, I could

5    hire your firm to do the same thing and say, so-and-so

6    owes me money, here's their pertinent information which I

7    could have easily gotten off of Google.

8                ZOHAIB ALI:  Well, they do have -- I'm -- look,

9    I'm sure, you know, our firm is not just doing this just

10   because they say that you took out a loan.  They have

11   information.  They do have the right -- the title for

12   this loan that they have purchased, and that's why they

13   have us trying to do this.  They're not just -- you know,

14   they're not just doing this just because they say that

15   there's a loan out there.  I'm sure they have more proof

16   and they would have to present that in court.

17               CHRISTINA ████:  All right.  But wouldn't you

18   ask them to present that before you made a phone call to

19   somebody and got them all riled up about they owe so much

20   money and you're going to --

21               ZOHAIB ALI:  Well, that's why -- that's why --

22               CHRISTINA ████:  -- take them to court and sue

23   them.

24               ZOHAIB ALI:  I mean, we have all of this

25   information that's provided.  We wouldn't have all of

13

1    this information if it wasn't, you know, a legitimate

2    thing.  This is -- I mean, is any of this information not

3    your information.

4              CHRISTINA     :  This day and age, this could

5    very well be fraudulent.

6              ZOHAIB ALI:  Okay, ma'am --

7              CHRISTINA     :  This day and age, you

8    understand.  I know you know that.

9              ZOHAIB ALI:  Yeah, and I do understand that.  I

10   do know that.  It is possible, but there are a lot of

11   them that -- you know, a lot of people say that it's --

12   oh, I didn't take anything out, I didn't do this.  But

13   really they have taken out these loans --

14             CHRISTINA     :  I'm not saying I never took

15   out a payday loan.

16             ZOHAIB ALI:  Mm-hmm.

17             CHRISTINA     :  Again, I'm not saying I

18   haven't taken out -- I have.  I'm a very strange math

19   person.  I only do $500 increments because it's easier

20   for me to add that into my budget instead of $450 or $475

21   or $525.

22             ZOHAIB ALI:  Mm-hmm.

23             CHRISTINA     :  Nice round numbers work sense

24   to me.

25             ZOHAIB ALI:  Mm-hmm.

14

1       CHRISTINA ▮▮▮▮: So, when they said it was

2   $450, that was my first red flag, okay?

3       ZOHAIB ALI:   Okay.

4       CHRISTINA ▮▮▮▮: Second red flag is there's no

5   information other than you (inaudible) out or we'll sue

6   you (inaudible) out or we'll sue you, and then suddenly

7   at the end of the phone call it's, oh, well, we can set

8   up a payment plan.

9       ZOHAIB ALI:   Mm-hmm.

10      CHRISTINA ▮▮▮▮: It kind of sounds like you

11  just want my money. So, there's red flag number two.

12      Red flag number three, there is no paperwork

13  that can be provided to me to show me here's your

14  contract that you had, okay; here's the insufficient

15  funds date when we tried to remove the funds from your

16  account; here's your account number that we tried to use

17  and that did not go through; here's why we're suing you.

18  These are all things --

19      ZOHAIB ALI:   Mm-hmm.

20      CHRISTINA ▮▮▮▮: -- that would make sense if

21  they were in order. But, right now, it's just throwing

22  up so many red flags, especially with all the scams going

23  on these days. And I hope you can appreciate that.

24      ZOHAIB ALI: And I completely understand that.

25  I do understand that. Like I said, I can send the

15

```
 1    validation of debt to you and that gives you your rights.
 2    You can contest it in writing.  You can just write back
 3    that you're contesting.  It says, you know, it will give
 4    you all of your rights that you have.  And that would be
 5    the best route for you to take.
 6              So, I'll get that sent out to you.  Do you
 7    want --
 8              CHRISTINA     :  I would also request that
 9    paperwork, as well as the date and amount that they tried
10    to remove from my account with my account number that
11    they tried to use.
12              ZOHAIB ALI:  Well, like I said, I don't have
13    that information.  I don't have the -- I have the charge-
14    off date --
15              CHRISTINA     :  But you can request it.
16              ZOHAIB ALI:  -- and I have the open date.
17              CHRISTINA     :  But you can request it.  You
18    can say, I have somebody -- if I owe the money, by God,
19    I'll pay it.
20              ZOHAIB ALI:  Mm-hmm.
21              CHRISTINA     :  But I want to make sure that
22    it's an accurate and real amount that I owe.
23              ZOHAIB ALI:  Mm-hmm.
24              CHRISTINA     :  If I owe it, I owe it, I'll
25    pay it.
```

16

```
 1              ZOHAIB ALI:  Okay.
 2              CHRISTINA ███:  But you've got to prove that I
 3    owe it.
 4              ZOHAIB ALI:  Okay.
 5              CHRISTINA ███:  I can't just take your word
 6    for it.  I'm sorry.
 7              ZOHAIB ALI:  That's fine.  Is the address still
 8    valid, the ████████████████████, Jacksonville,
 9    Florida?
10              CHRISTINA ███:  Oh, no.
11              ZOHAIB ALI:  No?
12              CHRISTINA ███:  No, not at all.
13              ZOHAIB ALI:  Okay.  Or do you want this emailed
14    to you?  I could email it to you as well.
15              CHRISTINA ███:  Email would be great.
16              ZOHAIB ALI:  Okay.  What's your -- what is your
17    email address?
18              CHRISTINA ███:  The ███████████.com
19    is still accurate.
20              ZOHAIB ALI:  Yes.  Okay, all right.
21              CHRISTINA ███:  Yep.
22              ZOHAIB ALI:  I'll get it sent over.
23              CHRISTINA ███:  And they can just contact me
24    that way or with my phone number because only my address
25    has ever changed.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Menjivar Att. Y**
**Page 16 of 18**

1        ZOHAIB ALI:  Okay, all right.  I'll go ahead
2    and get that sent out.
3        CHRISTINA ████:  And that's another red flag.
4    I didn't get anything until four years later.
5        ZOHAIB ALI:  All right.
6        CHRISTINA ████:  All right.  Thank you very
7    much.
8        ZOHAIB ALI:  No problem.  Have a good day.
9        CHRISTINA ████:  You, too.
10        **(The call was concluded.)**
11        **(The recording was concluded.)**
12
13
14
15
16
17
18
19
20
21
22
23
24
25

18

# CERTIFICATION OF TYPIST

MATTER NUMBER: X160030

CASE TITLE: STARK LAW, LLC

TAPING DATE: MAY 19, 2015

TRANSCRIPTION DATE: MAY 9, 2016

REVISION DATE: MAY 25, 2016


I HEREBY CERTIFY that the transcript contained herein is a full and accurate transcript of the tapes transcribed by me on the above cause before the FEDERAL TRADE COMMISSION to the best of my knowledge and belief.


DATED: MAY 25, 2016

*Elizabeth M. Farrell*

ELIZABETH M. FARRELL


# CERTIFICATION OF PROOFREADER


I HEREBY CERTIFY that I proofread the transcript for accuracy in spelling, hyphenation, punctuation and format.

*Sara J. Vance*

SARA J. VANCE

# Menjivar Attachment Z

ORIGINAL

# OFFICIAL TRANSCRIPT PROCEEDING

# FEDERAL TRADE COMMISSION

MATTER NO.      X160030

TITLE      STARK LAW, LLC

DATE      RECORDED: OCTOBER 14, 2015
TRANSCRIBED: MAY 9, 2016
REVISED: MAY 25, 2016

PAGES      1 THROUGH 13

TELEPHONE CONVERSATION BETWEEN TWO UNIDENTIFIED MALES
2015_14_10_04_17PM_13123912000_304

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Menjivar Att. Z
Page 1 of 13

