UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and | ) |
| STATE OF ILLINOIS, | ) |
| Plaintiffs, | ) Case No. 1:16-cv-3463 |
| v. | ) Judge Rebecca R. Pallmeyer |
| STARK LAW, LLC, an Illinois limited liability company, also doing business as STARK RECOVERY, *et al.*, | ) Magistrate Judge Sheila M. Finnegan |
| Defendants. | ) |

**PLAINTIFFS' MOTION FOR AN ORDER HOLDING DEFENDANT
HIRSH MOHINDRA IN CIVIL CONTEMPT AND FOR SANCTIONS**

Plaintiffs, the Federal Trade Commission ("FTC") and the State of Illinois, pursuant to Fed. R. Civ. P. 65(d), Local Rules 37.1 and 66.1, and the Court's inherent authority, move this Court for an order holding Defendant Hirsh Mohindra in civil contempt for blatantly and repeatedly violating the asset freeze imposed by this Court's temporary restraining order and subsequent preliminary injunction. Beginning immediately after he was served with the temporary restraining order, and continuing until only recently when the Court-appointed Receiver discovered the missing assets, Mohindra concealed and then dissipated over $100,000 in frozen funds. Bank records show that these funds were spent to maintain the lavish lifestyle Mohindra was accustomed to prior to the imposition of the asset freeze. Mohindra's actions have demonstrated a patent disregard for this Court's asset freeze. Therefore, he should be held in civil contempt.

As explained in more detail below, Mohindra owns and leases to tenants three residential

1

rental properties in Chicago. Mohindra is the lessor on these leases, and prior to the imposition of the Court's asset freeze, he regularly deposited the rental payments into the bank account of Aura Development, Inc. ("Aura"), an entity he controls. Once the asset freeze was imposed and Aura's assets were frozen, however, Mohindra failed to disclose the existence of the rental properties to Plaintiffs or the Receiver and instead diverted the rental payments into a separate bank account maintained by his wife that was not subject to the asset freeze. Mohindra then used his wife's account to pay expenses associated with the properties and with his own extravagant lifestyle despite the Court's freeze. Mohindra's diversion and dissipation of the rental payments violates the asset freeze imposed by the Court's temporary restraining order ("TRO") and subsequent preliminary injunction ("PI").

Mohindra's manipulation of the rent payments shows that he has little regard for this Court's orders. Moreover, this is not the first time Mohindra violated the Court's orders. The very day he was served with the TRO, Mohindra withdrew over $605,000 from a corporate bank account before the freeze could be imposed. The Receiver, however, quickly identified the missing funds and secured their return before Mohindra was able to dissipate them. Although those funds ultimately were returned through the good work of the Receiver, Mohindra's actions demonstrated his lack of respect for the Court's asset freeze. His actions since then with respect to the rental payments further demonstrate that Mohindra cannot be trusted to comply with the asset freeze. Mohindra's actions have disrupted the status quo as well as this Court's ability to provide effective final relief in the form of restitution to consumers who were victimized by Defendants' fraudulent debt collection scheme.

Plaintiffs respectfully request that the Court enter an order holding Mohindra in civil contempt. To purge the contempt, and to prevent further dissipation and additional asset freeze

violations, Plaintiffs request that the Court: (1) require Mohindra to return the funds he diverted within seven (7) days; (2) place Mohindra's individual assets, including the rental properties, under the control of the Receiver; and (3) enter such additional relief as the Court deems proper.

## I. FACTUAL BACKGROUND

### A. Procedural History

On March 21, 2016, Plaintiffs filed a Complaint, pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), Section 814 of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692l, Section 7 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7, and Section 9.7 of the Illinois Collection Agency Act, 225 ILCS 425/9.7, against six entities and three individuals, including Mohindra.[1] Plaintiffs alleged that Defendants operated a fraudulent debt collection scheme in violation of federal and state laws. Concurrent with filing their Complaint, Plaintiffs also moved this Court for an *ex parte* TRO and requested that the Court freeze Defendants' assets to preserve them for restitution to victims and appoint a temporary receiver to preserve assets and manage the Corporate Defendants.[2] On March 22, 2016, the Court entered an *ex parte* TRO that granted Plaintiffs' requested relief.[3] On July 11, 2016, the Court subsequently entered a PI over all Defendants including Mohindra.[4]