```
 1                    FEDERAL TRADE COMMISSION

 2                        I N D E X

 3

 4    RECORDING:                                    PAGE:

 5    Telephone conversation between 2 Unidentified Males    4

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                      FEDERAL TRADE COMMISSION

2

3        In the Matter of:              )

4        Stark Law, LLC                 )   Matter No. X160030

5                                        )

6        ------------------------------)

7                                        October 14, 2015

8

9

10

11              The following transcript was produced from a

12       digital recording provided to For The Record, Inc. on

13       May 5, 2016.

14

15

16

17

18

19

20

21

22

23

24

25
```

**Menjivar Att. Z**
**Page 3 of 13**

4

```
 1                    P R O C E E D I N G S

 2                    -    -    -    -    -

 3       TELEPHONE CONVERSATION BETWEEN TWO UNIDENTIFIED MALES

 4              UNIDENTIFIED MALE 1:  Hello.

 5              UNIDENTIFIED MALE 2:  Hey.

 6              UNIDENTIFIED MALE 1:  Hey.

 7              UNIDENTIFIED MALE 2:  Yes, sir.

 8              UNIDENTIFIED MALE 1:  What's happening, dude?

 9              UNIDENTIFIED MALE 2:  This has got me stressed

10       out all day.

11              UNIDENTIFIED MALE 1:  Well, I'm sorry.  Would

12       you rather me not tell you?

13              UNIDENTIFIED MALE 2:  No, I'd rather you tell

14       me.

15              UNIDENTIFIED MALE 1:  Okay.  So, here's what I

16       know.

17              UNIDENTIFIED MALE 2:  Mm-hmm.

18              UNIDENTIFIED MALE 1:  The guy -- the guy they

19       went to won't talk.  He won't say a word.

20              UNIDENTIFIED MALE 2:  Yeah.

21              UNIDENTIFIED MALE 1:  Okay?  About anything,

22       okay?  They -- the deal he was offered --

23              UNIDENTIFIED MALE 2:  Mm-hmm.

24              UNIDENTIFIED MALE 1:  -- was a $10 million fine

25       and you can never do business again.
```

5

```
1                    UNIDENTIFIED MALE 2:  Mm-hmm.
2                    UNIDENTIFIED MALE 1:  And that's if he
3        cooperated.
4                    UNIDENTIFIED MALE 2:  Right.
5                    UNIDENTIFIED MALE 1:  Okay?  If he cooperated,
6        it was just a fine and not do business and no criminal
7        charges.
8                    UNIDENTIFIED MALE 2:  Right.
9                    UNIDENTIFIED MALE 1:  It was -- according to
10       them, the first guy who takes this deal gets the deal.
11                   UNIDENTIFIED MALE 2:  Mm-hmm.
12                   UNIDENTIFIED MALE 1:  Nobody else is getting a
13       deal.
14                   UNIDENTIFIED MALE 2:  Mm-hmm.
15                   UNIDENTIFIED MALE 1:  Okay?  He said, listen,
16       you're bankrupting me, you're putting me out of business,
17       I have no way of earning a living, so go fuck yourselves,
18       do what you want to do.
19                   UNIDENTIFIED MALE 2:  Mm-hmm, mm-hmm.
20                   UNIDENTIFIED MALE 1:  Okay?  But according to
21       them, they're going to you, but they also want you to
22       give them Tucker.
23                   UNIDENTIFIED MALE 2:  Joel.  Yeah, I know.
24       Yeah.
25                   UNIDENTIFIED MALE 1:  Okay.
```

6

1            UNIDENTIFIED MALE 2:  It's all -- it's all --
2        everything comes down to Tucker.
3            UNIDENTIFIED MALE 1:  No, no, they want him
4        like away.  They don't want him paying fines anymore;
5        they want him away.  But they want -- but they know that
6        you're it.
7            UNIDENTIFIED MALE 2:  Right, right, right,
8        right, right.
9            UNIDENTIFIED MALE 1:  Okay?  I don't know why,
10       how or what, okay?
11           UNIDENTIFIED MALE 2:  Right, right, right,
12       right, right.
13           UNIDENTIFIED MALE 1:  What I do know from my
14       time going through this, okay, is, A, they have -- they
15       have unlimited resources.
16           UNIDENTIFIED MALE 2:  Right.
17           UNIDENTIFIED MALE 1:  And, B -- and this goes
18       for me or anybody else you ever talk to.
19           UNIDENTIFIED MALE 2:  Right.
20           UNIDENTIFIED MALE 1:  Okay?  If anybody starts
21       asking you questions -- and I'm talking about even the
22       guys from Highland.
23           UNIDENTIFIED MALE 2:  Anybody, right, right,
24       right, anything.
25           UNIDENTIFIED MALE 1:  I mean especially

7