Both the TRO and PI contain identical asset freeze provisions that cover both *existing* and *after acquired* assets.[5] Specifically, the TRO and PI prohibit Defendants, and all persons in active concert or participation with them, from:

---

[1] *See* Dkt. No. 1 (Complaint).
[2] *See* Dkt. No. 7 (*Ex Parte* Motion for TRO).
[3] *See* Dkt. No. 17 (TRO).
[4] *See* Dkt. No. 82 (PI).
[5] *See* Dkt. No. 17 § III (Asset Freeze) at pp. 11-13; Dkt. No. 82 § III (Asset Freeze) at pp. 11-12.

3

> Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, accounts, contracts, shares of stock, lists of consumer names, or other assets, or any interest therein, wherever located . . . .[6]

The freeze extends to assets (1) owned, controlled, or held by, in whole or in part, for the benefit of, or subject to access by, or belonging to, any Defendant; (2) in the actual or constructive possession of any Defendant; or (3) in the actual or constructive possession of, or owned, controlled, or held by, or subject to access by, or belonging to, any other corporation, partnership, trust, or any other entity directly or indirectly owned, managed, or controlled by, or under common control with, any Defendant.[7]

The TRO and PI allow the Individual Defendants to pay from individual assets reasonable and necessary living expenses *provided that* the individual completes the sworn financial statement required by the orders and obtains prior written agreement from the FTC.[8] Mohindra did not comply with the requirement that he submit a sworn financial statement until September 2016,[9] and he has not requested, nor have Plaintiffs agreed, that any funds should be released from the freeze to cover his living expenses.

### B. Immediate Access to Defendants' Business Premises

At approximately 10:00 a.m. on March 23, 2016, the Receiver and his representatives entered Defendants' business premises to take control of the businesses as authorized by the TRO.[10] Defendants Preetesh Patel and Gaurav Mohindra (the brother of Hirsh Mohindra) were

---

[6] *See* Dkt. No. 17 (TRO) at p. 11; Dkt. No. 82 (PI) at p. 11.
[7] *See* Dkt. No. 17 (TRO) at pp. 11-12; Dkt. No. 82 (PI) at pp. 11-12.
[8] *See* Dkt. No. 17 (TRO) at p. 13; Dkt. No. 82 (PI) at p. 12.
[9] Defendants' counsel provided Plaintiffs with Mohindra's financial statement on or about September 9, 2016. The statement itself is dated August 18, 2016. *See* Plaintiffs' Exhibit ("PX") 23 Menjivar Declaration ("Dec.") ¶ 11 & Att. F (signature page).
[10] *See* Dkt. No. 17 (TRO) § IX (Access to Business Premises) at p. 29.

at the premises at the time and were personally served.[11] Mohindra arrived about 45 minutes later and was then personally served with the summons, complaint, and TRO, among other documents.[12] Also on March 23, the Receiver's representatives and FTC staff began serving the TRO on financial institutions known to have assets belonging to Defendants.

### C. Aura Development, Inc.

Although Aura is not named as a defendant in Plaintiffs' Complaint, the Receiver quickly determined that Aura was affiliated with the Receivership Defendants under the terms of the TRO and that its assets should be covered by the freeze. The Receiver concluded that Aura acted "not unlike a bank," in that it received millions of dollars from the Receivership Defendants and transferred money to or for the benefit of the Individual Defendants and third parties. The Receiver further determined that "Hirsh Mohindra was at all relevant times in sole control of Aura's bank account and financial affairs."[13] On September 29, 2016, the Court granted the Receiver's unopposed motion to expand the receivership to include Aura.[14] Since then, the Receiver has been consolidating Aura's assets and investigating a series of transfers and purported loans from Aura to third parties.[15]

### D. The Rental Properties

After he was served with the TRO and his assets were frozen, Mohindra repeatedly violated the asset freeze by diverting monthly rent payments received from the tenants at three rental residences located at (1) 195 N. Harbor Drive, #5409, Chicago, Illinois (the "Harbor Drive