```
1      Highland.
2              UNIDENTIFIED MALE 2:  Yeah, yeah, yeah, yeah,
3      yeah.
4              UNIDENTIFIED MALE 1:  Because those guys can't
5      handle it.
6              UNIDENTIFIED MALE 2:  Yeah.
7              UNIDENTIFIED MALE 1:  Okay?
8              UNIDENTIFIED MALE 2:  They're on the map.
9      Exactly.
10             UNIDENTIFIED MALE 1:  And they're -- they're a
11     target.
12             UNIDENTIFIED MALE 2:  Right.
13             UNIDENTIFIED MALE 1:  So, if they get to them,
14     they're -- they'll flip them in three seconds.
15             UNIDENTIFIED MALE 2:  Exactly.
16             UNIDENTIFIED MALE 1:  Okay?
17             UNIDENTIFIED MALE 2:  Exactly.
18             UNIDENTIFIED MALE 1:  So, I'm just telling you
19     from -- as a friend, okay?
20             UNIDENTIFIED MALE 2:  Right.
21             UNIDENTIFIED MALE 1:  Okay.
22             UNIDENTIFIED MALE 2:  No, I appreciate it.  I
23     don't --
24             UNIDENTIFIED MALE 1:  What it is.
25             UNIDENTIFIED MALE 2:  No, I know.
```

8

1                UNIDENTIFIED MALE 1:  And what it -- and as I

2      find out more, I get anything --

3                UNIDENTIFIED MALE 2:  Right, right.

4                UNIDENTIFIED MALE 1:  -- I'll let you know.

5                UNIDENTIFIED MALE 2:  In your experience, you

6      know, I mean, you've seen guys and you've seen things

7      happen, what should I do right now?  I mean, business as

8      normal?

9                UNIDENTIFIED MALE 1:  Yep.

10              UNIDENTIFIED MALE 2:  Yeah, that's what I

11    figured.  I mean, I got to liquidate cash, do what I got

12    to do.  There's nothing and whatever's going to happen is

13    going to happen.

14             UNIDENTIFIED MALE 1:  Once they come in --

15    if they seize it, they're going to seize it anyways,

16    okay?

17             UNIDENTIFIED MALE 2:  Right, right, right,

18    right, right.

19             UNIDENTIFIED MALE 1:  But just know what they

20    want and what they're coming for.

21             UNIDENTIFIED MALE 2:  Right.

22             UNIDENTIFIED MALE 1:  Do your other stuff.

23             UNIDENTIFIED MALE 2:  Right, right, right.

24             UNIDENTIFIED MALE 1:  And don't -- I wouldn't

25    do anything of that because --

**Menjivar Att. Z**
**Page 8 of 13**

9

1               UNIDENTIFIED MALE 2:  Right.

2               UNIDENTIFIED MALE 1:  -- if you all of a sudden

3      have a big sale come through, it's bullshit.  They

4      (inaudible).

5               UNIDENTIFIED MALE 2:  Yeah, yeah, yeah, yeah,

6      yeah, yeah, yeah.  Makes sense.

7               UNIDENTIFIED MALE 1:  All of a sudden, somebody

8      out of the woodwork.

9               UNIDENTIFIED MALE 2:  Yeah, just shows up --

10              UNIDENTIFIED MALE 1:  All of the sudden wants

11     this.

12              UNIDENTIFIED MALE 2:  -- wants 100 million, 200

13     million, yep.

14              UNIDENTIFIED MALE 1:  Yeah.

15              UNIDENTIFIED MALE 2:  Yep, yep.

16              UNIDENTIFIED MALE 1:  No fucking way, okay?

17              UNIDENTIFIED MALE 2:  Yep.

18              UNIDENTIFIED MALE 1:  It's -- it's -- it's

19     entrapment, but they can't -- you can't prove it.

20              UNIDENTIFIED MALE 2:  Yeah, yeah, yeah, yeah,

21     no, exactly, exactly, exactly, exactly.  Perfect.

22              UNIDENTIFIED MALE 1:  They're -- okay.

23              UNIDENTIFIED MALE 2:  I mean, no, I get it, I

24     get it.  It's perfect.  I mean, they're just trying to

25     get it up the totem pole.  It's not hard to know who is

**Menjivar Att. Z**
**Page 9 of 13**

```
1        the main buyer and -- you know, the servicer on this and,

2        you know, so they're just trying to (inaudible) their

3        call.

4                  UNIDENTIFIED MALE 1:  (Inaudible) but -- but --

5        but little guys, if that's the deal they're offering,

6        okay, this isn't what they're saying not.  I'm saying

7        that's what they offered.  If they're -- if that's all --

8        if they're offering that to the little guys --

9                  UNIDENTIFIED MALE 2:  Yeah.

10                 UNIDENTIFIED MALE 1:  -- they're on a witch

11       hunt.

12                 UNIDENTIFIED MALE 2:  Right.

13                 UNIDENTIFIED MALE 1:  I just know it.

14                 UNIDENTIFIED MALE 2:  Right, right, right.

15                 UNIDENTIFIED MALE 1:  I know how they work.

16                 UNIDENTIFIED MALE 2:  Right, right, right,

17       right.

18                 UNIDENTIFIED MALE 1:  I know this how the CFTC

19       works, I know how all of them work.