---

[11] *See* Dkt. Nos. 25, 26 (returns of service).
[12] *See* Dkt. No. 24 (return of service).
[13] *See* Dkt. No. 132 at pp. 3-4 (uncontested motion of Receiver). *See also* Dkt. No. 69 at pp. 8-9 (second report of Receiver); PX 1 Menjivar Dec. ¶¶ 31-34 & Att. G (Aura corporate records), ¶ 60 & Att. L (Aura bank account signature card and records).
[14] *See* Dkt. No. 138 (order).
[15] *See* Dkt. No. 171 at pp. 3-4 (third report of Receiver).

property"); (2) 1614 N. Mohawk Street, Chicago, Illinois (the "Mohawk Street property"); and (3) 416 E. North Water Street, Chicago, Illinois (the "Water Street property") (collectively, the "rental properties"). The rental properties are held in a trust created by Mohindra on October 6, 2014. Mohindra is the primary beneficiary of the trust and his wife, Renuka ("Renu") Mohindra, is a contingent beneficiary.[16] Bank records show that the rental properties were purchased with funds from Aura's bank account, meaning that the properties were purchased with the proceeds of Defendants' debt collection scheme.[17] The rental properties already were leased at the time Plaintiffs filed this action, and Mohindra himself was the lessor.[18] The properties collectively generate $14,300 per month in rent,[19] which Mohindra regularly deposited into Aura's bank account.[20] Under the plain language of the asset freeze, the rental properties themselves and any rents generated from the properties are subject to the asset freeze, as both the properties and the rents are assets of Defendant Mohindra.

## II. DEFENDANT MOHINDRA'S VIOLATIONS OF THE ASSET FREEZE

Immediately after he was served with the TRO, and continuing for months thereafter, Mohindra stopped depositing the rent payments into Aura's frozen bank account and instead diverted the payments to a bank account maintained solely by his wife. At this point, Plaintiffs and the Receiver were unaware even of the existence of the rental properties, as Mohindra had

---

[16] *See* PX 23 Menjivar Dec. ¶ 5 & Att. A at pp. 2-4, 5-11, 12-14, 15-18 (trust agreement and deeds). The trust additionally holds at least four other properties, Units 5002 and 5003, and parking spaces D-98 and D-99, at 505 North Lake Shore Drive, Chicago, Illinois (the "Lake Shore Drive properties"). *See id.* ¶ 5 & Att. A at pp. 19-22 (Trustee's Deed in Trust).

[17] The Receiver's accountants have traced withdrawals from Aura's bank account used to purchase the rental and other properties, including the Lake Shore Drive properties. *See id.* ¶ 17 & Att. J (accountant summary and Aura bank statements).

[18] *See id.* ¶ 6 & Att. B at pp. 1-2, 3-6, 7-8 (leases).

[19] *See id.*

[20] *See id.* ¶ 16 & Att. I (bank statements and images of rent checks deposited into Aura's bank account prior to March 23, 2016).

6

not yet disclosed them. The diverted rental payments then helped to finance Mohindra's extravagant living and other expenses. Mohindra's actions violate the clear and unambiguous language of the asset freeze.

### A. The Harbor Drive and Mohawk Street Properties

Just days after service of the TRO, Mohindra began depositing rent payments from the Harbor Drive and Mohawk Street properties into a bank account solely maintained by his wife, which is not subject to the asset freeze.[21] As noted, rent payments from the Harbor Drive and Mohawk Street properties previously had been deposited by Mohindra into Aura's bank account—that is, until Aura's bank account was frozen and placed under the control of the Receiver. Beginning in late March 2016, images and statements from Renuka Mohindra's account show month-after-month deposits of rent payments from Scott Duncan, lessee of the Mohawk Street property, and Alborz Kiani, lessee of the Harbor Drive property.[22] The following chart totals the series of deposits into Renuka Mohindra's account:

| Check Date | Post Date | Lessee | Payee | Memo | Amount |
|---|---|---|---|---|---|
| 03/22/2016 | 04/04/2016 | Scott Duncan | Hirsh Mohindra | Rent for 1614 N Mohawk | $5,800.00 |
| 05/01/2016 | 04/25/2016 | Alborz Kiani | Mr. Renu Mohindra | May-Rent | $2,500.00 |
| 04/22/2016 | 05/02/2016 | Scott Duncan | Hirsh Mohindra | Rent for 1614 N Mohawk | $5,800.00 |
| 06/01/2016 | 06/09/2016 | Alborz Kiani | Mr. Renu Mohindra | June Rent | $2,500.00 |
| 05/22/2016 | 06/16/2016 | Scott Duncan | Hirsh Mohindra | Rent for 1614 N Mohawk | $5,800.00 |
| 07/01/2016 | 07/13/2016 | Alborz Kiani | Mr. Renu Mohindra | July Rent | $2,500.00 |
| 07/22/2016 | 08/01/2016 | Scott Duncan | Hirsh Mohindra | Rent for 1614 N Mohawk | $5,800.00 |
| 08/01/2016 | 08/10/2016 | Alborz Kiani | Mr. Renu Mohindra | August Rent | $2,500.00 |
| 08/22/2016 | 08/30/2016 | Scott Duncan | Hirsh Mohindra | Rent for 1614 N Mohawk | $5,800.00 |
| 09/01/2016 | 09/02/2016 | Alborz Kiani | Mr. Renu Mohindra | September Rent | $2,500.00 |
| 09/22/2016 | 09/29/2016 | Scott Duncan | Hirsh Mohindra | Rent for 1614 N Mohawk | $5,800.00 |
| 10/01/2016 | 10/04/2016 | Alborz Kiani | Mr. Renu Mohindra | October Rent | $2,500.00 |

---

[21] At present, Renuka Mohindra is not a named defendant or relief defendant in this action.
[22] *See id.* ¶ 8 & Att. C (Renuka Mohindra bank statements March 23, 2016, through October 25, 2016); ¶ 9 & Att. D at pp. 9, 19, 22, 30, 36, 43, 46, 50, 52, 55, 61, 64, 70 (Duncan and Kiani rent check deposit images).
Beginning on February 22, 2016, Scott Duncan paid the rent on the Mohawk Street property by checks payable to Hirsh Mohindra that were automatically issued each month from his bank account. PX 24 Duncan Dec. ¶¶ 11-12.

7

| 10/22/2016 | 11/02/2016 | Scott Duncan | Hirsh Mohindra | Rent for 1614 N Mohawk | $5,800.00 |

In total, Mohindra diverted $55,600 in frozen rent payments from the Harbor Drive and Mohawk Street properties to his wife's account.

### B. The Water Street Property

At the same time, and likewise after service of the TRO, Mohindra also began diverting $48,000 in rent payments for the Water Street property from Aura's bank account to his wife's account. Images and statements from Renuka Mohindra's account show month-after-month deposits of rent payments from Alexander Vasileski, lessee of the Water Street property.[23] The following chart totals the Water Street property rent deposits into Renuka Mohindra's account:

| Check Date | Post Date | Lessee | Payee | Memo | Amount |
|---|---|---|---|---|---|
| 04/01/2016 | 04/05/2016 | Alexander Vasileski | Hirsh Mohindra | April Rent | $6,000.00 |
| 05/01/2016 | 05/02/2016 | Alexander Vasileski | Mohindra | Rent | $6,000.00 |
| 06/01/2016 | 06/06/2016 | Alexander Vasileski | Renu Mohindra | Rent | $6,000.00 |
| 07/01/2016 | 07/07/2016 | Alexander Vasileski | Renu Mohindra | Rent | $6,000.00 |
| 08/01/2016 | 08/01/2016 | Alexander Vasileski | Renu Mohindra | Rent | $6,000.00 |
| 09/01/2016 | 09/02/2016 | Alexander Vasileski | Renu Mohindra | Rent | $6,000.00 |
| 10/01/2016 | 10/04/2016 | Alexander Vasileski | Mohindra | Rent | $6,000.00 |
| 11/01/2016 | 11/02/2016 | Alexander Vasileski | Renu Mohindra | Rent | $6,000.00 |