20                 UNIDENTIFIED MALE 2:  Right, right, right,

21       right, right, right, right, right.  All right, buddy,

22       thanks for the heads-up.  I got -- I'm in the middle of a

23       move --

24                 UNIDENTIFIED MALE 1:  So, you're moving out to

25       the 'burbs?
```

 1                    UNIDENTIFIED MALE 2:  I'm moving out to the

 2          'burbs.  So --

 3                    UNIDENTIFIED MALE 1:  You're going to be a

 4          suburbanite now.  Look at you.

 5                    UNIDENTIFIED MALE 2:  I know, I know, I know, I

 6          know.  As long as -- I'm fine with these numbers.  Who

 7          knows where else they might take me.  (Laughter).

 8                    UNIDENTIFIED MALE 1:  (Laughter).  No, now,

 9          now, now.

10                    UNIDENTIFIED MALE 2:  All right, all right, all

11          right.  Well --

12                    UNIDENTIFIED MALE 1:  Listen --

13                    UNIDENTIFIED MALE 2:  -- just keep your eyes

14          and ears open.  I know you do.

15                    UNIDENTIFIED MALE 1:  Absolutely.  And -- and

16          when you get settled --

17                    UNIDENTIFIED MALE 2:  Yeah.

18                    UNIDENTIFIED MALE 1:  -- let's go grab lunch

19          and I'll tell you --

20                    UNIDENTIFIED MALE 2:  100 percent.

21                    UNIDENTIFIED MALE 1:  -- talk to you more.

22                    UNIDENTIFIED MALE 2:  Perfect.

23                    UNIDENTIFIED MALE 1:  Okay?  And I'll try to

24          find out more as I can.

25                    UNIDENTIFIED MALE 2:  Cool.  Excellent.

12

1          UNIDENTIFIED MALE 1:  Just (inaudible).  Bye.

2          UNIDENTIFIED MALE 2:  Bye.

3          **(The call was concluded.)**

4          **(The recording was concluded.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13

1          C E R T I F I C A T I O N   O F   T Y P I S T

2     MATTER NUMBER: X160030 _____

3     CASE TITLE: STARK LAW, LLC _____

4     TAPING DATE:  OCTOBER 14, 2015 _____

5     TRANSCRIPTION DATE:  MAY 9, 2016 _____

6     REVISION DATE:  MAY 25, 2016 _____

7

8          I HEREBY CERTIFY that the transcript contained

9     herein is a full and accurate transcript of the tapes

10    transcribed by me on the above cause before the FEDERAL

11    TRADE COMMISSION to the best of my knowledge and belief.

12

13                    DATED:  MAY 25, 2016

14

15                    _____

16                    ELIZABETH M. FARRELL

17

18        C E R T I F I C A T I O N   O F   P R O O F R E A D E R

19

20         I HEREBY CERTIFY that I proofread the transcript for

21    accuracy in spelling, hyphenation, punctuation and

22    format.

23

24                    _____

25                    SARA J. VANCE

# Menjivar Attachment AA

ORIGINAL

## OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

MATTER NO.     X160030

TITLE     STARK LAW, LLC

DATE     RECORDED:  SEPTEMBER 1, 2015
TRANSCRIBED:  MAY 11, 2016
REVISED:  MAY 25, 2016

PAGES     1 THROUGH 7

TELEPHONE CONVERSATION BETWEEN TWO UNIDENTIFIED MALES
2015_01_09_12_56PM_13125431006_304

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Menjivar Att. AA
Page 1 of 7

2

```
 1                 FEDERAL TRADE COMMISSION

 2                      I N D E X

 3

 4   RECORDING:                                    PAGE:

 5   Telephone conversation between 2 Unidentified Males    4

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                    FEDERAL TRADE COMMISSION

2

3        In the Matter of:            )

4        Stark Law, LLC               )   Matter No. X160030

5                                     )

6        ------------------------------)

7                                 September 1, 2015

8

9

10

11            The following transcript was produced from a

12    digital recording provided to For The Record, Inc. on

13    May 5, 2016.

14

15

16

17

18

19

20

21

22

23

24

25

4

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | -   -   -   -   - |
| 3 | **TELEPHONE CONVERSATION BETWEEN 2 UNIDENTIFIED MALES** |
| 4 | UNIDENTIFIED MALE 1:  Hey. |
| 5 | UNIDENTIFIED MALE 2:  Okay, not to add another |
| 6 | thing to your plate, but this is important.  What corp |
| 7 | can you open an international -- can you open an |
| 8 | international -- |
| 9 | (Break in recording) |
| 10 | UNIDENTIFIED MALE 2:  -- and also -- |
| 11 | UNIDENTIFIED MALE 1:  An international what? |
| 12 | UNIDENTIFIED MALE 2:  Processor, processor. |
| 13 | (Inaudible).  Choose any corp we have. |
| 14 | UNIDENTIFIED MALE 1:  I mean, you want to -- |
| 15 | just like wanted a Stark or something. |
| 16 | UNIDENTIFIED MALE 2:  If you have something |
| 17 | that's not Stark, that would be better. |
| 18 | UNIDENTIFIED MALE 2:  I mean, I don't.  But if |
| 19 | you have something -- |
| 20 | UNIDENTIFIED MALE 1:  Well, you know, don't we |
| 21 | have a -- didn't we open an SRS or something? |
| 22 | UNIDENTIFIED MALE 2:  We never opened it. |
| 23 | UNIDENTIFIED MALE 1:  Okay.  Go through -- we |
| 24 | opened so many, let's just use one of them.  Can we |
| 25 | change the descriptors? |

**Menjivar Att. AA**
**Page 4 of 7**

5

1          UNIDENTIFIED MALE 2:  It depends.  Yeah, I
2     mean, you -- you'll have some latitude.  For example, our
3     descriptor right now is just reading as Stark.
4          UNIDENTIFIED MALE 1:  Okay.  So, we can make it
5     like SRS or something?
6          UNIDENTIFIED MALE 2:  Probably not SRS.  I mean
7     -- you know, it depends on the company, right?  So, I
8     don't think you want to use Stark again.
9          UNIDENTIFIED MALE 1:  Yeah, because I'm going
10    to go kind of rough out there.
11         UNIDENTIFIED MALE 2:  Yeah.  So, that's going
12    to corrupt everything.  That's what we're -- I'm still
13    trying to get these domestic ones up and running here,
14    you know.
15         UNIDENTIFIED MALE 1:  Um, all right.  See if
16    you have a corp; otherwise, open a corp because we've got
17    to get this open right away.  Pick any name, I don't
18    care.  Just anything.
19         UNIDENTIFIED MALE 2:  Okay.
20         UNIDENTIFIED MALE 1:  Pick something generic.
21         UNIDENTIFIED MALE 2:  Okay.
22         UNIDENTIFIED MALE 1:  (Inaudible) has a list of
23    names, he'll give you a generic name.
24         UNIDENTIFIED MALE 2:  You don't want your name
25    on this thing, I imagine?

6

1             UNIDENTIFIED MALE 1:  Well, if I have to put it

2     on and then move it off.  How else are we going to get

3     it?

4             UNIDENTIFIED MALE 2:  Who's opening the bank

5     account?

6             UNIDENTIFIED MALE 1:  We're going to be in

7     control of the bank accounts and we're going to be in

8     control of everything, so...

9             UNIDENTIFIED MALE 2:  So, it's going to be your

10    name then and we'll get it off afterwards.