In 2016, Mohindra and Vasileski entered into a new lease agreement, which extended the lease from May 1, 2016, until April 30, 2017.[24] When he entered into the new lease, Vasileski provided the property manager with twelve post-dated checks, dated the first day of every month for which the rent would be due, for $6,000 each.[25] Vasileski made the checks payable to "Mohindra."[26] Each month thereafter, one of Vasileski's post-dated checks was deposited into

---

[23] *See id.* ¶ 8 & Att. C (Renuka Mohindra bank statements March 23, 2016, through October 25, 2016); ¶ 9 & Att. D at pp. 12, 21, 28, 39, 47, 54, 63, 69 (Vasileski rent check deposit images).
[24] *See id.* ¶ 6 & Att. B at pp. 7-8 (lease); PX 25 Vasileski Dec. ¶ 9.
[25] PX 25 Vasileski Dec. ¶ 10.
[26] *Id.*

Renuka Mohindra's bank account.[27] When the Receiver discovered that Mohindra possessed post-dated rental checks, he demanded that Mohindra turn them over.[28] Mohindra turned over five checks from Vasileski totaling $30,000.[29] Since then, however, Vasileski reports that an unknown individual has appeared at the Water Street property several times demanding that he pay $6,000 in cash for that month's rent. Vasileski reports that during one of these encounters, the person had a copy of what appeared to be his lease.[30]

Understandably, Vasileski has been troubled by these encounters. In an e-mail to the property management company, Vasileski wrote:

> Sarah, please address the other concerns that I sent you in the previous email in terms of the individual coming to the house stating that they represent the mohindra *[sic]* and the lease, threatening me to pay rent in cash. This is serious and all of this is catching us in the middle of a very confusing situation. . . . Please understand that this is serious and scary at the same time. We just want to live life normally.[31]

### C. Mohindra's Use of Diverted Rent Payments to Pay Excessive Living and Other Expenses

Mohindra used the rent payments he deposited into his wife's bank account to continue to finance his lavish lifestyle. He never requested and Plaintiffs never consented to the use of these funds to pay *any* living expenses, let alone the type of expenses reflected on Renuka Mohindra's monthly statements.

Before this case was filed, Renuka Mohindra's account had only nominal banking

---

[27] *See* PX 23 Menjivar Dec. ¶ 9 & Att. D at pp. 21, 28, 39, 47, 54, 63, 69 (Vasileski rent check deposit images May 1, 2016, through November 1, 2016).
[28] *See id.* ¶ 20 & Att. M (letter dated November 15, 2016, from Receiver's counsel to Mohindra's counsel).
[29] *See id.* ¶ 21 & Att. N (e-mail dated November 18, 2016, from Mohindra's counsel to Receiver's counsel); ¶ 23 & Att. P (uncashed checks).
[30] *See id.* ¶ 22 & Att. O (e-mail correspondence with Vasileski dated December 1, 2016). *See also* PX 25 Vasileski Dec. ¶¶ 13-14, 15, 16.
[31] *See* PX 23 Menjivar Dec. ¶ 22 & Att. O (e-mail correspondence with Vasileski dated December 1, 2016).

9

activity.[32] Beginning on March 23, however, the activity in the account markedly increased. Over the next several months, checks, electronic payments, and other withdrawals totaling tens of thousands of dollars were used to pay for high-end automobile leases, large American Express bills, home improvements, and other excessive expenses. The following chart illustrates just a sampling of some of the payments made from the account:[33]