11            UNIDENTIFIED MALE 1:  Yeah, and then we'll

12    remove it.  So, do it that way.

13            UNIDENTIFIED MALE 2:  Okay, okay.

14            UNIDENTIFIED MALE 1:  All right.

15            UNIDENTIFIED MALE 2:  All right.

16            **(The call was concluded.)**

17            **(The recording was concluded.)**

18

19

20

21

22

23

24

25

7

C E R T I F I C A T I O N   O F   T Y P I S T

MATTER NUMBER: X160030

CASE TITLE: STARK LAW, LLC

TAPING DATE: SEPTEMBER 1, 2015

TRANSCRIPTION DATE: MAY 11, 2016

REVISION DATE: MAY 25, 2016


I HEREBY CERTIFY that the transcript contained herein is a full and accurate transcript of the tapes transcribed by me on the above cause before the FEDERAL TRADE COMMISSION to the best of my knowledge and belief.


DATED: MAY 25, 2016

_____

ELIZABETH M. FARRELL


C E R T I F I C A T I O N   O F   P R O O F R E A D E R


I HEREBY CERTIFY that I proofread the transcript for accuracy in spelling, hyphenation, punctuation and format.

_____

SARA J. VANCE


For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Menjivar Att. AA**
**Page 7 of 7**

# Menjivar Attachment BB

ORIGINAL

## OFFICIAL TRANSCRIPT PROCEEDING

## FEDERAL TRADE COMMISSION

MATTER NO.  X160030

TITLE   STARK LAW, LLC

DATE   RECORDED: SEPTEMBER 8, 2015
     TRANSCRIBED: MAY 11, 2016
     REVISED: MAY 25, 2016

PAGES   1 THROUGH 21

TELEPHONE CONVERSATION BETWEEN TWO UNIDENTIFIED MALES
2015_08_09_02_46PM_13125431006_304

2

1                     FEDERAL TRADE COMMISSION

2                          I N D E X

3

4       RECORDING:                                    PAGE:

5       Telephone conversation between 2 Unidentified Males    4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    FEDERAL TRADE COMMISSION

2

3     In the Matter of:            )

4     Stark Law, LLC               )   Matter No. X160030

5                                  )

6     ------------------------------)

7                            September 8, 2015

8

9

10

11          The following transcript was produced from a

12    digital recording provided to For The Record, Inc. on

13    May 5, 2016.

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2                     -    -    -    -    -

3        TELEPHONE CONVERSATION BETWEEN 2 UNIDENTIFIED MALES

4              UNIDENTIFIED MALE 1:  Hey.

5              UNIDENTIFIED MALE 2:  Hey, bro.  No, our world

6        changed in the last two, three months, too, man.  I mean,

7        we --

8              UNIDENTIFIED MALE 1:  Yeah.

9              UNIDENTIFIED MALE 2:  -- we had our solid

10       processors, everything was great.  I was opening up

11       another -- I have an office in construction right now,

12       another 70 seats.

13             UNIDENTIFIED MALE 1:  (Inaudible).

14             UNIDENTIFIED MALE 2:  And right in the middle

15       of it, boom, you know, they -- I got a letter, actually.

16       They were cool enough to send a letter and say in 30 days

17       your processing ends.  So, we were like, okay, fine.  We

18       opened up a couple -- we opened up other processors which

19       showed that we're a -- with some, we showed we're a

20       billing company; with others, we're showed we're a law

21       firm.

22             UNIDENTIFIED MALE 1:  Right.

23             UNIDENTIFIED MALE 2:  With others, some other

24       bullshit.  And everything we did was like --

25             UNIDENTIFIED MALE 1:  Sure.

**Menjivar Att. BB**
**Page 4 of 21**

5

1          UNIDENTIFIED MALE 2:  -- some of them ran for

2     like 20 days, some of them ran for like three days, some

3     of them ran for one day.

4          UNIDENTIFIED MALE 1:  Right.

5          UNIDENTIFIED MALE 2:  And every single spot,

6     they just started jamming up and tossed out, to the point

7     where, you know, we had XYZ number of dollars tied up

8     into them and --

9          UNIDENTIFIED MALE 1:  Right.

10          UNIDENTIFIED MALE 2:  -- they're holding that

11     money.  And they're -- (inaudible) huge.  I don't know

12     what the fuck they're doing.  I'm watching that money,

13     because I get a report on the NSF, just going straight

14     down the fucking drain, you know.

15          UNIDENTIFIED MALE 1:  Right, right.

16          UNIDENTIFIED MALE 2:  And, so, what's happened

17     is here's -- let me tell you what the negative is of

18     offshore.  Here's the negative of off --

19          UNIDENTIFIED MALE 1:  Right.

20          UNIDENTIFIED MALE 2:  Here's the negative of

21     offshore.  One, what I was saying was the debtor, they

22     get an overseas transaction terms, like you use your --

23          UNIDENTIFIED MALE 1: Yep.

24          UNIDENTIFIED MALE 2:  You know, in Europe,

25     you're using your credit card, right?

6

```
 1                UNIDENTIFIED MALE 1:  Right, right.
 2                UNIDENTIFIED MALE 2:  And you get those -- you
 3      have a foreign transaction fee, right?
 4                UNIDENTIFIED MALE 1:  (Inaudible).
 5                UNIDENTIFIED MALE 2:  So, you're getting that.
 6                UNIDENTIFIED MALE 1:  Yep.
 7                UNIDENTIFIED MALE 2:  And, dude, you're talking
 8      about people who are like -- you know, they're spending
 9      like $400 a month on their credit card, like, dude, every
10      dollar is going to matter or any reason to call in and
11      say it's an NSF.  So, that's one (inaudible).
12                The second issue, they're taking a 10 percent
13      rolling reserve.  Third issue --
14                UNIDENTIFIED MALE 1:  Right.
15                UNIDENTIFIED MALE 2:  Third issue, okay, all
16      the prepaid cards, they can't be run on the offshore
17      processor because they can't even be ran offshore,
18      overseas.  They can only be ran domestically in America.
19      But the good thing is those credit cards that are prepaid
20      cards, they all have an ABA and an account number that
21      are --
22                UNIDENTIFIED MALE 1:  Right.
23                UNIDENTIFIED MALE 2:  -- associated with them.
24      So, you have to E --
25                UNIDENTIFIED MALE 1:  Sure.
```

7

1          UNIDENTIFIED MALE 2:  You have to E-track

2    those.