| Date | Type | Payee | Amount |
|---|---|---|---|
| 04/04/2016 | Electronic Withdrawal | Neiman Marcus Phone Pmt | $2,290.10 |
| 04/12/2016 | Electronic Withdrawal | Comcast Cable | $652.89 |
| 04/13/2016 | Electronic Withdrawal | Bmwfinancial Svs Bmwfs Pymt | $1,539.88 |
| 04/22/2016 | Check | Artistic Lighting | $5,000.00 |
| 05/17/2016 | Electronic Withdrawal | Bmwfinancial Svs Bmwfs Pymt | $3,674.86 |
| 05/31/2016 | Check | Mercedes Benz Financial Services | $1,512.52 |
| 05/29/2016 | Check | Ferrari Financial Services | $2,255.34 |
| 06/03/2016 | Other Withdrawal | | $2,500.00 |
| 06/07/2016 | Check | Mercedes Checkpaymt | $3,393.74 |
| 06/27/2016 | Electronic Withdrawal | Bmwfinancial Svs Bmwfs Pymt | $3,674.86 |
| 07/06/2016 | Electronic Withdrawal | American Express ACH Pmt | $5,000.00 |
| 07/25/2016 | Check | Clarence Davids & Company (landscaping) | $355.00 |
| 07/28/2016 | Check | Mercedes Checkpaymt | $1,594.65 |
| 07/29/2016 | Electronic Withdrawal | American Express ACH Pmt | $5,578.09 |
| 08/12/2016 | Other Withdrawal | | $2,000.00 |
| 08/16/2016 | Other Withdrawal | | $1,500.00 |
| 08/19/2016 | Check | Cash | $666.39 |
| 08/23/2016 | Check | Cash | $500.00 |
| 09/01/2016 | Electronic Withdrawal | American Express ACH Pmt | $4,561.09 |
| 09/19/2016 | Electronic Withdrawal | American Express ACH Pmt | $6,301.03 |
| 09/22/2016 | Electronic Withdrawal | Ferrari Financia Loan Pmt | $4,510.68 |
| 10/04/2016 | Check | Mercedes Checkpaymt | $678.33 |
| 10/04/2016 | Check | Mercedes Checkpaymt | $1,721.87 |
| 10/12/2016 | Check | Clarence Davids & Company (landscaping) | $355.00 |
| 10/14/2016 | Electronic Withdrawal | American Express ACH Pmt | $6,832.65 |
| 10/24/2016 | Electronic Withdrawal | American Express ACH Pmt | $3,004.55 |
| 11/09/2016 | Check | Clarence Davids & Company (landscaping) | $355.00 |

---

[32] *See, e.g., id.* ¶ 10 & Att. E (Renuka Mohindra bank statements December 23, 2014, through March 22, 2016, showing nominal banking activity).

[33] *See, e.g., id.* ¶ 8 & Att. C (Renuka Mohindra bank statements March 23, 2016, through October 25, 2016), ¶ 9 & Att. D at pp. 1-6 (Renuka Mohindra paid check images).

### D. Mohindra Previously Ignored This Court's Asset Freeze

Mohindra's diversion of the rent payments is not the first time he has shown disregard for the asset freeze in this case. The day Mohindra was served with the asset freeze, he withdrew $605,000 in frozen funds from Aura's bank account before the Receiver was able to take control of that account.[34] Of that amount, he deposited $575,000 directly into his wife's bank account and apparently took $30,000 in cash.[35] A week later, $200,000 was wired from Renuka Mohindra's account to Jenner & Block as a retainer for legal representation.[36] Fortunately, the Receiver quickly identified the missing funds and secured their return.[37]

Also on the day he was served, Mohindra withdrew an additional $34,791.48 from Aura's account to make a payment on his Chase Visa credit card. Five days later, Mohindra again raided the Aura account and withdrew $3,321.12 to make another credit card payment.[38] The Receiver again was able to secure the return of these funds (totaling $38,112.60) to the receivership estate, but not from Mohindra. Rather, Chase Bank remitted the funds because it allowed the payments despite having received notice of the asset freeze.[39]

## III. LEGAL ARGUMENT

### A. Legal Standard

---

[34] *See id.* ¶ 15 & Att. H at pp. 1-3 (withdrawal slips dated March 23, 2016, totaling $605,000), p. 4 (Aura bank account transaction report).
[35] *See id.* ¶ 8 & Att. C at p. 2 (Renuka Mohindra account statement showing deposits for $575,000 on March 23, 2016), ¶ 9 & Att. D at pp. 7-8 (Renuka Mohindra bank account deposit images).
[36] *See id.* ¶ 8 & Att. C at p. 3 ($200,000 wire to Jenner & Block dated March 30, 2016).
[37] *See id.* ¶ 8 & Att. C at p. 3 (transfer of $375,000 from Renuka Mohindra's account to Aura's account on April 8, 2016), ¶ 9 & Att. D at p. 3 (June 15, 2016, canceled check payable to Aura for $30,000). Jenner & Block also returned the $200,000 it received.
[38] *See id.* ¶ 15 & Att. H at p. 4 (Aura bank account transaction report showing credit card payments of $34,791.48 on March 23, 2016, and $3,321.12 on March 28, 2016).
[39] *See id.* ¶ 18 & Att. K (e-mail dated August 26, 2016), ¶ 19 & Att. L (September 14, 2016, letter to JPMorgan Chase Bank, N.A.).