3          UNIDENTIFIED MALE 1:  ACH (inaudible) right.

4          UNIDENTIFIED MALE 2:  Or ACH them.  Which has

5    its own set of issues because in credit card, we know the

6    NSF right away, right, and we can go chase it.  When you

7    do it on ACH or something --

8          UNIDENTIFIED MALE 1:  Right.

9          UNIDENTIFIED MALE 2:  -- you find out somewhere

10   between five days to up to a couple weeks later and then

11   you get bank charges hit on you.

12         UNIDENTIFIED MALE 1:  Correct.

13         UNIDENTIFIED MALE 2:  Okay?

14         UNIDENTIFIED MALE 1:  Yeah.

15         UNIDENTIFIED MALE 2:  So, that causes its own

16   nightmare and its own headache --

17         (Break in recording)

18         UNIDENTIFIED MALE 2:  -- stuff like that.

19         UNIDENTIFIED MALE 1:  Right.

20         UNIDENTIFIED MALE 2:  So, we went from like

21   making great money to, right now, I don't -- I've been

22   pouring in money to our own operation to --

23         UNIDENTIFIED MALE 1:  Right.

24         UNIDENTIFIED MALE 2:  -- keep it (inaudible)

25   because it's totally fucked.

8

1              UNIDENTIFIED MALE 1:  Right.

2              UNIDENTIFIED MALE 2:  And it's just -- upside

3    down has come, and that's what -- I mean, I've been

4    warning everybody that this is coming up because every

5    processor is getting out.  Now, good sign is, I have a

6    processor right now domestic who may be able to board us.

7    We're in like the last phases of conversations as a

8    collection agency.

9              UNIDENTIFIED MALE 1:  Right.

10             UNIDENTIFIED MALE 2:  Okay?  There's a lot of

11    guys --

12             UNIDENTIFIED MALE 1:  Right.

13             UNIDENTIFIED MALE 2:  -- that will tell you

14    they'll board you with other stuff.

15             UNIDENTIFIED MALE 1:  Right.

16             UNIDENTIFIED MALE 2:  Here's what happens:

17    You'll get boarded and then they'll put you under some

18    other coding.  But when the complaints are coming in to

19    the credit card company --

20             UNIDENTIFIED MALE 1:  Right.

21             UNIDENTIFIED MALE 2:  -- it's consistent with

22    the coding of a collection agency, and their software

23    triggers --

24             UNIDENTIFIED MALE 1:  Right.

25             UNIDENTIFIED MALE 2:  -- pick it up.

1          UNIDENTIFIED MALE 1:  So --

2          UNIDENTIFIED MALE 2:  So --

3          UNIDENTIFIED MALE 1:  Yeah, exactly.

4          UNIDENTIFIED MALE 2:  So, I mean, you know, I

5     know you're sick of funding the money, but your bigger

6     problem is not the money that needs to go into the

7     business this week, it's the fucking processing.  You

8     need a processor to run your payments.

9          UNIDENTIFIED MALE 1:  Right, of course, which I

10    can't get at all, and that's kind of where I stand

11    because, you know, I will -- I knew -- I knew -- so, what

12    happened was I got shut down like the 24th.

13         UNIDENTIFIED MALE 2:  Mm-hmm.

14         UNIDENTIFIED MALE 1:  You know, I (inaudible)

15    the account froze back in July.  I opened up another

16    account.  This guy literally just stole 10,000 bucks from

17    me.  I ran like a Wednesday, Thursday, Friday back.  It

18    was 10 grand.  Never saw a dime.  You know, he won't even

19    fucking call me anymore, literally just stole 10,000.

20         UNIDENTIFIED MALE 2:  Oh.

21         UNIDENTIFIED MALE 1:  So, it was like

22    (inaudible).  So, they kept -- you know, they kept 25.

23    My -- you know, DMS (phonetic) kept 25.  Then I ran

24    Wednesday, Thursday, Friday and that guy just stole

25    10,000.  So, I was like, well, you know, I fought with

10

1    DMS, they put me back on, and by the time I -- I was in

2    Europe.  By the time I got back, DMS was just like, yeah,

3    we're going in for review today, you're shut down.  They

4    didn't even blink.  I mean, they were just getting rid of

5    us no matter what.

6              UNIDENTIFIED MALE 2:  Yeah.

7              UNIDENTIFIED MALE 1:  So, you know, then I was

8    like, all right.  So, now I have ten other applications

9    in, all that said we find out by, you know, August 28th,

10   and now it's September 8th.

11             UNIDENTIFIED MALE 2:  Yeah.

12             UNIDENTIFIED MALE 1:  You know, half of them

13   said we're going to keep -- you know, we'll -- you know,

14   half of them are like, oh, yeah, you're preapproved,

15   which means nothing.

16             UNIDENTIFIED MALE 2:  Mm-hmm.

17             UNIDENTIFIED MALE 1:  You know, and, yeah, I --

18   my opinion is I've never taken a check off this thing.

19             UNIDENTIFIED MALE 2:  Yeah.

20             UNIDENTIFIED MALE 1:  I know you've killed it

21   and I know Dave and Omar have done good (inaudible)

22   whatever it is.  So, you know, for me, you know, I

23   (inaudible) --

24             UNIDENTIFIED MALE 2:  You haven't been making

25   money over the last two years?

11

1     UNIDENTIFIED MALE 1: No. I mean, I've paid

2  for my car and shit, but, I mean, I (inaudible) --

3     UNIDENTIFIED MALE 2: Which is just bullshit.

4     UNIDENTIFIED MALE 1: I haven't taken a check

5  and I've put $40- or $50,000 in every year.

6     UNIDENTIFIED MALE 2: I remember the last time

7  we talked, you were like 400 in, give or take, I

8  remember.

9     UNIDENTIFIED MALE 1: Yeah.

10     UNIDENTIFIED MALE 2: And you were just on the

11  cusp of getting everything stabilized.

12     UNIDENTIFIED MALE 1: Right. And, you know, so

13  the real kick in the balls is this. So, I figure out the

14  formula here from the labor, you know. I've got 15 guys

15  that are fucking in every day, killing it. I don't let

16  them (inaudible). You know, I give them one day a month

17  off. After that, you lose your bonus. Next day after

18  that, you get fired.