Courts possess the inherent authority to enforce compliance with their orders through civil contempt. *FTC v. Asia Pac. Telecom, Inc.*, 788 F. Supp. 2d 779, 789 (N.D. Ill. 2011) (citing *SEC v. Homa*, 514 F.3d 661, 673-74 (7th Cir. 2008)). Obedience to judicial orders is a fundamental expectation of our legal system. In particular, injunctions issued by a court of competent jurisdiction must be obeyed until withdrawn or vacated. *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983); *APC Filtration, Inc. v. Becker*, 2010 U.S. Dist. LEXIS 125871, *3 (N.D. Ill. Nov. 30, 2010).

"The purposes of a civil contempt order are two-fold: (1) to coerce compliance with the underlying injunction and/or (2) to compensate that complaining party for loss as a result of the disobedience." *APC Filtration*, 2010 U.S. Dist. LEXIS 125871 at *3-4 (citing *Blocksom & Co. v. Marshall*, 582 F.2d 1122, 1124 (7th Cir. 1978)). "A civil contempt order can serve to coerce a party to obey a court order, or it can be intended to compensate a party who has suffered unnecessary injuries or costs because of contemptuous conduct." *Ohr v. Latino Express, Inc.*, 776 F.3d 469, 479 (7th Cir. 2015). The movant may seek civil contempt through notice and motion, without seeking a show-cause order. *SEC v. Hyatt*, 621 F.3d 687, 695 (7th Cir. 2010).

In this Circuit, a party is in contempt if clear and convincing evidence shows that: "(1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply." *Hyatt*, 621 F.3d at 692 (citing *Prima Tek II, LLC v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008)); *Ohr*, 776 F.3d at 474; *Asia Pac. Telecom*, 788 F. Supp. 2d at 789 (citation omitted). "The court does not have to find that the violation was willful, and may find a party in civil contempt if that party has not been reasonably diligent and energetic in

12

attempting to accomplish what was ordered." *Select Med. Corp. v. Cash Flow Consultants, Inc.*, 2010 U.S. Dist. LEXIS 73847, *3 (N.D. Ill. July 20, 2010) (citing *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995)).

### B. Plaintiffs Meet the Burden of Demonstrating Mohindra's Contempt

Clear and convincing evidence establishes all of the elements necessary for contempt. First, the identical asset freeze provisions of the TRO and PI clearly and unambiguously prohibit Mohindra from "[t]ransferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property. . . ." Because the asset freeze applies to existing and after acquired assets, it applies to the rental payments at issue here. By diverting those payments to his wife's bank account and subsequently using them to pay expenses, Mohindra violated the clear terms of the asset freeze.[40]

Mohindra's repeated violations of the asset freeze were significant. Although Defendants' fraudulent debt collection scheme has caused millions of dollars in consumer injury, only a small portion of the amount lost has been identified and frozen for eventual restitution to victims. The asset freeze is crucial to ensuring that the Court has the ability to fashion meaningful relief at the conclusion of the case. Here, Mohindra diverted and dissipated *over $100,000*. Significantly, Mohindra's contumacious conduct was not a one-time occurrence—it continued *for several months*, all while he refused to complete financial statements required by the orders. Mohindra's earlier withdrawal of $605,000 from frozen corporate funds the day he was served with the TRO demonstrates that this was not an isolated incident—he has no regard for the Court's orders.

---

[40] *See* Dkt. No. 17 § III (Asset Freeze) at pp. 11-13; Dkt. No. 82 § III (Asset Freeze) at pp. 11-12.