19     UNIDENTIFIED MALE 2: Mm-hmm.

20     UNIDENTIFIED MALE 1: So, you know,

21  everybody -- I still train everybody myself. So, I've

22  got the formula. I've got 15 guys in there killing it.

23  You know, like I said, I've got $47,000 (inaudible)

24  there, $24 million in paper that I haven't run in a year

25  just because I've, you know, been just fucking sitting on

12

1       it, living off of (inaudible) paper.  You know, but for

2       me, you know, it's not like I've got money in the bank

3       from this project to fucking jump into it, you know.

4                  UNIDENTIFIED MALE 2:  Right.

5                  UNIDENTIFIED MALE 1:  It's just time, you know.

6       So, to me, I've got, you know, an asset which is the

7       paper, you know, whatever you call fucking, you know, no

8       -- not running a year of paper worth.

9                  UNIDENTIFIED MALE 2:  Mm-hmm.

10                  UNIDENTIFIED MALE 1:  And I've got the 15

11      collectors there every day ready to work.

12                  UNIDENTIFIED MALE 2:  Right.

13                  UNIDENTIFIED MALE 1:  You know, and Omar

14      (phonetic) did let me run, you know, 14 grand and I've

15      got a $14,000 payroll.  I can do it another few weeks,

16      but then I run into, you know, just fucking, you know,

17      throwing good money after bad.  Do I -- do I -- you know,

18      I mean, for 2,000 bucks, I'm going to run it another two

19      weeks for sure.

20                  UNIDENTIFIED MALE 2:  Mm-hmm.

21                  UNIDENTIFIED MALE 1:  But at that point, you

22      know, it's not like -- you know, it -- I'm just borrowing

23      money to -- you know, I mean, the guys are owed this

24      money from payroll anyway, you know.  So, if I let them

25      work for another two weeks and don't pay them, I'm just

Menjivar Att. BB
Page 12 of 21

```
 1        going to deal with Department of Labor shit.

 2                    UNIDENTIFIED MALE 2:  Mm-hmm.

 3                    UNIDENTIFIED MALE 1:  So, I don't see me

 4        getting a credit card processor any time soon.

 5                    UNIDENTIFIED MALE 2:  Well, the credit card

 6        processing, I'm telling you the honest truth, we spent

 7        two months doing exactly what you're doing right now for

 8        the last two weeks.

 9                    UNIDENTIFIED MALE 1:  Right.

10                    UNIDENTIFIED MALE 2:  And it's the most

11        frustrating thing.  And then, finally, I woke up one day

12        and I told my whole team, I'm like, stop, we're chasing

13        after a tree that doesn't exist.

14                    UNIDENTIFIED MALE 1:  Right.

15                    UNIDENTIFIED MALE 2:  And we've got to think of

16        the new reality.  The new reality is fucking offshore and

17        this E-check, and it sucks.  I'm telling you it sucks.

18        Like it changes everything under the sun.  I mean, like,

19        dude, I -- and I'm not even billing paper to my company

20        because I sell a lot of paper out on the market.  I'm

21        giving --

22                    UNIDENTIFIED MALE 1:  Right.

23                    UNIDENTIFIED MALE 2:  -- it paper-free and I'm

24        still losing money with a fucking streamlined process,

25        you know.  Like everything's fucking tight.
```

14

```
 1                UNIDENTIFIED MALE 1:  Right.  I know.
 2                UNIDENTIFIED MALE 2:  And, you know, like I'm
 3    literally coming down to Florida to look at other call
 4    centers to learn what they're doing to see -- you know,
 5    we've spent all these years in this space like what other
 6    options do I have, you know what I'm saying, like to
 7    switch this thing into something else.
 8                UNIDENTIFIED MALE 1:  Yeah.
 9                UNIDENTIFIED MALE 2:  And -- you know.  So, I
10    mean, here's -- I mean, the best I could tell you, bro,
11    here, I talked to Dave and Omar, you know.
12                UNIDENTIFIED MALE 1:  Right.
13                UNIDENTIFIED MALE 2:  They're willing to give
14    you their offshore processor and let you keep running
15    money, right.
16                UNIDENTIFIED MALE 1:  Right.
17                UNIDENTIFIED MALE 2:  I think that's going to
18    bring its own, you know, set of issues for you if you
19    don't have --
20                UNIDENTIFIED MALE 1:  Yeah.
21                UNIDENTIFIED MALE 2:  -- their domestic
22    solution, right.
23                UNIDENTIFIED MALE 1:  Right.
24                UNIDENTIFIED MALE 2:  But, you know, that's
25    going to be bring its own set of headaches, running their
```

15

1    offshore, but at least it's something.  And like you

2    said --

3                UNIDENTIFIED MALE 1:  Right.

4                UNIDENTIFIED MALE 2:  -- you just keep pushing

5    and -- you're pushing the ball, but hopefully the ball --

6    maybe some domestic solution may open up.  The good side

7    is the house did say that this is illegal, this show

8    point is illegal.  The question is, when is this thing

9    going to get eradicated and, you know, pushed through.

10   And even if it is, are the banks still going to open up,

11   right?  If it's the mortgage industry, like right now --

12               UNIDENTIFIED MALE 1:  Right, right.

13               UNIDENTIFIED MALE 2:  -- you look at it and

14   money is at 3.25, but it's not available, you know.

15   Yeah, that's great --

16               UNIDENTIFIED MALE 1:  Yeah.

17               UNIDENTIFIED MALE 2:  -- but if you have to go

18   get a home loan, they'll fucking put you through the

19   ringer and it's not going to happen, you know.

20               UNIDENTIFIED MALE 1:  Right, exactly.

21               UNIDENTIFIED MALE 2:  So, it's like that.  So,

22   even if they lift the restrictions off, I mean, at the

23   end of our day, our industry is still a horsehair

24   (phonetic).  Do they even want the noise, you know?