13

Finally, Mohindra made no effort to comply with the Court's order. On the contrary, he simply diverted and dissipated the funds, without initially disclosing the rental properties to Plaintiffs or seeking approval from Plaintiffs or the Court. In sum, clear and convincing evidence shows that Mohindra flagrantly violated the asset freeze and that he should be held in civil contempt.

## IV. REQUESTED RELIEF

To remedy Mohindra's contempt, Plaintiffs seek an order: (1) requiring that he return the dissipated funds to the Court-appointed Receiver within seven (7) days; (2) placing Mohindra's individual assets, including the rental properties, under the control of the Receiver; and (3) such additional relief as the Court deems proper. Appropriate contempt remedies may include coercing compliance with the Court's order. *See SEC v. First Choice Mgmt. Servs.*, 678 F.3d 538, 543 (7th Cir. 2012) (the Court has inherent authority to impose sanctions for misconduct by litigants). The relief sought by Plaintiffs is entirely appropriate to maintain the integrity of the Court's asset freeze and to ensure that Mohindra's contemptuous conduct does not continue.

First, Mohindra should be ordered to return the $103,600 he unlawfully took in violation of the asset freeze so that those funds will be available for eventual restitution to victims. If Mohindra claims that he cannot comply, he should be required to provide an accounting. As Judge Nordberg explained in *SEC v. Custable*, No. 94 C 3755, 1999 U.S. Dist. LEXIS 1776, *7 (N.D. Ill. Feb. 10, 1999), "[i]n the case of failure to pay a court-ordered monetary penalty, the defendant must produce evidence of poverty or insolvency that prevent compliance," and such evidence "must show categorically and in detail why [the alleged contemnor] was unable to comply with the Court's previous order." *See also SEC v. Bilzerian*, 112 F. Supp. 2d 12, 16

(D.D.C. 2000) ("Bilzerian must substantiate his inability to comply with the Court's orders categorically and in detail." (internal quotation omitted)).

Second, through his previous and current violations of the asset freeze, Mohindra has demonstrated that he cannot be trusted to comply with the Court's orders. To ensure the integrity of the asset freeze, then, Mohindra's individual assets, including the rental properties, should be placed under the control of the Receiver. *See, e.g., Pennant Mgmt. v. First Farmers Fin., LLC*, 2015 U.S. Dist. LEXIS 96642, *12 (N.D. Ill. July 24, 2015) (receiver "especially appropriate remedy in cases involving fraud and the possible dissipation of assets since the primary consideration in determining whether to appoint a receiver is the necessity to protect, conserve and administer property pending final disposition of a suit." (quoting *In re McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994)). Courts have imposed individual receiverships in FTC cases when, as here, the individual has attempted to conceal or dissipate frozen assets through individual estates.[41]

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order holding Defendant Hirsh Mohindra in civil contempt, require him to return the funds that he dissipated, and place his individual assets under the control of the Receiver.

Respectfully submitted,

Dated: January 10, 2017
/s/ William J. Hodor
WILLIAM J. HODOR
Federal Trade Commission Midwest Region
55 West Monroe Street, Suite 1825

---

[41] *See* PX 26 (Order Appointing Receiver and Implementing Ancillary Relief in *FTC v. Trudeau*, No. 1:03-cv-03904 (N.D. Ill. Aug. 7, 2013) (Gettleman, J.) (Dkt. No. 742)). *See also* Orders in *FTC v. Nationwide Connections, Inc., et al.*, No. 9:06-cv-80180-KLR (S.D. Fla. Sept. 25, 2006) (Dkt. No. 223); *FTC v. Ameridebt, Inc. et al.*, No. 8:03-cv-03317-PJM (D. Md. Apr. 20, 2005) (Dkt. No. 122); *FTC v. Assail, et al.*, No. 6:03-cv-00007-WSS (W.D. Tex. Feb. 4, 2003) (Dkt. No. 36).

Chicago, Illinois 60603
(312) 960-5634 [telephone]
(312) 960-5600 [facsimile]
whodor@ftc.gov [e-mail, Hodor]
Attorney for Plaintiff

ERIN GROTHEER
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-8966 [telephone]
(312) 814-2593 [facsimile]
egrotheer@atg.state.il.us [e-mail, Grotheer]
Attorney for Plaintiff