25               UNIDENTIFIED MALE 1:  Right.

16

```
1                UNIDENTIFIED MALE 2:  But here's a good --
2       here's a good sign.  After all the bullshit, we have one
3       guy who may be able to board us on -- if we get boarded
4       on with this guy, and this shit's looking legit, I'm
5       going to -- the first thing I'm going to do is put him on
6       the phone with you so you guys can get rolled up and
7       rolled on to this guy's platform.
8                UNIDENTIFIED MALE 1:  Right.
9                UNIDENTIFIED MALE 2:  I have another guy who's
10      gotten on, but he told me he's gotten on as a loan
11      modification company.  Like I don't like the idea of
12      that.
13               UNIDENTIFIED MALE 1:  Right.
14               UNIDENTIFIED MALE 2:  And it's through Bank of
15      America.  Because I know what happens.  I've already
16      tried that with a couple of different things --
17               UNIDENTIFIED MALE 1:  Yeah, no, I did, too.
18               UNIDENTIFIED MALE 2:  -- and they freeze --
19      they went and they freeze it up.  So --
20               UNIDENTIFIED MALE 1:  Right.
21               UNIDENTIFIED MALE 2:  -- you know, if you can,
22      try to just -- just try to sit tight for -- you know, use
23      the processor over there to just get through this time
24      right now.  I mean, we buckled down, we fired, you know,
25      the people who weren't producing and, you know, tightened
```

**Menjivar Att. BB**
**Page 16 of 21**

17

1      up as much as we can.

2               UNIDENTIFIED MALE 1:  Right.

3               UNIDENTIFIED MALE 2:  And let's just try to

4      fucking get through this, you know, couple of weeks

5      there.

6               UNIDENTIFIED MALE 1:  Yeah.  I -- you know, I'm

7      just being honest with you, I'm probably just going to

8      shut it all down probably tomorrow or the next day.  And

9      I'll be -- you know, I've got paper to sell --

10             (Break in recording)

11            UNIDENTIFIED MALE 2:  Yeah (inaudible) --

12            UNIDENTIFIED MALE 1:  -- (inaudible) another

13      dime in it.

14            UNIDENTIFIED MALE 2:  At least liquid that

15      paper and pull out -- you know, pull out whatever.  If

16      you've got $18 million paper, like you said, if you get

17      one cent on it, you move on to get $180,000 back where --

18            UNIDENTIFIED MALE 1:  Exactly.

19            UNIDENTIFIED MALE 2:  -- (inaudible) figuring

20      out what needs to happen.

21            UNIDENTIFIED MALE 1:  Yeah.  Because I kind of

22      do that, too.  I was looking to flip the call center for

23      a while and there's -- there's nothing that you -- there

24      is no markets for the infrastructure of the call center.

25      There's none, you know.

18

1          UNIDENTIFIED MALE 2:  Right.

2          UNIDENTIFIED MALE 1:  Like I talked to a

3     bunch of guys, you know.  If you have the leads, they're

4     not -- you know, if you have the leads and the paper,

5     they're not giving it up.  And if you don't, then -- you

6     know, then you're stuck with are you just pouring money

7     down the drain.  It's just not (inaudible) you know.

8     (Inaudible).  You know, I've got a buddy who's, you know,

9     got a factoring business that said, you know, if you want

10    to go into hard core sales and put your own money into

11    the factory, use this formula.

12         UNIDENTIFIED MALE 2:  Mm-hmm.

13         UNIDENTIFIED MALE 1:  That doesn't do me any

14    good.

15         UNIDENTIFIED MALE 2:  Mm-hmm.

16         UNIDENTIFIED MALE 1:  But whatever.  I mean,

17    you know, if you get somebody (inaudible) --

18         UNIDENTIFIED MALE 2:  Well, if you've got

19    $155,000 on your books, at least run whatever you can to

20    start getting that money liquidated.  You see what I'm

21    saying?  Cut a deal with him where he'd at least let your

22    155 -- even if you get 90,000, you know what I'm saying?

23         UNIDENTIFIED MALE 1:  Right, yeah, yeah.

24         UNIDENTIFIED MALE 2:  And let it play out.

25    Just put one or two people to run, you know, the NSF on

19

1      it, even if Dad's doing it and just chasing the NSF and

2      getting that money in over the next couple months.

3               UNIDENTIFIED MALE 1:  Yeah, yeah (inaudible).

4               UNIDENTIFIED MALE 2:  You know?  And then, if

5      I --

6               UNIDENTIFIED MALE 1:  All right, bud.

7               UNIDENTIFIED MALE 2:  If something happens --

8               UNIDENTIFIED MALE 1:  If you hear anything, let

9      me know.

10              UNIDENTIFIED MALE 2:  I will, bro.

11              UNIDENTIFIED MALE 1:  If you hear anything, let

12     me know.  And like I said, I mean, obviously, hopefully,

13     those guys will give me the money they ran on Friday so

14     I've got two more weeks, but that will be it.

15              UNIDENTIFIED MALE 2:  Right.

16              UNIDENTIFIED MALE 1:  And then I'll just shut

17     it down.

18              UNIDENTIFIED MALE 2:  I gotcha, bro.

19              UNIDENTIFIED MALE 1:  All right.

20              UNIDENTIFIED MALE 2:  Let me see -- let me see

21     what happens with this processor, this domestic guy.  If

22     this comes into play, I think that will take care of a

23     lot of headaches.

24              UNIDENTIFIED MALE 1:  All right, cool, sounds

25     good.

20

```
 1                    UNIDENTIFIED MALE 2:  All right, bro.  Thanks.

 2                    UNIDENTIFIED MALE 1:  All right (inaudible).

 3        Bye.

 4                    (The call was concluded.)

 5                    (The recording was concluded.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

21

1          C E R T I F I C A T I O N   O F   T Y P I S T

2     MATTER NUMBER: X160030

3     CASE TITLE: STARK LAW, LLC

4     TAPING DATE: SEPTEMBER 8, 2015

5     TRANSCRIPTION DATE: MAY 11, 2016

6     REVISION DATE: MAY 25, 2016

7

8          I HEREBY CERTIFY that the transcript contained

9     herein is a full and accurate transcript of the tapes

10     transcribed by me on the above cause before the FEDERAL

11     TRADE COMMISSION to the best of my knowledge and belief.

12

13                    DATED:  MAY 25, 2016

14

15                    _____

16                    ELIZABETH M. FARRELL

17

18          C E R T I F I C A T I O N   O F   P R O O F R E A D E R

19

20          I HEREBY CERTIFY that I proofread the transcript for

21     accuracy in spelling, hyphenation, punctuation and

22     format.

23

24                    _____

25                    SARA J. VANCE

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Menjivar Att. BB**
**Page 21 of 21**